UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **ANDRÉ PAUWELS**<br><br>*Plaintiff*,<br><br>v.<br><br>**THE BANK OF NEW YORK MELLON CORPORATION, DELOITTE LLP, DELOITTE USA LLP**, and **DELOITTE TAX LLP**<br><br>*Defendants*. | Case No.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff André Pauwels ("Pauwels"), through his undersigned attorneys, brings this action on his own behalf against The Bank of New York Mellon Corporation ("BNYM"), Deloitte LLP, Deloitte USA LLP, and Deloitte Tax LLP (collectively, "Deloitte," and together with BNYM, "Defendants") and states the following based upon his personal knowledge with respect to his own acts or acts taking place in his presence, and upon information or belief as to all other matters:

## NATURE OF THE ACTION

1.      This is an action by Plaintiff for the theft of his trade secrets by the Defendants. Specifically, without Pauwels' express permission (and, indeed, contrary to his explicit instructions), BNYM took for its own a proprietary model that Pauwels developed to analyze, assess, and monitor a complex form of investment in the energy sector ("Pauwels Model"). Worse, BNYM shared the Pauwels Model with Deloitte, despite representing to Pauwels that they had done no such thing.

2.      After Pauwels discovered that BNYM and Deloitte had stolen the Pauwels Model for their own uses, BNYM terminated its relationship with Pauwels, thereby pushing Pauwels to

1

file this suit. Defendants' actions have resulted in Pauwels suffering the loss of business, economic damages, and the dissemination of his proprietary, trade secrets—specifically, the Pauwels Model.

## PARTIES

3. Pauwels is a natural person and citizen of Belgium, residing in London, United Kingdom.

4. BNYM is a corporation registered according to laws of Delaware, and having its principal place of business in New York State at 240 Greenwich Street, New York, New York 10286.

5. Deloitte LLP is a limited liability partnership registered according to the laws of Delaware, and having its principal place of business in New York State at 30 Rockefeller Plaza, New York, New York 10112.

6. Deloitte USA LLP is a limited liability partnership registered according to the laws of Delaware, and having its principal place of business in New York State at 30 Rockefeller Plaza, New York, New York 10112.

7. Deloitte Tax LLP is a limited liability partnership registered according to the laws of Delaware, and having its principal place of business in New York State at 30 Rockefeller Plaza, New York, New York 10112.

## JURISDICTION AND VENUE

8. This Court has subject jurisdiction over this matter pursuant to 28 USC § 1332 given the complete diversity of parties and the amount in controversy.

9. This Court has personal jurisdiction over the Defendants given that they are headquartered in New York City, New York and conduct substantial business in this State.

10. Venue is proper in this Court under 28 USC § 1391 as the Defendants have their principal places of business in New York City, New York.

## BACKGROUND

*Pauwels' Relationship with BNYM*

11. In early 2009, Pauwels was approached by Kevin Peterson of BNYM with an offer to work for the bank. In particular, Peterson proposed that Pauwels analyze BNYM's potential investments and provide his assessment of the strength and desirability of the proposed deal. Pauwels would work to analyze several different kinds of investments, including, among others, Low Income Housing Tax Credit (LIHTC) transactions.

12. Peterson had worked with Pauwels before and knew that he could rely on Pauwels' knowledge and expertise—particularly Pauwels' ability to effectively model proposed transactions. Thus, beginning in April 2009, Pauwels found himself providing his analytical services to BNYM on a deal-by-deal basis.

13. Pauwels was not provided with a contract by BNYM, nor did he request one. Instead, he functioned as an independent advisor to whom BNYM looked for outside expertise and analysis and was compensated for his services based on invoices that he would submit periodically to BNYM for processing. Moreover, in 2013, Pauwels was given a BNYM email address to facilitate his work for the bank.

14. Several years into his relationship with BNYM, in 2014, Peterson approached Pauwels about working to value a potential investment in the alternative energy sector—specifically, a wind farm. Pauwels thereafter began working on a method for valuing and analyzing the proposed energy investment and, later that year, flew to New York to participate in meetings with other BNYM employees regarding the proposed investment.

15.     By this time, Pauwels performed his work for BNYM through Andre Pauwels Advisory Ltd., a company he founded specifically for his BNYM work. Pauwels was the founder, CEO, and sole employee of this company.

16.     Relying on his years of experience and expertise in evaluating complex financial transactions—including in his work for BNYM—Pauwels developed his own, proprietary model to value BNYM's proposed energy sector investments ("Pauwels Model"). The Pauwels Model served as both a direct valuation tool and as a way to check proposals sent to BNYM by investment sponsors. BNYM, recognizing that the Pauwels Model offered unique advantages to other available tools for evaluating energy sector investments, accepted and approved the use of the Pauwels Model to evaluate the bank's proposed deals.

17.     Thereafter, from 2014 onward, the scope of Pauwels' work for BNYM expanded to include a number of energy investments, and for several years BNYM and Pauwels worked together to the mutual success of both parties. Initially, Pauwels would analyze potential investment projects for BNYM using the Pauwels Model. Later, he also began using the Pauwels Model to monitor BNYM's existing investments (many of which he had initially evaluated).

18.     Based in no small part on Pauwels' work (and, by extension, the Pauwels Model), BNYM made hundreds of millions of dollars in profit through its lending and investment activity. Pauwels, in turn, was paid between £400,000 and £600,000 per year by BNYM (before taxes)—approximately $500,000 to $750,000 per year.

*The Pauwels Model*

19.     Because energy-sector investments (particularly those based around renewable or alternative energy) implicate a host of potential revenue/support streams, including government subsidies, tax breaks, and other non-customer sources, valuing such an investment requires lengthy

4

negotiation between the venture's sponsor and the investing bank. All parties involved typically employ sophisticated financial models to determine an agreed-upon value for the investment.

20. Using the Pauwels Model, Pauwels provided BNYM with guidance on what amount they should optimally invest in an alternative energy project. The Pauwels Model was particularly adept at analyzing "tax equity investments"—that is, investments in alternative energy projects for which the primary return on the investment is expected to come in the form of tax benefits (*e.g.*, tax credits). For example, if BNYM made a tax equity investment, it could expect to receive substantially all of the venture's tax credits for a number of years (typically for a decade) along with a portion of the revenue generated by the venture.

21. Pauwels designed and built his Pauwels Model to evaluate and monitor this exact type of investment. By looking to data on aspects of a venture such as the projected energy production, asset depreciation, and operating expenses, the Pauwels Model would calculate how much BNYM could stand to invest in light of the proposed project's value such that the bank's initial investment could be repaid and it could achieve the desired return.

22. Needless to say, this calculation is extremely complicated; by extension, so is the Pauwels Model. Estimating the optimal investment size for a project requires several layers of analysis. For example, the Pauwels Model considers the proposed project's energy and cash flow production potential under various scenarios (to account for potential market changes and fluctuations). Additionally, the Pauwels Model accounts for US tax benefits, which requires the calculation and evaluation of all income, expenses, depreciation, distributions, and excess distributions for a given project.

23. The Pauwels Model also looks to and calculates a potential investment's Hypothetical Liquidation at Book Value, which looks at how much BNYM could receive if the

proposed venture (including all its equipment, *etc.*) was liquidated at book value. This number *must* be modelled as it is not typically provided by a venture's sponsor, and is calculated based on a multitude of different financial inputs and market considerations.

24. Implementing and using the Pauwels Model was a major undertaking. Indeed, obtaining the necessary data and ensuring that it was loaded correctly into the Pauwels Model could take several months, and each BNYM investment required its own implementation of the Pauwels Model.

25. Once a final version of the Pauwels Model was created for a particular transaction, Pauwels could then later update the Model with new data to monitor and track the investment's performance. By loading updated data from the investment's actual production, income, expenses, and cash distributions, Pauwels could provide monthly updates to BNYM's personnel. Such performance tracking was useful for providing updates to the "flip date" of an investment (*i.e.*, the projected date that BNYM achieved its investment return goal) and on periodic accounting impacts of the investment.

*Keeping the Pauwels Model Confidential*

26. In the course of reporting his results, Pauwels would share Excel spreadsheets incorporating the Pauwels Model with select individuals at BNYM. This was a necessary part of reporting the results obtained using the Pauwels Model, as BNYM needed to see the full spreadsheet to understand the results and implications of Pauwels' analysis.

27. However, Pauwels was always careful to indicate—and, in fact, insisted—that BNYM never share or otherwise disseminate the Pauwels Model (or the resulting Excel spreadsheets) to third parties such as rival banks or accounting companies. Indeed, on the several occasions when BNYM *did* ask Pauwels if they could share the Pauwels Model spreadsheets more

widely, Pauwels refused and did not allow the Pauwels Model to be shared. BNYM complied with this refusal.

28. On two occasions, BNYM continued to request that Pauwels authorize sharing the Pauwels Model spreadsheets despite Pauwels' adamant refusal. Ultimately, BNYM explained that it was seeking to share some additional analysis with a counterparty as part of BNYM's negotiations over its intended investment—the counterparties were intransigent and BNYM wanted to further justify its position by citing to results generated with the Pauwels Model. Pauwels nonetheless refused to allow the bank to share either the Pauwels Model itself or the spreadsheets generated by the Pauwels Model.

29. Ultimately, Pauwels tried to ensure the continued confidentiality of the Pauwels Model (and prevent its dissemination to third parties) by providing BNYM with separate, abbreviated Excel spreadsheets that contained only small portions of the model. These abbreviated spreadsheets contained the information helpful to BNYM's negotiations and could not be used to reverse-engineer the Pauwels Model.

*Deloitte*

30. In late 2016, BNYM requested that Pauwels stop using the Pauwels Model to track and monitor the bank's existing energy sector investments. BNYM further informed Pauwels that they were in the process of engaging an outside consulting firm to take over such monitoring responsibilities. Several months later, in early 2017, BNYM notified Pauwels that Deloitte would be taking over the monitoring work.

31. Reza Sarmasti, an executive at BNYM and an individual to whom Pauwels directly reported as part of his work for the bank, asked if Pauwels would participate in a phone call with Deloitte to share his expertise and experience regarding energy sector investments. Pauwels

declined to participate and further told Sarmasti: "I hope they [Deloitte] are not using my spreadsheets." Sarmasti assured Pauwels that Deloitte had its own software and would not be using the Pauwels Model.

32. Sarmasti's assurances were false, however. Unbeknownst to Pauwels, BNYM deliberately shared more than a hundred Pauwels Model spreadsheets with Deloitte, betraying not only Pauwels' confidences but going against his repeated instructions to never share the Pauwels Model with third parties.

33. Because of Sarmasti's statements—and because he had no other way of knowing that BNYM and Deloitte had stolen the Pauwels Model—Pauwels did not take any further actions to prevent or remedy the theft of his work (*e.g.*, demanding the return of all the spreadsheets he generated).

34. Also in 2016, and again without Pauwels' knowledge, a Deloitte employee (Amit Agarwal) was seconded to BNYM. Agarwal, a tax analyst and member of Deloitte Tax LLP's Partnership Solutions Group, monitored BNYM's energy sector investments. Notably, Agarwal boasts in his LinkedIn profile about "[c]reating excel based model for Wind Credit, which include financial analysis of the client wind portfolio, PTC and HLBV (Hypothetical Liquidation at Book Value) calculation [sic]."

35. However, the model Agarwal refers to—and the model that Deloitte used in its monitoring work for BNYM—is, in sum and substance, a modified version of the Pauwels Model. This is no coincidence. To monitor BNYM's energy sector investments, Deloitte copied the Pauwels Model from the spreadsheets that BNYM shared and modified them to fit their own specific purposes. All this, while BNYM adamantly assured Pauwels that they would do no such thing.

8

*Pauwels Confronts BNYM, Is Fired*

36.     Throughout 2017 and the beginning of 2018, Pauwels remained unaware of BNYM's betrayal and bad faith conduct. He continued to believe that Deloitte was using its own software, as Sarmasti had assured him, and that the Pauwels Model remained a secret from Deloitte.

37.     This all changed in April 2018, when a BNYM employee forwarded to him a Deloitte monitoring spreadsheet and asked that he review some of the calculations and results therein. Upon opening the file, Pauwels quickly realized that Deloitte was *not* using its own software, that the Pauwels Model had *not* remained a secret from Deloitte, and that BNYM had betrayed his trust by giving Deloitte the Pauwels Model. Indeed, Pauwels realized soon after opening the received file that Deloitte was using the Pauwels Model in its monitoring work for BNYM.

38.     In early May 2018, Pauwels confronted both Sarmasti and Peterson about Deloitte's use of the Pauwels Model, expressed his disappointment and confusion over how this could have happened, and demanded an explanation. No explanation was given.

39.     Instead, in an early-May 2018 telephone call, Sarmasti argued that BNYM could do whatever they wanted with the Pauwels Model. Sarmasti added that, in reviewing the spreadsheets that Pauwels had explicitly never let BNYM share with any third parties, Deloitte had found an alleged mistake in the Pauwels Model. Sarmasti then terminated the conversation.

40.     Several weeks later, BNYM terminated its relationship with Pauwels, informing him that he should stop working on any current engagements and that such work would be transferred to others.

*An Ongoing, Damaging Use*

41. Deloitte continues to use the Pauwels Model in performing tracking work for BNYM. Every month, it generates tracking spreadsheets for the bank's energy sector investments; the data for Deloitte's monthly spreadsheets is generated using the stolen Pauwels Model.

42. BNYM's decision to fire Pauwels, meanwhile, has deprived him of the potential income he would otherwise earn by using his proprietary Pauwels Model to track and/or evaluate the bank's energy sector investments. Moreover, by giving the Pauwels Model to Deloitte, BNYM has further damaged Pauwels by stealing his trade secret and severely undercutting Pauwels' ability to use the Pauwels Model as his proprietary and unique tool for assessing energy sector investments, generally (*e.g.*, for other clients).

43. Pauwels also believes that BNYM has shared with Deloitte his proprietary spreadsheets for analyzing and monitoring complex LIHTC transactions ("LIHTC Model"). Like the Pauwels Model, the LIHTC Model reflected and incorporated Pauwels' experience and expertise in evaluating complex financial transactions. Also like the Pauwels Model, Pauwels had never permitted BNYM to share his LIHTC Model with other banks or counterparties. Thus, once BNYM had terminated their relationship with Pauwels, the bank seized on the opportunity to share Pauwels' proprietary LIHTC Model now that he was no longer in a position to know about or object to BNYM's efforts to disseminate his proprietary work.

44. As a final indignity, BNYM has seen fit to avoid paying Pauwels' invoices in full. After terminating their relationship, BNYM refused to pay the full amount of Pauwels' outstanding invoices, instead demanding that he discount and/or otherwise disregard some of his time—BNYM had not previously asked for such reductions. In October 2018, after Pauwels demanded payment

in full, BNYM did begin paying, but only to cover the discounted rates that it had desired (and that Pauwels never granted).  To date, the full amount of Pauwels' invoices remains unpaid.

## FIRST CAUSE OF ACTION
### Misappropriation of Trade Secrets
### (All Defendants)

45. The foregoing allegations are incorporated here as if fully set forth herein.

46. BNYM and Deloitte stole trade secrets from Pauwels—*i.e.*, they stole the Pauwels Model.

47. Pauwels possessed a trade secret and the course of dealing between BNYM and Pauwels indicates that they were in a relationship of trust and confidence.

48. The Pauwels Model was a set of complex financial formulas, implemented in an Excel spreadsheet, and constituted a unique and proprietary method of tax equity investment analysis.  Pauwels used the Pauwels Model to help obtain an advantage over competitors in that (i) it allowed him to easily and effectively evaluate potential investment opportunities and (ii) no one else had access to the model outside himself and BNYM.  The model advantaged Pauwels.

49. The Pauwels Model was a trade secret:

    a. Only Pauwels and BNYM personnel knew of the model (it was, of necessity, implemented in evaluation spreadsheets used internally at BNYM);

    b. Pauwels is self-employed, so he was the only one who understood and knew about the Pauwels Model outside BNYM;

    c. Although Pauwels did not have an explicit contract with BNYM, he made it clear throughout the course of his dealings that the Pauwels Model was to remain secret—he refused every request to disclose the full Pauwels Model

        to outside parties, and allowed the disclosure of a simplified version on only two occasions;

    d.    The Pauwels Model is very effective in helping BNYM choose investments, and was the basis for Pauwels' collaboration with BNYM;

    e.    Pauwels developed the model on his own through months of effort and analysis; and

    f.    As this is a proprietary set of formulas and incorporates Pauwels' unique insight into the alternative energy market, it would be extremely difficult to duplicate the Pauwels Model.

50.    The course of dealing between Pauwels and BNYM indicates that they were in a relationship of trust and confidence. BNYM respected Pauwels' decision, on multiple occasions, not to share the Pauwels Model with third parties. To the extent third parties were privy to the result of the Pauwels Model, they would at most see abbreviated versions of the Pauwels Model spreadsheets.

51.    Despite this relationship and Pauwels' explicit instructions to the contrary, BNYM stole the Pauwels Model and gave it to Deloitte.

52.    Deloitte used the Pauwels Model without permission, copied it, and used it to act as a direct substitute for Pauwels.

53.    As a result of Defendants' actions, Pauwels has suffered and will continue to suffer millions of dollars in damages in the form of lost wages and a diminished ability to use his trade secret (the Pauwels Model) to obtain an advantage in the market for analyzing and monitoring energy sector investments (*e.g.*, for both BNYM and for other clients).

## SECOND CAUSE OF ACTION
### Fraud
### (BNYM)

54. The foregoing allegations are incorporated here as if fully set forth herein.

55. Sarmasti, on behalf of BNYM, told Pauwels that Deloitte would not be using the Pauwels Model to monitor BNYM's energy sector investments.

56. This was a false and misleading representation; Sarmasti knew that, contrary to his representation, BNYM had provided (or would shortly provide) Deloitte with the Pauwels Model spreadsheets and that Deloitte would copy and modify the Pauwels Model.

57. Pauwels did not know and could not reasonably know that Sarmasti was misleading him.

58. Deloitte's use (or, rather, non-use) of the Pauwels Model was an important, material fact for Pauwels.

59. In reasonable reliance on Sarmasti's material misrepresentation, Pauwels refrained from taking any action that would have mitigated the damage resulting from BNYM and Deloitte stealing his Pauwels Model.

60. As a result of his reasonable reliance, Pauwels has been damaged.

## THIRD CAUSE OF ACTION
### Unjust Enrichment
### (BNYM)

61. The foregoing allegations are incorporated here as if fully set forth herein.

62. By concealing crucial information from Pauwels—*i.e.*, that BNYM planned to share or had already shared the Pauwels Model with Deloitte despite Pauwels' express wishes and direction never to do so—BNYM was able to enrich itself by continuing to benefit from the Pauwels Model long after (a) BNYM told Pauwels to stop monitoring the bank's investments and

13

(b) BNYM terminated its relationship with Pauwels. All while no longer having to pay for Pauwels' services.

63. Because Pauwels (a) had his model taken from him against his instructions and wishes, (b) was deceived by BNYM as to the bank's plans to share the Pauwels Model with Deloitte, and (c) was ultimately terminated after BNYM took what it wanted from Pauwels (*i.e.*, his model) surreptitiously, BNYM was enriched at Pauwels' expense.

64. Given that BNYM accomplished the foregoing by deceiving Pauwels, equity and good conscience cannot permit BNYM to retain their ill-gotten gains.

## FOURTH CAUSE OF ACTION
### Misappropriation of Trade Secrets
### (BNYM)

65. The foregoing allegations are incorporated here as if fully set forth herein.

66. BNYM stole trade secrets from Pauwels—*i.e.*, they stole Pauwels' LIHTC Model.

67. Pauwels possessed a trade secret and the course of dealing between BNYM and Pauwels indicates that they were in a relationship of trust and confidence.

68. Pauwels' LIHTC Model was a set of complex financial formulas, implemented in an Excel spreadsheet, and constituted a unique and proprietary method of complex LIHTC investment analysis. Pauwels used the LIHTC Model to help obtain an advantage over competitors in that (i) it allowed him to easily and effectively evaluate potential LIHTC investment opportunities and (ii) no one else had access to the LIHTC Model outside himself and BNYM. The model advantaged Pauwels.

69. The LIHTC Model was a trade secret:

    a. Only Pauwels and BNYM personnel knew of the model (it was, of necessity, implemented in evaluation spreadsheets used internally at BNYM);

    b. Pauwels is self-employed, so he was the only one who understood and knew about the LIHTC Model outside BNYM;

    c. Although Pauwels did not have an explicit contract with BNYM, he made it clear throughout the course of his dealings that the LIHTC Model was to remain secret;

    d. The LIHTC Model is very effective in helping BNYM evaluate and track complex LIHTC investments;

    e. Pauwels developed the model on his own through months of effort and analysis; and

    f. As this is a proprietary set of formulas and incorporates Pauwels' unique insight into complex LIHTC transactions, it would be extremely difficult to duplicate the LIHTC Model.

70. The course of dealing between Pauwels and BNYM indicates that they were in a relationship of trust and confidence. While Pauwels worked with BNYM, the bank respected Pauwels' decision not to share the LIHTC Model with third parties.

71. Despite this relationship and Pauwels' explicit instructions to the contrary, BNYM stole the LIHTC Model and gave it to a third party.

72. As a result of BNYM's actions, Pauwels has suffered and will continue to suffer millions of dollars in damages in the form of lost wages and a diminished ability to use his trade

secret (the LIHTC Model) to obtain an advantage in the market for analyzing and monitoring complex LIHTC transactions.

## PRAYER FOR RELIEF

WHEREFORE, as redress for the foregoing legal violations, Pauwels respectfully requests that this Court, either cumulatively or in the alternative:

1. Award Pauwels damages, including compensatory damages, damages in quantum meruit, and punitive damages, for Defendants' misappropriation of trade secrets (the Pauwels Model) and termination of the BNYM-Pauwels employment relationship;

2. Award Pauwels damages, including compensatory damages, damages in quantum meruit, and punitive damages, for Defendants' misappropriation of trade secrets (the LIHTC Model);

3. Issue an injunction against Defendants to halt the use of the proprietary Pauwels Model and related spreadsheets;

4. Issue an injunction against Defendants to halt the use of the proprietary LIHTC Model and related spreadsheets;

5. Award Pauwels reasonable attorneys' fees and his costs of suit; and

6. Award Pauwels any such further relief as the Court may deem appropriate.

## DEMAND FOR A JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38 and to the extent that it is permitted by law, Plaintiff demands a trial by jury in this action of all issues so triable.

Dated: New York, New York
       March 14, 2019

Respectfully submitted,

_____
Joshua I. Schiller
Benjamin Margulis
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Tel:    (212) 446-2300
jischiller@bsfllp.com
bmargulis@bsfllp.com

*Counsel for Plaintiff André Pauwels*
