UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**ANDRÉ PAUWELS**

  *Plaintiff*,

v.

**THE BANK OF NEW YORK MELLON CORPORATION**, **THE BANK OF NEW YORK MELLON, DELOITTE LLP, DELOITTE USA LLP**, and **DELOITTE TAX LLP**

  *Defendants*.

---

Case No. 1:19-CV-02313-RA

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiff André Pauwels ("Pauwels"), through his undersigned attorneys, brings this action on his own behalf against The Bank of New York Mellon Corporation ("BNY Mellon"), The Bank of New York Mellon (together with BNY Mellon, "BNYM"), Deloitte LLP, Deloitte USA LLP, and Deloitte Tax LLP (collectively, "Deloitte," and together with BNYM, "Defendants") and states the following based upon his personal knowledge with respect to his own acts or acts taking place in his presence, and upon information or belief as to all other matters:

## NATURE OF THE ACTION

1. This is an action by Plaintiff for the theft of his trade secrets by the Defendants. Most notably, without Pauwels' express permission (and, indeed, contrary to his explicit instructions), BNYM took for their own a proprietary model that Pauwels developed to analyze, assess, and monitor a complex form of investment in the energy sector ("Pauwels Model"). Worse, BNYM shared the Pauwels Model with Deloitte—essentially a direct competitor to Pauwels for BNYM's business—despite representing to Pauwels that they had done no such thing.

2.     BNYM sought to provide Deloitte with Pauwels' proprietary trade secrets so that they could provide the services that Pauwels was already providing and to avoid the cost of paying Deloitte to develop their own model or models for BNYM's investments.  Deloitte in turn accepted the trade secrets in order to maintain BNYM's business instead of Pauwels and to avoid expending its own time and money to develop a substitute for the Pauwels Model.

3.     After Pauwels discovered that BNYM and Deloitte had stolen the Pauwels Model for their own uses, he confronted BNYM.

4.     BNYM promptly terminated their relationship with Pauwels, telling him that BNYM would not "take this shit" from a "small advisor" like Pauwels, thereby pushing Pauwels to file this suit.  Defendants' actions have resulted in Pauwels suffering loss of business, economic damages, and the dissemination of his proprietary, trade secrets—specifically, the Pauwels Model.

## PARTIES

5.     Pauwels is a natural person and citizen of Belgium, residing in London, United Kingdom.

6.     BNY Mellon is a corporation registered according to laws of Delaware, and having its principal place of business in New York State at 240 Greenwich Street, New York, New York 10286.

7.     The Bank of New York Mellon ("Bank") is a subsidiary of BNY Mellon and one of its banks.  Chartered by New York, the Bank houses BNY Mellon's institutional businesses, including Asset Servicing, Issuer Services, including Broker-Dealer and Advisor Services.  The Bank has its principal place of business in New York State at 240 Greenwich Street, New York, New York 10286.

8.      Deloitte LLP is a limited liability partnership registered according to the laws of Delaware, and having its principal place of business in New York State at 30 Rockefeller Plaza, New York, New York 10112.

9.      Deloitte USA LLP is a limited liability partnership registered according to the laws of Delaware, and having its principal place of business in New York State at 30 Rockefeller Plaza, New York, New York 10112.

10.      Deloitte Tax LLP is a limited liability partnership registered according to the laws of Delaware, and having its principal place of business in New York State at 30 Rockefeller Plaza, New York, New York 10112.

## JURISDICTION AND VENUE

11.      This Court has subject jurisdiction over this matter pursuant to 28 USC § 1332 given the complete diversity of parties and the amount in controversy.

12.      This Court has personal jurisdiction over the Defendants given that they are headquartered in New York City, New York and conduct substantial business in this State.

13.      Venue is proper in this Court under 28 USC § 1391 as the Defendants have their principal places of business in New York City, New York.

## BACKGROUND

*Pauwels' Relationship with BNYM*

14.      In early 2009, Pauwels was approached by Kevin Peterson of BNYM with an offer to work for BNYM as an independent advisor.  In particular, Peterson proposed that Pauwels analyze BNYM's potential investments and provide his assessment of the strength and desirability of the proposed deal.  Pauwels would work to analyze several different kinds of investments, including, among others, Low Income Housing Tax Credit (LIHTC) transactions.

15.     Peterson had worked with Pauwels before and knew that he could rely on Pauwels' knowledge and expertise—particularly Pauwels' ability to effectively model proposed transactions.  Thus, beginning in April 2009, Pauwels found himself providing his analytical services to BNYM on a deal-by-deal basis—both to BNY Mellon and the Bank.

16.     Pauwels was not provided with a contract by BNYM, nor did he request one. Instead, he worked as an independent advisor to whom BNYM looked for outside expertise and analysis and was compensated for his services based on invoices that he would submit periodically to BNYM for processing.  Moreover, in 2013, Pauwels was given a BNYM email address to facilitate his work.

17.     Several years into his relationship with BNYM, in 2014, Peterson approached Pauwels about working to value a potential investment in the alternative energy sector— specifically, a wind farm.  Pauwels thereafter began working on a method for valuing and analyzing the proposed energy investment and, later that year, flew to New York to participate in meetings with project sponsors, other prospective investors, and relevant members of the legal team regarding the proposed investment.

18.     By this time, Pauwels performed his work for BNYM through Andre Pauwels Advisory Ltd., a company he founded specifically for his BNYM work.  Pauwels was the founder, CEO, and sole employee of this company.

19.     Relying on his years of experience and expertise in evaluating complex financial transactions, Pauwels developed his own, proprietary model to value BNYM's proposed energy sector investments ("Pauwels Model").  The Pauwels Model served as both a direct valuation tool and as a way to check spreadsheets and proposals sent to BNYM by investment sponsors and arrangers.  BNYM, recognizing that the Pauwels Model offered unique advantages to other

available tools for evaluating energy sector investments, accepted and approved the use of the Pauwels Model to evaluate BNYM's proposed deals.

20.     From 2014 onward, the scope of Pauwels' work for BNYM expanded to include a number of energy investments, and for several years BNYM and Pauwels worked together to their mutual success.  Initially, Pauwels would analyze potential investment projects for BNYM using the Pauwels Model.  Later, he also began using the Pauwels Model to monitor BNYM's existing investments (many of which he had initially evaluated).

21.     Based in no small part on Pauwels' work (and, by extension, the Pauwels Model), BNYM made hundreds of millions of dollars in profit through their lending and investment activity.  Pauwels, in turn, was paid between £400,000 and £600,000 per year by BNYM (before taxes)—approximately $500,000 to $750,000 per year.

*The Pauwels Model*

22.     Because energy-sector investments (particularly those based around renewable or alternative energy) implicate a host of potential revenue/support streams, including government subsidies, tax breaks, and other non-customer sources, valuing such an investment requires lengthy negotiation between the venture's sponsor and the investing bank.  All parties involved typically employ sophisticated financial models to determine an agreed-upon value for the investment. Rather than use an off-the-shelf solution, BNYM began relying on the Pauwels Model, as it was a bespoke solution, difficult to replicate without access to the spreadsheets themselves, and where the creator (Pauwels) could—and did—tailor the analysis to BNYM's proposed investments.

23.     Using the Pauwels Model, Pauwels provided BNYM with guidance on what amount they should optimally invest in an alternative energy project.  The Pauwels Model was particularly adept at analyzing "tax equity investments"—that is, investments in alternative energy

projects for which the primary return on the investment is expected to come in the form of tax benefits (*e.g.*, tax credits). For example, if BNYM made a tax equity investment, they could expect to receive substantially all of the venture's tax credits for a number of years (typically for a decade) along with a portion of the revenue generated by the venture.

24.     Pauwels designed and built his Pauwels Model to evaluate and monitor this exact type of investment. By looking to data—typically sourced from third parties, including the deal's sponsor—on aspects of a venture such as the projected energy production, asset depreciation, and operating expenses, the Pauwels Model would calculate how much BNYM could stand to invest in light of the proposed project's value such that BNYM's initial investment could be repaid and achieve the desired return.

25.     Needless to say, this calculation is extremely complicated; by extension, so is the Pauwels Model. Estimating the optimal investment size and a variety of other parameters for a project requires several layers of analysis. For example, the Pauwels Model calculates the proposed project's tax credits, taxable income, and cash flow under various wind scenarios, combining the various results into a simple rate of return or, alternatively, outputs the expected delay in the date on which BNYM would achieve their target return on the investment. Additionally, the Pauwels Model accounts for US tax benefits, which requires the calculation and evaluation of all income, expenses, depreciation, distributions, and excess distributions for a given project.

26.     The Pauwels Model also looks to and calculates a potential investment's Hypothetical Liquidation at Book Value, which looks at how much BNYM could receive if the proposed venture (including all its equipment, *etc.*) was liquidated at book value, and which helped establish the accounting impact of the investment. This number *must* be modelled as it is not

typically provided by a venture's sponsor, and is calculated based on a multitude of different financial inputs.

27.    Implementing and using the Pauwels Model was a major undertaking requiring significant expenditure of Pauwels' labor and skill, including in ensuring that the generated spreadsheets were tailored to BNYM's specific investments as well as their deal terms and particularities.  Indeed, obtaining the necessary data and ensuring that it was loaded correctly into the Pauwels Model could take several months, with each BNYM investment requiring its own implementation of the Pauwels Model.  The data itself would come from third parties—*e.g.*, the sponsor, wind engineers, transmission specialists, market forecasts, etc.—and either would be provided directly to Pauwels or placed in a data room for Pauwels to access.

28.    After loading his model with data, Pauwels would generate an analysis of the proposed investment.  He would then either share the resulting spreadsheet with BNYM or, in most cases, would provide just the top-line results to BNYM for use in negotiations with the sponsor.

29.    Moreover, once a final version of the Pauwels Model was created for a particular transaction, Pauwels could then later update the Model with new data to monitor and track the investment's performance.  By loading updated data from the investment's actual production, income, expenses, and cash distributions, Pauwels could provide monthly updates to BNYM's personnel.  Such performance tracking was useful for providing updates to the "flip date" of an investment (*i.e.*, the projected date that BNYM achieved their investment return goal) and on periodic accounting impacts of the investment.

*Keeping the Pauwels Model Confidential*

30.    In the course of reporting his results, Pauwels would at times share Excel spreadsheets incorporating the Pauwels Model with select individuals at BNYM.  This was a necessary part of reporting the results obtained using the Pauwels Model, as BNYM needed to see the full spreadsheet to understand the accounting results and implications of Pauwels' analysis.

31.    Still, the Pauwels Model was complex to run, so if BNYM wanted to see the impact of a specific change in their investment metrics, they would ask Pauwels to run his model.  BNYM would not use the Pauwels Model themselves.  There was therefore never a question of who owned the Pauwels Model.  In correspondence sent by BNYM to Pauwels, it was referred to as "your model" (and conversely "my model" in correspondence from Pauwels to BNYM).  Moreover, Pauwels included his initials—"AP"—in most of the spreadsheets that he shared with BNYM.

32.    Pauwels was always careful to indicate—and, in fact, insisted—that BNYM never share or otherwise disseminate the Pauwels Model (or the resulting Excel spreadsheets) to third parties such as rival banks or accounting companies.  Indeed, on the several occasions when BNYM *did* ask Pauwels if they could share the Pauwels Model spreadsheets more widely, Pauwels refused and did not allow the Pauwels Model to be shared.  BNYM complied with this refusal.

33.    On two occasions, once in November 2014 and again in December 2016, BNYM requested that Pauwels authorize sharing the Pauwels Model spreadsheets despite Pauwels' adamant refusal.  BNYM explained that they were seeking to share some additional analysis with a counterparty as part of BNYM's negotiations over an intended investment—the counterparty was intransigent and BNYM wanted to further justify their position by citing to results generated with the Pauwels Model.  Pauwels nonetheless refused to allow anyone at BNYM to share either the Pauwels Model itself or the spreadsheets generated by the Pauwels Model.

34.     Ultimately, Pauwels tried to ensure the continued confidentiality of the Pauwels Model (and prevent its dissemination to third parties) by providing BNYM with separate, abbreviated Excel spreadsheets that contained only small portions of the model.  These abbreviated spreadsheets, only shared with an investment sponsor on two occasions, contained the information helpful to BNYM's negotiations and could not be used to reverse-engineer the Pauwels Model.

*Deloitte*

35.     In late 2016, BNYM requested that Pauwels stop using the Pauwels Model to track and monitor their existing energy sector investments.  BNYM further informed Pauwels that they were in the process of engaging an outside consulting firm to take over such monitoring responsibilities.  Several months later, in early 2017, BNYM notified Pauwels that Deloitte would be taking over the monitoring work.

36.     In March 2017, BNYM invited Pauwels to participate in a phone call with Deloitte to share his expertise and experience regarding the monitoring of energy sector investments.  In a subsequent email to Reza Sarmasti, a Managing Director at BNYM and one of Pauwels' main points of contact, Pauwels declined to participate in the call and explained that he considered Deloitte to be competition, that he had developed the Pauwels Model himself, and that he expected Deloitte to do the same.

37.     On March 10, 2017, Pauwels spoke with Sarmasti by phone.  During the call, Pauwels explicitly told Sarmasti:  "I hope they [Deloitte] are not using my spreadsheets."  Sarmasti falsely assured Pauwels that Deloitte had its own software and would not be using the Pauwels Model.

38.     Sarmasti, however, knew that what he had told Pauwels was false.  Specifically, Sarmasti knew that, unbeknownst to Pauwels, BNYM deliberately shared more than a hundred

Pauwels Model spreadsheets with Deloitte, betraying not only Pauwels' confidences but going against his repeated instructions to never share the Pauwels Model with third parties.

39.     Because of Sarmasti's false assurances—and because he had no other way of knowing that BNYM and Deloitte had stolen the Pauwels Model—Pauwels did not take any further actions to prevent or remedy the theft of his work (*e.g.*, demanding the return of all the spreadsheets he generated and terminating his relationship with BNYM).

40.     After BNYM stopped asking Pauwels to monitor their investments, the task transferred to Amit Agarwal, a tax analyst and member of Deloitte Tax LLP's Partnership Solutions Group who was seconded to BNYM.   Agarwal monitored BNYM's energy sector investments; though Pauwels was not aware of who took over the monitoring work.  Notably, Agarwal boasts in his LinkedIn profile about "[c]reating excel based model for Wind Credit, which include financial analysis of the client wind portfolio, PTC and HLBV (Hypothetical Liquidation at Book Value) calculation [sic]."

41.     However, the model Agarwal refers to—and the model that Deloitte used in its monitoring work for BNYM—is, in sum and substance, the Pauwels Model.   This is no coincidence.  To monitor BNYM's energy sector investments, Deloitte (through Agarwal, among others) copied the Pauwels Model from the spreadsheets that BNYM shared and filled in new data to fit their own specific purposes.   All this, while BNYM adamantly assured Pauwels that they would do no such thing.

*Pauwels Confronts BNYM, BNYM Retaliates*

42.     Throughout 2017 and the beginning of 2018, Pauwels remained unaware of BNYM's betrayal and bad faith conduct.  He continued to believe that Deloitte was using its own

software, as Sarmasti had assured him, and that the Pauwels Model remained a secret from Deloitte.

43.     This all changed in April 2018, when a BNYM employee forwarded to him a Deloitte monitoring spreadsheet and asked that he review some of the calculations and results therein.  Upon opening the file, it became clear to Pauwels that Deloitte's model was copied from the Pauwels Model.  The structure, layout, design, row headings, column headings, sequencing of the calculations, and the formulas themselves were virtually identical to the Pauwels Model.  Thus, Pauwels quickly realized that Deloitte was *not* using its own software, that the Pauwels Model had *not* remained a secret from Deloitte, and that BNYM had betrayed his trust by giving Deloitte the Pauwels Model.  To put it bluntly: Pauwels realized soon after opening the received file that Deloitte was using the Pauwels Model in its monitoring work for BNYM.

44.     In early May 2018, Pauwels confronted both Sarmasti and Peterson about Deloitte's use of the Pauwels Model, expressed his disappointment and confusion over how this could have happened, and demanded an explanation.  No explanation was given.

45.     Instead, in an early-May 2018 telephone call, Sarmasti noted that Pauwels was a "small advisor," that Sarmasti did not "take this shit" from even large advisors, and that BNYM had been doing a favor for Pauwels by offering him the opportunity to review Deloitte's copy of the Pauwels Model.  Ultimately, Sarmasti argued that BNYM could do whatever they wanted with the Pauwels Model, adding that in reviewing the spreadsheets that Pauwels had explicitly never let BNYM share with any third parties, Deloitte had found an alleged mistake in the Pauwels Model.  Sarmasti then terminated the conversation.

46.     Two weeks after his conversation with Sarmasti, BNYM terminated their relationship with Pauwels, informing him that he should stop working on any current engagements and that such work would be transferred to others.

*An Ongoing, Damaging Use*

47.     Deloitte continues to use the Pauwels Model in performing tracking work for BNYM.  Every month, it generates multiple tracking spreadsheets for BNYM's energy sector investments; the data for Deloitte's monthly spreadsheets is generated using the stolen Pauwels Model.

48.     BNYM's decision to terminate their relationship with Pauwels, meanwhile, has deprived him of the potential income he would otherwise earn by using his proprietary Pauwels Model to track and/or evaluate BNYM's energy sector investments.  Moreover, by giving the Pauwels Model to Deloitte, BNYM has further damaged Pauwels by stealing his trade secret, providing it to Pauwels' competitor, and severely undercutting Pauwels' ability to use the Pauwels Model as his proprietary and unique tool for assessing energy sector investments, generally (*e.g.*, for other clients).

49.     Pauwels also believes that BNYM has shared his proprietary spreadsheets for analyzing and monitoring complex LIHTC transactions ("LIHTC Model") with third parties who are his direct competitors.  Pauwels developed this bespoke model when BNYM entered into a large structured acquisition of LIHTC assets from an international bank in 2009.  The LIHTC Model shows all cash inflows (principally the cash flows resulting from the LIHTC assets) and determines their distribution under a complex capital structure, which itself was determined to suit a variety of tax objectives and scenarios.  Like the Pauwels Model, the LIHTC Model reflected and incorporated Pauwels' experience and expertise in evaluating complex financial transactions.

Also like the Pauwels Model, Pauwels had never permitted BNYM to share his LIHTC Model with other banks or counterparties.  Thus, once BNYM had terminated their relationship with Pauwels, BNYM seized on the opportunity to share Pauwels' proprietary LIHTC Model with his competitors now that he was no longer in a position to know about or object to BNYM's efforts to disseminate his proprietary work.  The investments for which Pauwels had used the LIHTC Model while acting as an independent advisor to BNYM would have ended in mid-2018 but were instead extended after BNYM terminated their relationship with Pauwels.

50.     As a final indignity, BNYM has seen fit to avoid paying Pauwels' invoices in full. After terminating their relationship, BNYM refused to pay the full amount of Pauwels' outstanding invoices, instead demanding that he discount and/or otherwise disregard some of his time—BNYM had not previously asked for such reductions.  In October 2018, after Pauwels demanded payment in full, BNYM did begin paying, but only to cover the discounted rates that BNYM had desired (and that Pauwels never granted).  To date, the full amount of Pauwels' invoices remains unpaid.

## FIRST CAUSE OF ACTION
### Misappropriation of Trade Secrets
### (All Defendants)

51.     The foregoing allegations are incorporated here as if fully set forth herein.

52.     BNYM and Deloitte stole trade secrets from Pauwels—*i.e.*, they stole the Pauwels Model.

53.     Pauwels possessed a trade secret and the course of dealing between BNYM and Pauwels indicates that they were in a relationship of trust and confidence.

54.     The Pauwels Model was a set of complex financial formulas, implemented in an Excel spreadsheet, and constituted a unique and proprietary method of tax equity investment analysis.  Pauwels used the Pauwels Model to help obtain an advantage over competitors in that

(i) it allowed him to effectively evaluate potential investment opportunities and (ii) no one else had access to the model outside himself and BNYM.  The model advantaged Pauwels.

55.     The Pauwels Model was a trade secret:

a.      Only Pauwels and BNYM personnel knew of the model (it was, of necessity, implemented in evaluation spreadsheets used internally at BNYM);

b.      Pauwels is self-employed, so he was the only one who understood and knew about the Pauwels Model outside BNYM;

c.      Although Pauwels did not have an explicit contract with BNYM, he made it clear throughout the course of his dealings that the Pauwels Model was to remain secret—he refused every request to disclose the full Pauwels Model to outside parties, and allowed the disclosure of a simplified version on only two occasions;

d.      The Pauwels Model is very effective in helping BNYM value and assess investments, and was the basis for Pauwels' collaboration with BNYM;

e.      Pauwels developed the model on his own through months of effort and analysis; and

f.      As this is a proprietary set of formulas and incorporates Pauwels' unique insight into the alternative energy market, it would be extremely difficult to duplicate the Pauwels Model.

56.     The course of dealing between Pauwels and BNYM indicates that they were in a relationship of trust and confidence.  BNYM respected Pauwels' decision, on multiple occasions, not to share the Pauwels Model with third parties.  To the extent third parties were privy to the

result of the Pauwels Model, they would at most see abbreviated versions of the Pauwels Model spreadsheets.

57.     Despite this relationship and Pauwels' explicit instructions to the contrary, BNYM stole the Pauwels Model and gave it to Deloitte, one of Pauwels' competitors.

58.     Deloitte used the Pauwels Model without permission, copied it, and used it to act as a direct substitute for Pauwels—with whom they were competing for BNYM's business.

59.     Deloitte was aware that Pauwels developed the Pauwels Model, and was placed on notice of this by at least March 2017, when BNYM invited Pauwels to participate in a phone call with Deloitte to share his expertise and experience regarding the monitoring of energy sector investments.

60.     As a result of Defendants' actions, Pauwels has suffered and will continue to suffer millions of dollars in damages in the form of lost earnings and a diminished ability to use his trade secret (the Pauwels Model) to obtain an advantage in the market for analyzing and monitoring energy sector investments (*e.g.*, for BNYM and for other clients).

## SECOND CAUSE OF ACTION
### Unfair Competition – Misappropriation of Labor, Skill, and Expenditure
### (All Defendants)

61.     The foregoing allegations are incorporated here as if fully set forth herein.

62.     Pauwels has a property interest in the Pauwels Model, which he developed through significant labor, skill, and expenditure:

> a.     The Pauwels Model was a set of complex financial formulas, implemented in an Excel spreadsheet, and constituted a unique and proprietary method of tax equity investment analysis;

b.      Pauwels developed the model on his own through months of effort and analysis; and

c.      As this is a proprietary set of formulas and incorporates Pauwels' unique insight into the alternative energy market, it would be extremely difficult to duplicate the Pauwels Model.

63.      The course of dealing between BNYM and Pauwels indicates that they were in a relationship of trust and confidence, in which Pauwels provided confidential information about the Pauwels Model to BNYM and insisted that they keep it confidential.

64.      Deloitte was aware that Pauwels developed the Pauwels Model, and was placed on notice of this by at least March 2017, when BNYM invited Pauwels to participate in a phone call with Deloitte to share his expertise and experience regarding the monitoring of energy sector investments.

65.      BNYM and Deloitte misappropriated the Pauwels Model in bad faith.  BNYM provided the model to Deloitte, despite repeated proclamations to Pauwels that they would not do so.  BNYM provided the model to Deloitte so that Deloitte could provide the services that Pauwels was already providing BNYM and so that BNYM would not have to pay for Deloitte to develop a substitute for the Pauwels Model; BNYM also deceived Pauwels to prevent Pauwels from taking any actions that would have mitigated the damage resulting from BNYM and Deloitte stealing his Pauwels Model.

66.      Deloitte accepted and used the Pauwels Model in order to acquire BNYM's business from Pauwels and to avoid having to develop their own model or models through their own labor, skill, and expenditure.

## THIRD CAUSE OF ACTION
### Breach of Confidence (United Kingdom Law)
### (All Defendants)

67.     The foregoing allegations are incorporated here as if fully set forth herein.

68.     Pauwels developed the Pauwels Model and performed most of his work on the model while in the United Kingdom.

69.     BNYM and Deloitte breached Pauwels' confidence by providing (and accepting) confidential information belonging to Pauwels—*i.e.*, the Pauwels Model.

70.     The Pauwels Model is of limited public availability because only Pauwels and BNYM personnel knew of the model.  Pauwels was the only one who understood and knew about the Pauwels Model outside of BNYM.

71.     The Pauwels Model is capable of clear definition with clear limits—it consists of the proprietary calculations and financial formulas, implemented in an Excel spreadsheet, that Pauwels developed to evaluate, analyze, and monitor energy investments.

72.     Pauwels and BNYM had a consultant-client relationship.

73.     Pauwels provided BNYM with explicit instructions not to share the Pauwels Model.

74.     Despite this relationship and Pauwels' explicit instructions to the contrary, BNYM stole the Pauwels Model and gave it to Deloitte, one of Pauwels' competitors.

75.     Deloitte was aware that Pauwels developed the Pauwels Model, and was placed on notice of this by at least March 2017, when BNYM invited Pauwels to participate in a phone call with Deloitte to share his expertise and experience regarding the monitoring of energy sector investments.

76.     Deloitte used the Pauwels Model without permission, copied it, and used it to act as a direct substitute for Pauwels—with whom they were competing for BNYM's business.

77.     As a result of Defendants' actions, Pauwels has suffered and will continue to suffer millions of dollars in damages in the form of lost earnings and a diminished ability to use his confidential information (the Pauwels Model) to obtain an advantage in the market for analyzing and monitoring energy sector investments (*e.g.*, for both BNYM and for other clients).

## FOURTH CAUSE OF ACTION
### Fraud
### (BNYM)

78.     The foregoing allegations are incorporated here as if fully set forth herein.

79.     Sarmasti, on behalf of BNYM (both BNY Mellon and the Bank), told Pauwels that Deloitte would not be using the Pauwels Model to monitor BNYM's energy sector investments.

80.     This was a false and misleading representation.

81.     Given Sarmasti's role at BNYM and his experience with Pauwels and Deloitte, Sarmasti knew that, contrary to his representation, BNYM had provided (or shortly intended to provide) Deloitte with the Pauwels Model spreadsheets and that Deloitte had copied or would shortly copy the Pauwels Model.

82.     Pauwels did not know and could not reasonably know that Sarmasti was misleading him.

83.     Deloitte's use (or, rather, non-use) of the Pauwels Model was an important, material fact for Pauwels.

84.     In reasonable reliance on Sarmasti's material misrepresentation, Pauwels refrained from taking any action that would have mitigated the damage resulting from BNYM and Deloitte stealing his Pauwels Model, including terminating his relationship with BNYM and/or demanding the return of all spreadsheets and materials generated using the Pauwels Model.

85.     As a result of his reasonable reliance, Pauwels has been damaged.

## FIFTH CAUSE OF ACTION
### Negligent Misrepresentation
### (BNYM)

86.     The foregoing allegations are incorporated here as if fully set forth herein.

87.     The course of dealing between Pauwels and BNYM indicates that they were in a relationship imposing a duty on BNYM—and, by extension, their respective agents and employees, including Sarmasti—to impart correct information to Pauwels.

88.     While Pauwels was not an employee (he was an independent advisor), his position and dealings with BNYM made it critical for BNYM to provide Pauwels with timely, accurate, and correct information (including to help him in applying the Pauwels Model to potential or existing investments).  Pauwels' repeated, express instructions to BNYM to keep the Pauwels Model confidential likewise required BNYM to provide Pauwels with truthful information regarding what BNYM did with any spreadsheets generated by Pauwels using his model.

89.     Sarmasti, on behalf of BNYM (both BNY Mellon and the Bank), told Pauwels that Deloitte would not be using the Pauwels Model to monitor BNYM's energy sector investments.

90.     This was an incorrect, false, and misleading representation which, given Sarmasti's role at BNYM and his experience with Pauwels and Deloitte, Sarmasti should have known was false.

91.     Pauwels did not know and could not reasonably know that Sarmasti's statement to him was false and incorrect.

92.     In reasonable reliance on Sarmasti's misrepresentation, Pauwels refrained from taking any action that would have mitigated the damage resulting from BNYM and Deloitte stealing his Pauwels Model, including terminating his relationship with BNYM and/or demanding the return of all spreadsheets and materials generated using the Pauwels Model.

93.     As a result of his reasonable reliance, Pauwels has been damaged.

## SIXTH CAUSE OF ACTION
**Unjust Enrichment**
**(BNYM)**

94.    The foregoing allegations are incorporated here as if fully set forth herein.

95.    By concealing crucial information from Pauwels—*i.e.*, that BNYM planned to share or had already shared the Pauwels Model with Deloitte despite Pauwels' express wishes and direction never to do so—BNYM enriched themselves by continuing to benefit from the Pauwels Model long after (a) BNYM told Pauwels to stop monitoring their investments and (b) BNYM terminated their relationship with Pauwels.  All while no longer having to pay for Pauwels' services.

96.    Because Pauwels (a) had his model taken from him against his instructions and wishes, (b) was deceived by BNYM as to their plans to share the Pauwels Model with Deloitte, and (c) was ultimately terminated after BNYM took what they wanted from Pauwels (*i.e.*, his model) surreptitiously, BNYM was enriched at Pauwels' expense.

97.    Given that BNYM accomplished the foregoing by deceiving Pauwels, equity and good conscience cannot permit BNYM to retain their ill-gotten gains.

## SEVENTH CAUSE OF ACTION
**Unjust Enrichment**
**(BNYM)**

98.    The foregoing allegations are incorporated here as if fully set forth herein.

99.    By failing to pay Pauwels in full for the work that he performed for BNYM in the final months of their relationship with him, BNYM were able to enrich themselves at Pauwels' expense.

100.    Specifically, despite express demands for a full payment, BNYM paid lower rates (based on a discount that BNYM themselves decided to impose) for Pauwels' valuable work, benefiting BNYM, denying Pauwels the full value of his work, and adding insult to injury.

20

101.    Pauwels deserves to be paid for the full value of his work, and equity and good conscience cannot permit BNYM to retain their ill-gotten gains.

### EIGHTH CAUSE OF ACTION
**Misappropriation of Trade Secrets**
**(BNYM)**

102.    The foregoing allegations are incorporated here as if fully set forth herein.

103.    BNYM stole trade secrets from Pauwels—*i.e.*, they stole Pauwels' LIHTC Model.

104.    Pauwels possessed a trade secret and the course of dealing between BNYM and Pauwels indicates that they were in a relationship of trust and confidence.

105.    Pauwels' LIHTC Model was a set of complex financial formulas, implemented in an Excel spreadsheet, and constituted a unique and proprietary method of complex LIHTC investment analysis.  Pauwels used the LIHTC Model to help obtain an advantage over competitors in that (i) it allowed him to effectively evaluate potential LIHTC investment opportunities and (ii) no one else had access to the LIHTC Model outside himself and BNYM.  The model advantaged Pauwels.

106.    The LIHTC Model was a trade secret:

      a.      Only Pauwels and BNYM personnel knew of the model (it was, of necessity, implemented in evaluation spreadsheets used internally at BNYM);

      b.      Pauwels is self-employed, so he was the only one who understood and knew about the LIHTC Model outside BNYM;

      c.      Although Pauwels did not have an explicit contract with BNYM, he made it clear throughout the course of his dealings that the LIHTC Model was to remain secret;

d.  The LIHTC Model is very effective in helping BNYM evaluate and monitor complex LIHTC investments;

e.  Pauwels developed the model on his own through months of effort and analysis; and

f.  As this is a proprietary set of formulas and incorporates Pauwels' unique insight into complex LIHTC transactions, it would be extremely difficult to duplicate the LIHTC Model.

107.  The course of dealing between Pauwels and BNYM indicates that they were in a relationship of trust and confidence.  BNYM respected Pauwels' wish not to share the LIHTC Model with third parties.

108.  Despite this relationship and Pauwels' explicit instructions to the contrary, BNYM stole the LIHTC Model and gave it to a third party.

109.  As a result of BNYM's actions, Pauwels has suffered and will continue to suffer millions of dollars in damages in the form of lost earnings and a diminished ability to use his trade secret (the LIHTC Model) to obtain an advantage in the market for analyzing and monitoring complex LIHTC transactions (*e.g.*, for both BNYM and for other clients).

## NINTH CAUSE OF ACTION
### Unfair Competition – Misappropriation of Labor, Skill, and Expenditure
### (BNYM)

110.  The foregoing allegations are incorporated here as if fully set forth herein.

111.  Pauwels has a property interest in the LIHTC Model, which he developed through significant labor, skill, and expenditure:

a.   The LIHTC Model was a set of complex financial formulas, implemented in an Excel spreadsheet, and constituted a unique and proprietary method of analyzing and monitoring complex LIHTC transactions;

b.   Pauwels developed the model on his own through months of effort and analysis; and

c.   As this is a proprietary set of formulas and incorporates Pauwels' unique insight into complex LIHTC transactions, it would be extremely difficult to duplicate the LIHTC Model.

112.   The course of dealing between BNYM and Pauwels indicates that they were in a relationship of trust and confidence, in which Pauwels provided confidential information about the LIHTC Model to BNYM and insisted that they keep it confidential.

113.   BNYM misappropriated the LIHTC Model in bad faith.  BNYM provided the model to a third party despite knowing that Pauwels considered his LIHTC models to be confidential and had not allowed BNYM to share the model with third parties.  BNYM provided the model to a third party so BNYM would not incur the substantial cost of the third party developing its own model from scratch.

## TENTH CAUSE OF ACTION
### Breach of Confidence (United Kingdom Law)
### (BNYM)

114.   The foregoing allegations are incorporated here as if fully set forth herein.

115.   Pauwels developed the LIHTC Model and performed most of his work on the model while in the United Kingdom.

116.   BNYM breached Pauwels' confidence by using and providing confidential information belonging to Pauwels to a third party—*i.e.*, the LIHTC Model.

117.    The LIHTC Model is of limited public availability because only Pauwels and BNYM personnel knew of the model.  Pauwels was the only one who understood and knew about the LIHTC Model outside of BNYM.

118.    The LIHTC Model is capable of clear definition with clear limits—it consists of the proprietary calculations and financial formulas, implemented in an Excel spreadsheet, that Pauwels developed to evaluate, analyze, and monitor complex LIHTC transactions.

119.    Pauwels and BNYM had a consultant-client relationship.

120.    Pauwels provided BNYM with explicit instructions not to share the LIHTC Model.

121.    Despite this relationship and Pauwels' explicit instructions to the contrary, BNYM stole the LIHTC Model and gave it to a third party.

122.    As a result of Defendants' actions, Pauwels has suffered and will continue to suffer millions of dollars in damages in the form of lost earnings and a diminished ability to use his confidential information (the LIHTC Model) to obtain an advantage in the market for analyzing complex LIHTC sector investments (*e.g.*, for BNYM and for other clients).

## PRAYER FOR RELIEF

WHEREFORE, as redress for the foregoing legal violations, Pauwels respectfully requests that this Court, either cumulatively or in the alternative:

1.    Award Pauwels damages, including compensatory damages, damages in quantum meruit, and punitive damages, for Defendants' misappropriation of trade secrets (the Pauwels Model), misappropriation of labor, skills, and expenditures, breach of confidence, termination of the BNYM-Pauwels relationship, and BNYM's failure to fully pay Pauwels' invoices;

2.      Award Pauwels damages, including compensatory damages, damages in quantum meruit, and punitive damages, for Defendants' misappropriation of trade secrets (the LIHTC Model), misappropriation of labor, skills, and expenditures, and breach of confidence;

3.      Issue an injunction against Defendants to halt the use of the proprietary Pauwels Model and related spreadsheets;

4.      Issue an injunction against Defendants to halt the use of the proprietary LIHTC Model and related spreadsheets;

5.      Award Pauwels reasonable attorneys' fees and his costs of suit; and

6.      Award Pauwels any such further relief as the Court may deem appropriate.

## **DEMAND FOR A JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38 and to the extent that it is permitted by law, Plaintiff demands a trial by jury in this action of all issues so triable.


Dated: New York, New York
       May 28, 2019


Respectfully submitted,

Joshua I. Schiller
Benjamin Margulis
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Tel:    (212) 446-2300
jischiller@bsfllp.com
bmargulis@bsfllp.com

*Counsel for Plaintiff André Pauwels*