USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 2/19/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANDRE PAUWELS,

        Plaintiff,

        v.

DELOITTE LLP; DELOITTE TAX LLP;
DELOITTE USA LLP; BANK OF NEW
YORK MELLON CORPORATION; and
THE BANK OF NEW YORK MELLON,

        Defendants.

No. 19-CV-2313 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

Plaintiff Andre Pauwels brings this action against Defendants The Bank of New York

Mellon Corporation and The Bank of New York Mellon (collectively, "BNYM") and Defendants

Deloitte LLP, Deloitte Tax LLP, and Deloitte USA LLP (collectively, "Deloitte"), alleging

several claims under New York law, including trade secret misappropriation, and one under

United Kingdom law. Before the Court are BNYM's and Deloitte's motions to dismiss. For the

following reasons, both motions are granted.

## BACKGROUND[1]

Plaintiff began working for BNYM as an "independent advisor" in 2009. Compl. ¶ 14.

His work focused on "analyz[ing] BNYM's potential investments and provid[ing] his assessment

of the strength and desirability of the proposed deal." *Id.* ¶ 14. Although Plaintiff was paid

between $500,000 and $750,000 per year, no contract was ever signed between the parties.

Instead, Plaintiff would periodically submit invoices for his work.

---

[1] The Court draws the following facts from the amended complaint ("Compl."), *see* Dkt. 36, and accepts
them as true for purposes of this motion. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).

In 2014, BNYM approached Plaintiff about a new project: "valu[ing] a potential investment in the alternative energy sector – specifically, a wind farm." *Id.* ⁋ 17. As a result of that project, Plaintiff "developed his own, proprietary model to value BNYM's proposed energy sector investments," referred to in the complaint as the "Pauwels Model." *Id.* ⁋ 19. Plaintiff describes the Pauwels Model "as both a direct valuation tool and as a way to check spreadsheets and proposals sent to BNYM by investment sponsors and arrangers." *Id.* For several years, Plaintiff used this model to analyze "a number of energy investments," "provid[ing] BNYM with guidance on what amount they should optimally invest in an alternative energy project." *Id.* ⁋⁋ 20, 23.

To "report[] the results obtained using the Pauwels Model" and so that BNYM could "understand the accounting results and implications of Pauwels' analysis," Plaintiff "would at times share Excel spreadsheets incorporating the Pauwels Model with select individuals at BNYM." *Id.* ⁋ 30. "[M]ost of the spreadsheets that he shared with BNYM . . . included his initials." *Id.* ⁋ 31. Plaintiff alleges that he "was always careful to indicate – and, in fact, insisted – that BNYM never share or otherwise disseminate the Pauwels Model (or the resulting Excel spreadsheets) to third parties such as rival banks or accounting companies." *Id.* ⁋ 32. According to Plaintiff, BNYM "complied" with his request. *Id.* Twice, however, Plaintiff created "separate, abbreviated Excel spreadsheets," "contain[ing] only small portions of the model" and "the information helpful to BNYM's negotiations," for BNYM to share with third parties. *Id.* ⁋ 34 (explaining that the purpose was to prevent third parties from using the spreadsheets "to reverse-engineer the Pauwels Model").

In late 2016, BNYM began to reduce Plaintiff's monitoring work and notified Plaintiff that it was looking to hire a consultancy firm to take over his responsibilities. *See id.* ⁋ 35. In

early 2017, BNYM told Plaintiff that it had hired Deloitte. *See id.* ¶ 36. Around this time, a tax analyst for Deloitte, Amit Agarwal, took over Plaintiff's role monitoring BNYM's energy sector investments. On LinkedIn, Agarwal wrote that he "creat[ed] [an] excel based model for Wind Credit, which include[d] financial analysis of the client wind portfolio, PTC and HLBV (Hypothetical Liquidation at Book Value) calculation." *Id.* ¶ 40.

In March 2017, BNYM asked Plaintiff to have a call with Deloitte "to share his expertise and experience regarding the monitoring energy sector investments." *Id.* ¶ 36. Plaintiff declined to participate. In doing so, he e-mailed Reza Sarmasti, a managing director at BNYM and "one of [his] main points of contact," to explain that "he considered Deloitte to be competition, that he had developed the Pauwels Model himself, and that he expected Deloitte to do the same." *Id.* On March 10, Plaintiff spoke with Sarmasti on the phone. He told him: "I hope [Deloitte] [is] not using my spreadsheets." *Id.* ¶ 37. According to Plaintiff, "Sarmasti falsely assured [Plaintiff] that Deloitte had its own software and would not be using the Pauwels Model." *Id.*

Despite Sarmasti's assurance, BNYM allegedly shared more than a hundred spreadsheets with Deloitte. Plaintiff remained unaware of this until April 2018, when a BNYM employee sent him one of Deloitte's monitoring spreadsheets for his review. Plaintiff asserts that it was evident that "Deloitte's model was copied from the Pauwels Model" based on "[t]he structure, layout, design, row headings, column headings, sequencing of the calculations, and the formulas[, which] themselves were virtually identical to the Pauwels Model." *Id.* ¶ 43. In May 2018, Plaintiff confronted BNYM, at which time Sarmasti allegedly called him "a small advisor" and said "that BNYM had been doing a favor for [him] by offering him the opportunity to review Deloitte's copy of the Pauwels Model." *Id.* ¶ 45. Shortly thereafter, BNYM terminated Plaintiff. Nonetheless, Deloitte allegedly continues to use the spreadsheets and, as a result, Plaintiff claims

to have lost potential income from using "his proprietary Pauwels Model" to track either BNYM's or another client's investments. *Id.* ¶ 48.

Plaintiff also alleges that BNYM improperly shared a second model – the Low Income Housing Tax Credit Model (the "LIHTC Model") – with an unidentified third party after his termination. The LIHTC Model monitors low income housing tax credit transactions by "show[ing] all cash inflows (principally the cash flows resulting from the LIHTC assets) and determin[ing] their distribution under a complex capital structure." *Id.* ¶¶ 14, 49. Plaintiff developed it in 2009, also while working for BNYM. According to Plaintiff, "[l]ike the Pauwels Model, the LIHTC Model reflected and incorporated [his] experience and expertise in evaluating complex financial transactions," and he "never permitted BNYM to share his LIHTC Model with other banks or counterparties." *Id.* ¶ 49.

Finally, Plaintiff also states that BNYM has failed to pay him in full for work done near the end of their relationship. Although he admits that BNYM began to pay the remaining invoices in October 2018, he states that BNYM did so at "the discounted rates that BNYM had desired (and that [Plaintiff] never granted)." *Id.* ¶ 50. As such, Plaintiff alleges that BNYM still owes him money for work performed prior to his termination.

On March 14, 2019, Plaintiff brought this action against BNYM and Deloitte. He filed an amended complaint on May 28, and Defendants filed the present motions to dismiss on June 18. On January 23, 2020, the Court held oral argument on both motions.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In reviewing

4

a motion to dismiss, the Court "constru[es] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008). The Court, however, need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

Plaintiff alleges several causes of action under New York law, as well one for breach of confidence under United Kingdom law. Addressing these in turn, the Court concludes that none of them state a plausible claim for relief.

## I. Trade Secret Misappropriation

Plaintiff first alleges the misappropriation of two trade secrets. Specifically, he asserts that both BNYM and Deloitte misappropriated the Pauwels Model and that BNYM misappropriated the LIHTC Model.

To successfully plead a trade secret misappropriation claim under New York law, a plaintiff must show "(1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as the result of discovery by improper means." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009). A trade secret is broadly defined as "any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it." *Id.*; *see also Integrated Cash Mgmt. Servs., Inc. v. Dig. Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990) ("[A] trade secret can 'exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination,

affords a competitive advantage and is a protectable trade secret."). "Although there is no one-size-fits all definition to a trade secret," New York uses several factors to guide its analysis: "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Elsevier Inc. v. Doctor Evidence, LLC*, No. 17-CV-5540 (KBF), 2018 WL 557906, at *3-4 (S.D.N.Y. Jan. 23, 2018).

## A. Pauwels Model

Plaintiff describes the Pauwels Model as "a set of complex financial formulas, implemented in an Excel spreadsheet [that] constitute a unique and proprietary method of tax equity investment analysis." Compl. ⁋ 54. He asserts that BNYM and Deloitte misappropriated the Pauwels Model by giving "more than a hundred spreadsheets" to Deloitte after Deloitte took over his work for BNYM.[2] *Id.* ⁋ 38. Both Defendants contend that Plaintiff fails to state a trade secret misappropriation claim under New York law because (1) his allegations are insufficiently particular; (2) he has not adequately alleged possession of a trade secret because he did not take reasonable measures to protect the secrecy of the Pauwels Model; and, even if he possessed a

---

[2] The complaint does not address what, if any, difference there is between the Pauwels Model and the spreadsheets. Therefore, at oral argument, the Court asked each party the same question: what is the distinction between the Pauwels Model and the spreadsheets? The parties seemed to agree that to the extent there is any distinction, it is merely that a spreadsheet serves as one example of the model as utilized. *See* Tr. at 3:23-24 (BNYM: "There is none. The model is the spreadsheet, and the spreadsheet is the model."); *id.* at 4:5-6 (BNYM: "I believe [Plaintiff] would call it a 'model' and say the spreadsheets reflect his creative model that he assembled, put together in the spreadsheets and delivered it[.]"); *id.* at 20:21-22 (Deloitte: "The complaint doesn't allege a difference between the model and the spreadsheets[.]"); *id.* at 31:8-11 (Plaintiff: "The model, essentially, is the formulas that are used to create the spreadsheet. The spreadsheet is the result of data being put in[.]").

trade secret, (3) he has not plausibly alleged that either Defendant misappropriated it.[3] The Court addresses each of these arguments.

## 1. Possession of a Trade Secret

Defendants first contend that Plaintiff's allegations are too conclusory to adequately allege that the Pauwels Model is a trade secret. *See* BNYM Mot. at 10-12. The Court disagrees.

As a threshold matter, trade secret claimants are required to "plead their trade secrets with sufficient specificity to inform the defendants of what they are alleged to have misappropriated." *ExpertConnect, L.L.C. v. Fowler*, No. 18-CV-4828 (LGS), 2019 WL 3004161, at *4 (S.D.N.Y. July 10, 2019). Although "sufficient particularity" is required, a plaintiff need not "divulge every detail of a trade secret." *Yeda Research & Dev. Co. v. iCad, Inc.*, No. 18-CV-8083 (GBD), 2019 WL 4562409, at *5 (S.D.N.Y. Sept. 5, 2019); *see also Medtech Prods, Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 789 (S.D.N.Y. 2008) (explaining that a plaintiff need not disclose "the precise trade secrets misappropriated" in the complaint to survive a motion to dismiss).

The Court rejects Defendants' assertion that Plaintiff has not described what he alleges is the trade secret with sufficient particularity at the pleading stage. Plaintiff describes the Pauwels Model as a "proprietary set of formulas . . . incorporat[ing] [his] unique insight into the alternative energy market." Compl. ¶ 55(f). The Pauwels Model, he claims, was "developed to analyze, assess, and monitor a complex form of investment in the energy sector" and, more specifically, to guide BNYM "on what amount [it] should optimally invest in an alternative energy project" for both potential and existing investments. *Id.* ¶¶ 1, 23; *see also id.* ¶¶ 19-20. Plaintiff further explains that the Pauwels Model "serve[s] as both a direct valuation tool and as a way to check

---

[3] BNYM and Deloitte filed separate motions to dismiss, cited in the opinion as "BNYM Mot." and "Deloitte Mot." Deloitte "joins and adopts" the arguments set forth in BNYM's motion. *See* Deloitte Mot. at 3-4. Deloitte also makes additional arguments to address the facts specific to its alleged role in the conduct alleged.

spreadsheets and proposals sent to BNYM by investment sponsors and arrangers." *Id.* ¶ 19; *see also id.* ¶ 24 ("[T]he Pauwels Model would calculate how much BNYM could stand to invest in light of the proposed project's value such that BNYM's initial investment could be repaid and achieve the desired return."). He then notes in detail that "the Pauwels Model calculates the proposed project's tax credits, taxable income, and cash flow under various wind scenarios," in addition to "account[ing] for U.S. tax benefits" and "a potential investment's Hypothetical Liquidation at Book Value." *Id.* ¶¶ 25-26.

This description is sufficient "to discern the general contours" of the alleged trade secret. *Next Commc'ns, Inc. v. Viber Media, Inc.*, No. 14-CV-8190 (RJS), 2016 WL 1275659, at *4 (S.D.N.Y. Mar. 30, 2016). "The requirement of particularity exists for the simple reason that a defendant must know what constitutes a plaintiff's trade secret[.]" *Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 257 (S.D.N.Y. 2014). Here, Plaintiff's allegations put Defendants on adequate notice of the "formula . . . or compilation of information which is used in [BNYM's] business" that Plaintiff believes was misappropriated. *Faiveley Transp. Malmo AB*, 559 F.3d at 117; *see also Twombly*, 550 U.S. at 555 (explaining that a plausible claim gives "fair notice of what the . . . claim is and the grounds upon which it rests"). The Court further notes that Plaintiff's allegations are similar in specificity to other trade secret allegations previously deemed sufficiently non-conclusory by courts in this district. *See, e.g., Irth Sols., LLC v. Apex Data Sols. & Servs., LLC*, No. 18-CV-6884, 2019 WL 283831, at *6 (W.D.N.Y. Jan. 22, 2019) ("[T]he 'unique combination' of a software program's system, architecture, and user interface is protectable."); *Medidata Sols., Inc. v. Veeva Sys. Inc.*, No. 17-CV-589 (LGS), 2018 WL 6173349, at *1, 3 (S.D.N.Y. Nov. 26, 2018) (finding "numerous specific categories of information," including "product design principles, software architecture and design, product roadmaps,

functionality requirements relating to platform integration across software modules, and clinical trial management tools," sufficient); *iSentium, LLC v. Bloomberg Fin. L.P.*, No. 17-CV-7601 (PKC), 2018 WL 6025864, at \*3 (S.D.N.Y. Nov. 16, 2018) (describing the alleged trade secret – "transformation methodologies for graphing and displaying information" and "for social sentiment data display and related documents and information" – as "broad" but "sufficient to provide [defendant] with fair notice"); *Tesla Wall Sys., LLC v. Related Co.*, No. 17-CV-5966 (JSR), 2017 WL 6507110, at \*9 (S.D.N.Y. Dec. 18, 2017) (stating that "plead[ing] numerous specific categories of information, such as 'technical data, internal pricing information, work product, research, engineering designs'" is "highly specific"); *Next Commc'ns, Inc.*, 2016 WL 1275659, at \*4 (holding that allegations of a "unique technique for routing calls, allowing for detailed traffic monitoring, reporting, and billing" provide "substantial detail").

Defendants next contend that, even if the allegations are particular enough, Plaintiff has not plausibly alleged the possession of a trade secret under New York's six factor-based analysis. Defendants contest this on one ground: whether Plaintiff took "reasonable steps to keep the spreadsheets (including the model) confidential." BNYM Mot. at 6. Although "the extent of measures taken by the business to guard the secrecy of the information" is only one factor in New York's analysis, it is the most critical one.[4] *Elsevier Inc*, 2018 WL 557906, at \*4; *see also*

---

[4] Defendants do not seem to dispute that Plaintiff plausibly alleges the other factors used in determining whether he possessed a trade secret. *See* BNYM Mot. at 7-10. The Court agrees that those factors are adequately plead. For instance, Plaintiff asserts that he expended significant effort – in time and money – developing the Pauwels Model. *See* Compl. ¶ 55(e) ("Pauwels developed the model on his own through months of effort and analysis[.]"); *see also id.* ¶ 27 ("Implementing and using the Pauwels Model was a major undertaking requiring significant expenditure of Pauwels' labor and skill[.]"). He also plausibly alleges that the Pauwels Model brought value and competitive advantage to both him and BNYM and was not readily known outside of the business or even outside of BNYM. *See id.* ¶ 19 ("BNYM, recognizing that the Pauwels Model offered unique advantages to other available tools for evaluating energy sector investments, accepted and approved the use of the Pauwels Model to evaluate BNYM's proposed deals."); *id.* ¶ 22 ("Rather than use an off-the-shelf solution, BNYM began relying on the Pauwels Model, as it was a bespoke solution . . . and where the creator (Pauwels) could – and did – tailor the analysis to BNYM's proposed investments.").

*Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir. 1986) (citation omitted) ("[W]hether the information was secret . . . [is] the most important consideration."); *Ashland Mgmt. Inc. v. Janien*, 624 N.E. 2d 1007, 1013 (N.Y. 1993) ("[A] trade secret must first of all be secret."). As such, to successfully plead possession of a trade secrect, Plaintiff "must show that [he] took substantial measures to protect the secret nature of [the Pauwels Model]." *Geritrex Corp. v. Dermarite Indus., LLC*, 910 F. Supp. 955, 961 (S.D.N.Y. 1996).

Plaintiff alleges that he took sufficient measures to keep the Pauwels Model confidential by "includ[ing] his initials – 'AP' – in most of the spreadsheets that he shared with BNYM." Compl. ¶ 31. He also claims he "was always careful to indicate – and, in fact, insisted – that BNYM never share or otherwise disseminate the Pauwels Model (or the resulting Excel spreadsheets) to third parties such as rival banks or accounting companies. . . . [and that] BNYM complied with this[.]" *Id.* ¶ 32. He mentions two specific times – in November 2014 and December 2016 – when he refused BNYM's request to share the spreadsheets with third parties. *Id.* ¶ 33. And twice, seeking to "ensure the continued confidentiality of the Pauwels Model," he "provid[ed] BNYM with separate, abbreviated Excel spreadsheets that contained only small portions of the model." *Id.* ¶ 34. As a result of these measures, Plaintiff alleges that "[t]here was . . . never a question of who owned the Pauwels Model." *Id.* ¶ 31. Not only did BNYM "not use the Pauwels Model themselves," but BNYM, in correspondence with him, "referred to [it] as 'your model.'" *Id.*

Plaintiff nonetheless admits that he shared the spreadsheets – reflecting the Pauwels Model – with BNYM, thus freely disclosing the very trade secret for which he now seeks protection. *See id.* ¶ 28 ("[Plaintiff] would then either share the resulting spreadsheet with BNYM or, in most cases, would provide just the top-line results to BNYM for use in

negotiations with the sponsor."); *id.* ¶ 30 ("In the course of reporting his results, Pauwels would at times share Excel spreadsheets incorporating the Pauwels Model with select individuals at BNYM."). Over the course of his time working for BNYM, Plaintiff admits to sending "more than a hundred Pauwels Model spreadsheets" to BNYM. *Id.* ¶ 38.

Although sending the spreadsheets to BNYM does not in itself destroy the secrecy of the alleged trade secret, Plaintiff's failure to allege "substantial measures" – if any measures at all – taken to protect the spreadsheets sent to BNYM does preclude this claim's success. *Geritrex Corp.*, 910 F. Supp. at 961. Notably, Plaintiff has not alleged the existence of any formal agreement between him and BNYM regarding the information's confidentiality. And while a formal agreement is not necessary to establish secrecy, Plaintiff does not even allege that he ever sought to establish any particular limitations on who within or outside of BNYM could see the spreadsheets.

Moreover, Plaintiff does not allege adequate measures taken to indicate to BNYM that the spreadsheets belonged to him. The most "substantial measure" alleged is that Plaintiff put his initials on "most" of the spreadsheets. Compl. ¶ 31. But putting one's initials on a document is not an obvious form of protection, particularly in contrast to more common measures like encryption, a password, or marking something as confidential. *See Universal Processing LLC v. Zhuang*, No. 17-CV-10210 (LTS), 2018 WL 4684115, at *3 (S.D.N.Y. Sept. 28, 2018) (noting that the plaintiff "t[ook] reasonable steps to protect the secrecy of its trade secret information . . . which includes, but is not limited to, [the] use of passwords, security timeouts and confidentiality policies and non-disclosure covenants in employment agreements"); *Big Vision Private Ltd.*, 1 F. Supp. 3d at 253 n.32 ("[The plaintiff's] failure to designate as Confidential anything disclosed . . . is particularly noteworthy because [the plaintiff] claims that it disclosed its claimed trade

11

secret."). Furthermore, Plaintiff shared the spreadsheets with BNYM via e-mail, which, as

BNYM notes, allowed it to "forward [them] to absolutely anybody." Tr. at 5:23-24. While

Plaintiff is correct to argue that "[t]here is no threshold rule that documents must be encrypted or

password-protected to qualify for trade secret protection," Pl.'s Opp. at 10, this ignores the

critical point that Plaintiff appears to have taken no adequate steps toward protecting the

spreadsheets – whether that be in the form of a formal agreement, marking it as confidential, or

anything else signaling to BNYM that the spreadsheets contained proprietary information. As

Deloitte stated, "a recipient [of the spreadsheets], like Deloitte, would not be on notice that there

was any issue associated with possessing [the spreadsheets] at all or receiving them from the

bank." Tr. at 21:2-4.

      Plaintiff disputes that he failed to take reasonable steps to protect the Pauwels Model's

secrecy. He first notes that "no one else had access to the model outside himself and BNYM"

and that, even within BNYM, he only shared it with "select individuals." Compl. ¶¶ 30, 54; *see

also id.* ¶ 55(a) ("Only Pauwels and BNYM personnel knew of the model (it was, of necessity,

implemented in evaluation spreadsheets used internally at BNYM[.]")). However, limiting the

number of people that he shared the Pauwels Model with, especially within BNYM, "in and of

itself is not determinative." *Big Vision Private Ltd.*, 1 F. Supp. at 272 ("[The plaintiff] took

some steps to limit who within the company knew of the project, but that in and of itself is not

determinative."). This is because – as one court in this district explained – restricting the number

of people who know about information, particularly within a business, instead "could speak more

to the size and structure of [the project], than to active efforts to maintain the secrecy of the

alleged trade secret." *Id.*

      Plaintiff next contends that he explicitly asked BNYM not to disseminate the

spreadsheets to third parties and that BNYM complied with that request. *See* Compl. ¶ 32; Pl.'s Opp. at 9 ("[T]he BNYM employees to whom he disclosed the model were pledged to secrecy."). He further claims that he allowed BNYM to share information with third parties on two occasions, but only after "providing BNYM with separate, abbreviated Excel spreadsheets that contained only small portions of the model" which "could not be used to reverse-engineer the Pauwels Model." *Id.* ¶ 34. Plaintiff argues that together this made clear to BNYM that the spreadsheets belonged to Plaintiff and were not to be disclosed to third parties.

But, as BNYM notes, "Pauwels does not allege to whom he supposedly 'insisted' that BNYM not share the spreadsheets." BNYM Mot. at 9; *see also* Tr. at 6:15-19 ("[T]here's no e-mail, no instruction. He doesn't claim that he talked to a specific individual who is identified. He doesn't reference any correspondence or any agreement that limits the bank from sharing it."). Although he does allege that he refused several of BNYM's requests to share the Pauwels Model, he identifies only two occasions when he did so. This does not rise to the level of a reasonable step to protect the spreadsheets when Plaintiff admittedly provided more than a hundred spreadsheets to BNYM over the course of several years. Moreover, the very fact that BNYM tried to schedule a call between Plaintiff and Deloitte to discuss Plaintiff's prior work for BNYM seems to contradict Plaintiff's assertion that BNYM was on notice that the spreadsheets were to be kept secret. *See* Compl. ¶¶ 36, 43. The Court thus agrees that this allegation – particularly without an identification of who it is that Plaintiff spoke with and when, information that should be readily available to him at this stage – does not constitute a "substantial measure" taken to protect the Pauwels Model. *Geritrex Corp.*, 910 F. Supp. at 961.

In any event, the fact that Plaintiff asked BNYM not to share the spreadsheets is not in itself a reasonable step to keep the Pauwels Model secret. Simply because Plaintiff made this

request does not mean that BNYM had a corresponding obligation. That it had such an obligation is particularly doubtful in light of the fact that BNYM paid Plaintiff a significant amount of money each year for his work, which included producing these spreadsheets. Plaintiff, therefore, made no more than a one-sided request. As another judge in this district stated, "disclos[ing] [a] trade secret to others who are under no obligation to protect the confidentiality of the information" ultimately "extinguishe[s] . . . [that] property right." *Structured Capital Sols., LLC v. Commerzbank AG*, 177 F. Supp. 3d 816, 832 (S.D.N.Y. 2016).

On this point, the Court finds *Jinno International v. Premier Fabrics, Inc.*, No. 12-CV-7820 (LGS), 2013 WL 4780049 (S.D.N.Y. May 24, 2013), particularly instructive. There, the plaintiff alleged that it protected the secrecy of the information at issue because "'Jinno and Premier's business relationship with respect to Premier's client accounts was clearly confidential in nature' and that 'Jinno agreed to maintain the confidentiality of Premier's trade secret information.'" *Id.* at \*5. The court concluded that these allegations were insufficient. As it explained, the plaintiff "does not allege how it was clear that the information was confidential, or how or when Jinno agreed to maintain confidentiality." *Id.* Plaintiff attempts to distinguish *Jinno* by arguing that he has alleged much more specific measures of protection than the "conclusory" ones in *Jinno*. Pl.'s Opp. at 11 n.4. This, however, ignores the underlying premise applicable to both actions: a request or presumption of confidentiality alone is insufficient to plausibly allege "substantial measures" taken to protect secrecy. *Geritrex Corp.*, 910 F. Supp. at 961.

While the Court recognizes that New York law does not require "absolute secrecy," it still demands "a substantial element of secrecy [to] exist." *Q-Co Indus, Inc. v. Hoffman*, 625 F. Supp. 608, 616-17 (S.D.N.Y. 1985). Merely stating that BNYM was not permitted to share the

spreadsheets because Plaintiff so requested – without having an agreement in place or including any clear indication on the spreadsheets that they were to be deemed confidential – does not satisfy this requirement of New York law. Accordingly, Plaintiff has not plausibly alleged that he possessed a trade secret in the Pauwels Model.

## 2. Misappropriation of a Trade Secret

Even if Plaintiff had plausibly alleged the possession of a trade secret in the Pauwels Model, his claim would nonetheless fail given that he has not plead that either BNYM or Deloitte "used [the Pauwels Model] in breach of an agreement, confidential relationship or duty, or as the result of discovery by improper means." *Faiveley Transp. Malmo AB*, 559 F.3d at 117. As an initial matter, Plaintiff acknowledges that he "did not have an explicit contract," such as a confidentiality or non-disclosure agreement, with Defendants. Compl. ¶ 55(c). The question, therefore, is whether Plaintiff has sufficiently plead that either Defendant breached a "confidential relationship or duty" or "discover[ed] [the Pauwels Model] by improper means." *Faiveley Transp. Malmo AB*, 559 F.3d at 117.

As to BNYM, Plaintiff alleges that BNYM breached their "relationship of trust and confidence" by sharing the spreadsheets with Deloitte. Compl. ¶ 56. He argues that this confidential relationship existed as a result of their "course of dealing," evident in part in that "BNYM respected Pauwels' decision, on multiple occasions, not to share the Pauwels Model with third parties." *Id.* Although an express contract is not necessary to establish a confidential relationship, *see* Pl.'s Opp. at 14 (citing *Heyman v. AR. Winarick, Inc.*, 325 F.2d 584, 587 (2d Cir. 1963)), Plaintiff has not plead other facts establishing the existence of a confidential relationship here. At best, Plaintiff asserts that "there was a tacit agreement between BNYM and [him] that the Pauwels Model was not to be disclosed." Pl.'s Opp. at 14. But this is conclusory

and without the "special facts" necessary to establish a confidential relationship. *Heyman*, 325 F.2d at 587.

Even more critically, Plaintiff does not address how he and BNYM had a "relationship of trust and confidence" when the complaint merely describes a traditional business arrangement between the parties. Compl. ¶ 56. By his own allegations, BNYM paid Plaintiff (substantially) for his analysis, reflected in the spreadsheets. *See id.* ¶ 21. The two, therefore, had "a conventional business relationship," which, "without more, is insufficient to create a fiduciary relationship." *Big Vision Private Ltd.*, 1 F. Supp. 3d at 273 n.57. Although a "conventional business relationship" could invoke fiduciary responsibilities, "a plaintiff must [then] show special circumstances." *Id.*; *see also Bear, Stearns Funding, Inc. v. Interface Grp.-Nev., Inc.*, 361 F. Supp. 2d 283, 305 (S.D.N.Y. 2005) ("The information that [the counterclaimant] contends constitutes trade secrets is information that Bear Stearns was expressly authorized to disclose in connection with a loan securitization . . . [thus] such information cannot possibly fit within even the broadest interpretation of New York's definition of a trade secret."). "[A] conclusory allegation that the parties developed a relationship of trust and confidence apart from their contractual relationship" – as is plead here – "is insufficient to . . . survive a motion to dismiss." *N. Shipping Funds I, LLC v. Icon Capital Corp.*, 921 F. Supp. 2d 94, 105-06 (S.D.N.Y. 2013).

As to Deloitte, Plaintiff's claim that it misappropriated the Pauwels Model is even weaker. Plaintiff does not allege that he had any direct contact with Deloitte, even admitting that he refused to participate in the March 2017 call that BNYM attempted to schedule between him and Deloitte. *See* Compl. ¶ 36. Plaintiff thus does not – and could not – allege that Deloitte breached a confidential relationship.

Instead, Plaintiff attempts to argue that Deloitte discovered the spreadsheets by improper

means.[5] *See* Pl.'s Opp. at 15-17. This requires showing that Deloitte acted in bad faith, which

typically is demonstrated by acts such as "fraudulent misrepresentations to induce disclosure,

tapping of telephone wires, eavesdropping or other espionage" – all conduct that "fall[s] below

the generally accepted standards of commercial morality and reasonable conduct." *Big Vision*

*Private Ltd.*, 1 F. Supp. at 273. But nothing in the complaint supports the notion that Deloitte

improperly discovered the spreadsheets. Rather, the complaint repeatedly states that BNYM

"shared" the spreadsheets with Deloitte. *See, e.g.*, Compl. ¶ 38. Plaintiff, therefore, appears to

acknowledge that BNYM voluntarily gave the spreadsheets to Deloitte – as part of a normal

business arrangement – and thus cannot argue that Deloitte used deception or even unreasonable

conduct to obtain them. *See Faiveley Transp. Malmo AB*, 559 F.3d at 117 ("[T]rade secret law . .

. does not offer protection against discovery by fair and honest means[.]").

Nor could Plaintiff plausibly argue that Deloitte used the spreadsheets in bad faith

because he has not even plausibly alleged that Deloitte knew or should have known that the

spreadsheets were made by him or contained his allegedly proprietary information. First,

because BNYM voluntarily gave Deloitte the spreadsheets, the fact that Plaintiff's initials were

on some of them would not reasonably indicate to Deloitte that the information was confidential.

Plaintiff, next, attempts to argue that Deloitte had notice that these were his spreadsheets because

of the March 2017 call that BNYM tried to schedule. But the complaint clearly states that

"BNYM invited" Plaintiff to join the call and says nothing about Deloitte's involvement in

planning or knowledge about the call. Compl. ¶ 36. The Court will not impute notice to Deloitte

---

[5] In his opposition to Deloitte's motion to dismiss, Plaintiff – for the first time – raises the theory that Deloitte misappropriated the Pauwels Model by committing espionage or conspiring with BNYM. *See* Pl.'s Opp. at 14, 18. The complaint, however, contains no allegations – either explicit or implicit – regarding espionage or a conspiracy. As such, the Court will not entertain either of these theories.

17

from this single allegation.

Here, *Schroeder v. Pinterest Inc.*, 17 N.Y.S. 3d 678 (1st Dep't 2015), offers useful guidance. In *Schroeder*, the plaintiff alleged that the two defendants, including Pinterest, had misappropriated its trade secret. Pinterest, however, was alleged to have received the information at issue directly from the other defendant. The court first noted that there was no agreement, confidential relationship, or "any contact whatsoever" alleged between Pinterest and the plaintiff. *Id.* at *691. Because the other defendant had "voluntarily g[iven] Pinterest the alleged trade secrets, not that Pinterest employed any improper means to acquire them," the court therefore held that there was no plausible allegation of misappropriation against Pinterest. *Id.* So too is the case here.

Accordingly, Plaintiff fails to state a plausible trade secret misappropriation claim regarding the Pauwels Model and Count One, as to both Defendants, is dismissed.

## B. LIHTC Model

Plaintiff also alleges the misappropriation of the LIHTC Model by BNYM. In a single paragraph, Plaintiff asserts that he developed the LIHTC Model, which "shows all cash inflows (principally the cash flows resulting from the LIHTC assets) and determines their distribution under a complex capital structure," for BNYM in 2009. Compl. ¶ 49. Like the Pauwels Model, he states that the LIHTC Model took significant time and expertise to develop and that he "never permitted BNYM to share his LIHTC Model with other banks or counterparties." *Id.* By contrast to the Pauwels Model, Plaintiff does not allege that BNYM improperly gave it to Deloitte, instead broadly stating that, "once BNYM had terminated their relationship with [him], BNYM seized on the opportunity to share Pauwels' proprietary LIHTC Model with his competitors." *Id.*

Given the paucity of the LIHTC Model allegations, Plaintiff has not plausibly alleged the elements of a trade secret misappropriation claim. Plaintiff, for instance, does not say what measures he took to protect the LIHTC Model's secrecy. Nor does he explain how it is that BNYM allegedly misappropriated the Model. The complaint merely states that "BNYM seized on the opportunity to share Pauwels' proprietary LIHTC Model with its competitors now[.]" *Id.* ¶ 49. Strikingly, Plaintiff does not even allege who the purported "competitors" are. *Id.* Accordingly, Plaintiff's allegations regarding the LIHTC Model are too conclusory to survive BNYM's motion to dismiss and Count Eight will also be dismissed.

## II.    Unfair Competition

Plaintiff also alleges unfair competition under New York law. He contends that he had "a property interest in the Pauwels Model" that both BNYM and Deloitte misappropriated, Compl. ¶¶ 61-66, and "a property interest in the LIHTC Model," which BNYM alone misappropriated by giving it to an unidentified third party without Plaintiff's consent, *id.* ¶¶ 110-13.

"The essence of an unfair competition claim under New York law is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship." *Telecom Int'l Am. Ltd v. AT&T Corp.*, 280 F.3d 175, 197 (2d Cir. 2001). A plaintiff must demonstrate that the property at issue was misappropriated in bad faith, thus a showing of "[m]ere negligence or recklessness" will not suffice. *Big Vision Private Ltd.*, 1 F. Supp. 3d at 275. "[W]here an unfair competition claim and a misappropriation claim arise from the same factual predicate . . . the two claims generally rise or fall together." *Faiveley Transp. USA, Inc. v. Wabtec Corp.*, 758 F. Supp. 2d 211, 221 (S.D.N.Y. 2010); *see also LinkCo, Inc. v. Fujistsu Ltd.*, 230 F. Supp. 2d 492, 501 (S.D.N.Y. 2002) ("The parties agree that if the predicate is trade secret

misappropriation, then [the plaintiff's] unfair competition claim is duplicative of its trade secret claim."). Accordingly, an unfair competition claim based on the same facts as an already-dismissed trade secret misappropriation claim will also be dismissed. *See Sci. Components Corp. v. Sirenza Microdevices, Inc.*, No. 03-CV-1851, 2006 WL 6937123, at \*20 n.21 (E.D.N.Y. July 11, 2006).

Defendants argue that the two unfair competition claims "are virtually identical" to the two alleged trade secret misappropriation claims. BNYM Mot. at 20-21. Because the trade secret misappropriation claims are "deficient," Defendants contend that the unfair competition claims are as well. *Id.* The Court agrees. The complaint grounds the misappropriation and unfair competition claims on the same allegation that BNYM took, without authorization, the Pauwels Model and the LIHTC Model and gave it to Deloitte and the unidentified third party for use that continued to serve BNYM's benefit after Plaintiff's termination. Plaintiff's opposition highlights the identical basis for these two claims, defending the unfair competition claims by stating, for example, that "BNYM misappropriated the Pauwels Model," which offered "a commercial advantage belonging exclusively to Pauwels," by sharing the spreadsheets with Deloitte. Pl.'s Opp. at 21-22.

Because the claims go hand-in-hand and the Court has already granted Defendants' motions as to the trade secret misappropriation claims, Counts Two and Nine for unfair competition claims must also be dismissed. *See Sci. Components Corp.*, 2006 WL 2524187, at \*20 ("Because the misappropriation claim fails, the unfair competition claim fails as well."); *see also LinkCo, Inc.*, 230 F. Supp. 2d at 501 ("Because I am granting judgment as a matter of law on [plaintiff's] trade secret claim, no further discussion of this predicate [unfair competition claim] is required.").

### III. Breach of Confidence

In his amended complaint, Plaintiff added a cause of action for breach of confidence under United Kingdom law. He alleges that "BNYM and Deloitte breached Pauwels' confidence by providing (and accepting) confidential information belonging to Pauwels" and that "BNYM breached Pauwels' confidence by using and providing [the LIHTC model] belonging to Pauwels to a third party." Compl. ¶¶ 69, 116. Defendants argue this claim must be dismissed because "New York law" – not United Kingdom law – "exclusively applies to Pauwels' claims." BNYM Mot. at 21.

In diversity cases such as this, federal courts apply the choice-of-law principles of the state in which they sit. *See Gilbert v. Seton Hall Univ.*, 332 F.3d 105, 109 (2d Cir. 2003). Under New York choice-of-law principles, the first inquiry is whether there is "an actual conflict" between New York law and the law of the other proposed jurisdiction. *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998). In a tort action, if there is a conflict, New York courts conduct an "interests analysis" to determine which jurisdiction has "the greatest interest in the litigation."[6] *Id.* "In deciding which state has the prevailing interest, we look only to those facts or contacts that relate to the purpose of the particular laws in conflict." *Id.* The primary considerations include: "(1) what are the significant contacts and in which jurisdiction are they located; and (2) whether the purpose of the law is to regulate conduct or allocate loss." *HSA Residential Mortg. Servs. of Tex. v. Casuccio*, 350 F. Supp. 2d 352, 362 (E.D.N.Y. 2003) (quoting *Padula v. Lilarn Props. Corp.*, 84 N.Y. 2d 519, 521 (1994)). Where the law is about regulating conduct – as is the case here – "the law of the jurisdiction where the tort occurred will generally apply." *HSA*

---

[6] The parties do not dispute that New York's choice-of-law principles and its interests analysis applies. *See* BNYM Mot. at 23; Pl.'s Opp. at 24.

*Residential Mortg. Servs.*, 350 F. Supp. 2d at 362.

As to this breach of confidence claim, there is a conflict between the law in New York and the United Kingdom. In New York, this claim requires demonstrating either "an agreement establishing such a confidential relationship" or "a duty of trust or confidentiality" that "is 'synonymous with fiduciary relationship[.]" *Stewart v. World Wrestling Fed'n Entm't, Inc.*, No. 03-CV-2468 (RLC), 2005 WL 66890, at *4 (S.D.N.Y. Jan. 11, 2005); *see also Boston Tea Co. v. Bay Valley, LLC*, No. 17-CV-4742 (ALC), 2018 WL 4211313, at *7 (S.D.N.Y. Sept. 4, 2018) ("The threshold issue is whether or not the contractual arrangement here constituted a confidential relationship."). United Kingdom law, by contrast, does not demand proof of a fiduciary relationship, but permits a confidential relationship to be established with a lesser showing. *See Napier v. Pressdram Ltd.* [2009] EWCA Civ. 443, ¶ 42 (requiring, "for a duty of confidentiality to be owed," that "information in question had to be of such a nature and obtained in such circumstances that any reasonable person in the position of the recipient ought to recognise that it should be treated as confidential") (BNYM Mot., Ex. A); *Coco v. AN Clark (Eng'rs) Ltd.* [1968] F.S.R. 415, 415 (holding that a plaintiff needs only to show that the information "was communicated in circumstances importing an obligation of confidence") (Pl.'s Opp., Ex. A). Because the United Kingdom applies a lesser standard for a breach of confidence claim, a conflict exists and the Court must engage in an interests analysis.

Here, the interests analysis does not present a close question. This litigation has, at most, a tangential tie to the United Kingdom, whereas its tie to New York is substantial. First, both Defendants have their principal place of business in New York. Second, BNYM employees with whom Plaintiff was in contact work and reside in New York. Third, and most importantly, the injuries that Plaintiff has asserted – stemming from the alleged misappropriation of the Pauwels

22

Model and the LIHTC Model – all took place in New York. For instance, it is in New York where BNYM allegedly would have shared the spreadsheets with Deloitte and where Deloitte would have used them. The gravamen of Plaintiff's allegations thus only pertain to conduct that occurred in New York.

By contrast, this action's only connection to the United Kingdom is that Plaintiff resides there.[7] *See id.* This factor, however, is less weighty than it might initially appear. Plaintiff was hired as an independent contractor with the intention that he would work remotely. BNYM did not give any thought to or gain any benefit from Plaintiff living in the United Kingdom when hiring him. As BNYM notes, it is "an irrelevant happenstance," BNYM Mot. at 22, or "fortuitous," Tr. at 17:4, that Plaintiff lived in the United Kingdom.

Therefore, in light of Defendants' substantial ties to New York, the irrelevance of Plaintiff's residence to his work for BNYM, and the general application of "the law of the jurisdiction where the tort occurred," *GlobalNet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 384 (2d Cir. 2006), New York law applies here. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157-58 (2d Cir. 2012) (explaining that the interest analysis is "intended to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation"). Counts Three and Ten, alleging breach of confidence under United Kingdom law against BNYM and Deloitte, will thus be dismissed.[8]

---

[7] Plaintiff is a citizen of Belgium, not the United Kingdom. *See* Compl. ¶ 5.

[8] Defendants also contend that the breach of confidence claim should be dismissed on due process grounds. *See* BNYM Mot. at 21-23. Because the claim fails for the reasons stated above, the Court need not address the due process argument.

## IV.    Fraud

Plaintiff also brings a fraud claim against BNYM alone.  He alleges that "Sarmasti, on behalf of BNYM . . . , told [Plaintiff] that Deloitte would not be using the Pauwels Model to monitor BNYM's energy sector investments," even though Sarmasti "knew that, contrary to his representation, BNYM had provided (or shortly intended to provide) Deloitte with the Pauwels Model spreadsheets." Compl. ¶¶ 79, 81.

To successfully plead a claim for fraud under New York law, a plaintiff must allege "(1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 402 (2d Cir. 2015).  A fraud claim is also subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which "requires that the plaintiff (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Id.* at 403.

As an initial matter, contrary to BNYM's urging, Sarmasti's words were not merely a promissory statement regarding "what will be done in the future." *EQT Infrastructure Ltd. v. Smith*, 861 F. Supp. 2d 220, 233 (S.D.N.Y. 2012).  "It is a general rule that a claim of intentional misrepresentation 'cannot be predicated upon statements which are promissory in nature at the time they are made and which relate to future actions or conduct.'" *Phillips Credit Corp. v. Regent Health Grp., Inc.*, 953 F. Supp. 482, 520 (S.D.N.Y. 1997) (citation omitted); *see also Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007) ("New York distinguishes between a promissory statement of what will be done in the future that gives rise

only to a breach of contract cause of action and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement.").

Plaintiff alleges that, on March 10, 2017, he told Sarmasti that he "hope[d] [Deloitte] [is] not using my spreadsheets," to which "Sarmasti falsely assured Pauwels that Deloitte had its own software and would not be using the Pauwels Model." Compl. ¶ 37. BNYM contends that the phrase "would not be using" has only future implications, rendering it a promissory statement. *See* BNYM Mot. at 16-17. The Court disagrees. First, the phrase "would not be using" is ambiguous and can be read to have a present and/or future meaning. Second, the surrounding allegations in the complaint support reading the statement to have present implications. The next paragraph asserts that when Sarmasti made that statement, he "knew that what he had told Pauwels was false. Specifically, Sarmasti knew that, unbeknownst to Pauwels, BNYM deliberately shared more than a hundred Pauwels Model spreadsheets with Deloitte." Compl. ¶ 38. This fairly permits – at least at the motion to dismiss stage – interpreting Sarmasti's statement to suggest that Deloitte was not presently using the spreadsheets.

Plaintiff nevertheless fails to state a plausible claim for relief because he has not adequately plead scienter, as required under Rule 9(b). A successfully plead fraud claim requires "a particularized factual assertion which supports the inference of scienter." *Ford v. Sivilli*, 770 N.Y.S. 2d 414, 416 (2d Dep't 2003). Although "[m]alice, intent, knowledge, or other condition of mind" may be "averred generally," an inference of scienter must be based on "a factual foundation for otherwise conclusory allegations of scienter." *Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1004 (2d Cir. 1988); *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (stating that scienter cannot be "base[d] . . . on speculation and conclusory allegations").

25

Although a close question, the Court nonetheless concludes that there is an insufficient factual basis to infer scienter. Here, the complaint contains only general inferences about Sarmasti's intent. Plaintiff, for example, conclusorily asserts that "Sarmasti . . . knew that what he had told [Plaintiff] was false." Compl. ¶ 38. Although he also states that Sarmsati knew that BNYM had already shared the spreadsheets with Deloitte, he does not offer any particular facts as to how Sarmasti would have known this or whether Sarmasti himself had shared the spreadsheets. Moreover, the complaint alleges that Sarmasti knew the spreadsheets were "shared" with Deloitte, not that he knew that Deloitte was *using* the spreadsheets at the time. *Id.* These allegations, therefore, do not offer sufficient facts to infer anything about Sarmasti's motive or intent in telling Plaintiff that Deloitte would not use the spreadsheets. *See SKR Res., Inc. v. Players Sports, Inc.*, 938 F. Supp. 235, 239 (S.D.N.Y. 1996) (requiring a plaintiff to "plead circumstances which 'give rise to a strong inference' that the defendant had knowledge of the fraudulent acts"); *Brown v. Lockwood*, 431 N.Y.S. 2d 186, 195 (3d Dep't 1980) ("Fraudulent intent not to perform a promise cannot be inferred merely from the fact of nonperformance, and additional proof is required." (internal citation omitted)).

The Court further notes that other allegations seem to contradict Plaintiff's assertion that Sarmasti had the requisite scienter. Plaintiff, for instance, alleges that, around the time of Sarmasti's statement to him, Sarmasti also helped schedule a call between Plaintiff and Deloitte to discuss Deloitte's monitoring work. *See* Compl. ¶ 36. Accepting this allegation as true, this does not reflect any intent by Sarmasti to hide Deloitte's work or to deceive Plaintiff about the spreadsheets.[9] Plaintiff's claim for fraud is thus dismissed.

---

[9] The Court is also skeptical as to whether Plaintiff has plausibly alleged that he "reasonably relied" on Sarmasti's statement. *Fin. Guar. Ins. Co.*, 783 F.3d at 402. Plaintiff asserts that, if he had known Deloitte was using the spreadsheets, he would have taken steps to remedy this by, *"e.g.*, demanding the return of all the

## V.    Negligent Misrepresentation

Plaintiff also brings a negligent misrepresentation claim against BNYM. This claim is predicated on the factual assertion that Plaintiff gave "repeated, express instructions to BNYM to keep the Pauwels Model confidential" and that Sarmasti made "an incorrect, false, and misleading representation" that Deloitte was not using the Pauwels Model. Compl. ¶¶ 88, 90.

"To state a claim for negligent misrepresentation under New York law, the plaintiff must allege that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 114 (2d Cir. 2012). As to the first element regarding duty, "New York strictly limits negligent misrepresentation claims to situations involving 'actual privity of control between the parties or a relationship so close as to approach that of privity.'" *Id.* (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 271 (2d Cir. 1993)); *see also Tyman v. Pfizer, Inc.*, No. 16-CV-6941 (LTS), 2017 WL 6988936, at *14 (S.D.N.Y. Dec. 27, 2017) ("The New York Court of Appeals has 'reiterated time and again' that, to satisfy the first element, 'there must be a showing that there was either actual privity of control between the parties or a relationship so close as to approach that of privity." (citation omitted)).

Plaintiff does not allege that actual privity existed between him and BNYM. *See* Compl.

---

spreadsheets he generated and terminating his relationship with BNYM[.]" Compl. ¶ 39. However, by the time Sarmasti allegedly made this statement, Plaintiff's relationship with BNYM was essentially over. Plaintiff, moreover, has not even alleged that he demanded the return of the spreadsheets upon finding out in April 2018 that Deloitte was purportedly using them.

¶ 16 ("Pauwels was not provided with a contract by BNYM, nor did he request one."). Thus, the only inquiry before the Court is whether Plaintiff and BNYM had "a relationship so close as to approach that of privity." *Anschutz Corp.*, 690 F.3d at 114. Such a relationship is established "only if the defendant owes the plaintiff a fiduciary duty." *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 327 (S.D.N.Y. 2012); *see also Stewart v. Jackson & Nash*, 976 F.2d 86, 90 (2d Cir. 1992) ("[U]nder New York law, a plaintiff may recover for negligent misrepresentation only where the defendant owes her a fiduciary duty.").

Plaintiff does not plausibly allege that BNYM owed him a fiduciary duty. Rather, Plaintiff alleges that, as result of "[t]he course of dealing between [him] and BNYM," "they were in a relationship imposing a duty on BNYM . . . to impart correct information to [him]." Compl. ¶ 87. But this is a conclusory statement, which does not explain the circumstances from which BNYM's duty would have arisen. Instead, what Plaintiff pleads is an employer-employee relationship – possibly better described as a consultancy – that is not typically "fiduciary in nature and thus does not constitute a 'special relationship' for purposes of a negligent misrepresentation claim." *Cohen*, 874 F. Supp. 2d at 327. BNYM, for instance, paid Plaintiff more than $500,000 per year for the very analysis and work product that is now at issue in this action. Thus, without any more specific facts asserted to take their relationship beyond a traditional business arrangement, Plaintiff's negligent misrepresentation claim must fail because he does not reasonably assert that BNYM had fiduciary responsibilities. *See Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 758, 779 (S.D.N.Y. 2011) ("The transaction between the defendants and Amusement is alleged to have been nothing more than an arm's length business arrangement between sophisticated and experienced parties, a circumstance insufficient to create a 'special relationship.'").

28

## VI.    Unjust Enrichment

Finally, Plaintiff alleges two claims of unjust enrichment against BNYM. The first is for purportedly concealing from Plaintiff that BNYM had shared the Pauwels Model with Deloitte and then benefitted from allowing Deloitte to use it. *See* Compl. ¶¶ 94-97. The second claim is for "failing to pay [Plaintiff] in full for the work that he performed for BNYM in the final months of their relationship with him," thus allowing "BNYM . . . to enrich [itself] at [Plaintiff's] expense." *Id.* ¶¶ 98-101.

An unjust enrichment claim requires plausible allegations that "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd. v. Phx. Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004). Generally, an unjust enrichment claim is "plead[] in the alternative to other claims" and "is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Elsevier Inc.*, 2018 WL 557906, at *2. It "is not," therefore, "a catchall cause of action to be used when others fail[] . . . [and] is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *PHL Variable Ins. v. Town of Oyster Bay*, No. 16-CV-4013, 2017 WL 2371188, at *14 (E.D.N.Y. May 30, 2017) (quoting *Corsello v. Verizon N.Y., Inc.*, 18 N.Y. 3d 777, 700 (2012)).

As to Plaintiff's first unjust enrichment claim, this must be dismissed because it is duplicative of – at a minimum – his trade secret misappropriation claim. Plaintiff alleges that "BNYM enriched themselves by continuing to benefit from the Pauwels Model after" terminating Plaintiff. Compl. ¶ 95. This claim thus hinges on the same facts that provide the

basis for the misappropriation claims.[10]

As to Plaintiff's unjust enrichment claim regarding the invoices, this too must be dismissed. Plaintiff fails to plausibly allege how BNYM was enriched at his expense. Addressing this claim in a single paragraph, he only states that "BNYM has seen fit to avoid paying [Plaintiff's] invoices in full." Compl. ¶ 50. Yet, he then asserts that "BNYM did begin paying" the invoices, although at "discounted rates." *Id.* This does not clearly allege (1) the basis for the alleged missing payments, (2) how much money Plaintiff was not paid, or (3) what the difference between the full and discounted rates are. This is particularly deficient in light of guidance from courts in this district that an unjust enrichment claim requires a showing of a "specific" or "direct" benefit that the defendant "actually received." *Regnante v. Sec. & Exch. Officials*, 134 F. Supp. 3d 749, 772 (S.D.N.Y. 2015). Thus, to simply state, as Plaintiff does, that he "deserves to be paid for the full value of his work" is woefully inadequate. Compl. ¶ 101.

Accordingly, the Court dismisses Plaintiff's unjust enrichment claims in Counts Six and Seven.

---

[10] Even if the unjust enrichment claim was not duplicative, Plaintiff also fails to plausibly allege that BNYM improperly obtained a benefit at his expense. BNYM paid Plaintiff for the very spreadsheets that he alleges were improperly kept and used after his termination. Accordingly, BNYM likely retained the right to use these spreadsheets even after Plaintiff's termination and thus this is not an instance where "equity and good conscience militate against permitting [BNYM] to retain" the spreadsheets. *Briarpatch Ltd.*, 373 F.3d at 306; *see also Mina Inv. Holdings Ltd. v. Lefkowitz*, 51 F. Supp. 2d 486, 490 (S.D.N.Y. 1999) (dismissing an unjust enrichment claim because the complaint "fails to provide any explanation of the nature of [the defendant's] enrichment, how the enrichment was or is at the real expense of Plaintiffs, and why good conscience requires that [the defendant] make restitution in this case").

## CONCLUSION

Both BNYM's and Deloitte's motions to dismiss are granted in their entirety. Plaintiff will be granted leave to amend. Should he choose to do so, he must file the amended complaint no later than March 19, 2020. The Clerk of Court is respectfully directed to terminate the motions pending at docket entries 41 and 43.

SO ORDERED.

Dated:    February 19, 2020
           New York, New York

_____

Ronnie Abrams
United States District Judge