UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **ANDRÉ PAUWELS** | Case No. 1:19-CV-02313-RA |
| *Plaintiff*, | |
| v. | **SECOND AMENDED COMPLAINT** |
| **THE BANK OF NEW YORK MELLON CORPORATION**, **THE BANK OF NEW YORK MELLON**, **DELOITTE LLP**, **DELOITTE USA LLP**, and **DELOITTE TAX LLP** | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

Plaintiff André Pauwels ("Pauwels"), through his undersigned attorneys, brings this action on his own behalf against The Bank of New York Mellon Corporation ("BNY Mellon"), The Bank of New York Mellon (together with BNY Mellon, "BNYM"), Deloitte LLP, Deloitte USA LLP, and Deloitte Tax LLP (collectively, "Deloitte," and together with BNYM, "Defendants") and states the following based upon his personal knowledge with respect to his own acts or acts taking place in his presence, and upon information or belief as to all other matters:

## NATURE OF THE ACTION

1.     This is an action by Plaintiff for the theft of his trade secrets by the Defendants. Most notably, without Pauwels' express permission (and, indeed, contrary to his explicit instructions), BNYM and Deloitte took for their own a proprietary computational model that Pauwels developed to analyze, assess, and monitor a complex form of investment in the energy sector ("Pauwels Model").  Worse, BNYM shared the Pauwels Model with Deloitte—a direct competitor to Pauwels for BNYM's business—despite representing to Pauwels that they had done no such thing.

1

2.     Together, BNYM and Deloitte used the Pauwels Model to replace Pauwels in his role as an independent BNYM contractor.  BNYM and Deloitte stole the Pauwels Model to avoid the time and expense it would take to develop a new model so that Deloitte could provide the services that Pauwels was already providing.

3.     After Pauwels discovered that BNYM and Deloitte had stolen the Pauwels Model for their own use, he confronted BNYM.

4.     BNYM promptly terminated their relationship with Pauwels, telling him that BNYM would not "take this shit" from a "small advisor" like Pauwels, thereby pushing Pauwels to file this suit.  Defendants' actions have resulted in Pauwels suffering loss of business, economic damages, and the dissemination of his proprietary, trade secrets—specifically, the Pauwels Model.

**PARTIES**

5.     Pauwels is a natural person and citizen of Belgium, residing in London, United Kingdom.

6.     BNY Mellon is a corporation registered according to laws of Delaware, and having its principal place of business in New York State at 240 Greenwich Street, New York, New York 10286.

7.     The Bank of New York Mellon ("Bank") is a subsidiary of BNY Mellon and one of its banks.  Chartered by New York, the Bank houses BNY Mellon's institutional businesses, including Asset Servicing, Issuer Services, including Broker-Dealer and Advisor Services.  The Bank has its principal place of business in New York State at 240 Greenwich Street, New York, New York 10286.

8.      Deloitte LLP is a limited liability partnership registered according to the laws of Delaware, and having its principal place of business in New York State at 30 Rockefeller Plaza, New York, New York 10112.

9.      Deloitte USA LLP is a limited liability partnership registered according to the laws of Delaware, and having its principal place of business in New York State at 30 Rockefeller Plaza, New York, New York 10112.

10.      Deloitte Tax LLP is a limited liability partnership registered according to the laws of Delaware, and having its principal place of business in New York State at 30 Rockefeller Plaza, New York, New York 10112.

## JURISDICTION AND VENUE

11.      This Court has subject matter jurisdiction over this matter pursuant to 28 USC § 1332 given the complete diversity of parties and the amount in controversy.

12.      This Court has personal jurisdiction over the Defendants given that they are headquartered in New York City, New York and conduct substantial business in this State.

13.      Venue is proper in this Court under 28 USC § 1391 as the Defendants have their principal places of business in New York City, New York.

## BACKGROUND

### *Pauwels' Relationship with BNYM*

14.      In early 2009, Pauwels was approached by Kevin Peterson of BNYM with an offer to work for BNYM as an independent advisor.  Peterson proposed that Pauwels analyze BNYM's potential investments and provide his assessment of the strength and desirability of the proposed deal.  Pauwels would work to analyze several different kinds of investments, including, among others, alternative energy transactions.

15.     Pauwels and Peterson had worked together multiple times and on multiple transactions starting in 1995, and Pauwels considered Peterson a close friend and trusted colleague. Peterson, in turn, knew that he could rely on Pauwels' knowledge and expertise regarding complex investments in light of Pauwels' ability to effectively model potential transactions.

16.     Beginning in April 2009, Pauwels began providing his analytical services to BNYM on a deal-by-deal basis—both to BNY Mellon and the Bank.  That is, Pauwels would analyze and consider a proposed BNYM investment and provide guidance and advice to the bank on the deal terms and valuation.  To help facilitate his work on certain kinds of investments, Pauwels would create complex financial models that he then used to help analyze proposed projects.  And while at times, to better explain his advice and opinions, Pauwels would attach copies of spreadsheets generated for a particular BNYM investment, he did so only when it was necessary to better illustrate the point for the bank—BNYM paid for Pauwels' advice and expertise, not for his models.

17.     Pauwels was not provided with a contract by BNYM, nor did he request one. Instead, he worked as an independent advisor, providing BNYM with outside expertise and analysis; he was compensated for his services based on invoices that he would submit periodically to BNYM for processing.  In 2013, Pauwels was given a BNYM email address to facilitate his work.

18.     In March 2014, several years into Pauwels' relationship with BNYM, Peterson approached Pauwels about working to value a potential investment in the alternative energy sector: a wind farm.

19.     By this time, Pauwels performed his work for BNYM through Andre Pauwels Advisory Ltd., a company he founded specifically for his BNYM work.  Pauwels was the founder, CEO, and sole employee of this company.

20.     To properly advise BNYM on the contemplated wind farm transaction, Pauwels worked on a method for valuing and analyzing the proposed energy investment and, later that year, flew to New York to participate in meetings with project sponsors, other prospective investors, and relevant members of the legal team regarding the proposed investment.

21.     Relying on his years of experience and expertise in evaluating complex financial transactions, Pauwels developed the Pauwels Model—his own, proprietary model to value BNYM's proposed energy sector investments.  The Pauwels Model served as both a direct valuation tool for Pauwels and as a means to check spreadsheets and proposals sent to BNYM by investment sponsors and arrangers.  BNYM, recognizing that the Pauwels Model offered unique advantages to other available tools for evaluating energy sector investments, accepted and approved the use of the Pauwels Model to evaluate BNYM's proposed deals.

22.     From 2014 onward, the scope of Pauwels' work for BNYM expanded to include more than twenty energy investments, and for several years BNYM and Pauwels worked together to their mutual success.  Initially, Pauwels would analyze potential investment projects for BNYM using the Pauwels Model and then advise BNYM of his conclusions.  Later, he also began using the Pauwels Model to monitor BNYM's existing investments (many of which he had initially evaluated) by maintaining and updating every month the spreadsheets generated with the Pauwels Model for each investment.

23.     Based in no small part on Pauwels' work (and, by extension, the Pauwels Model), BNYM made hundreds of millions of dollars in profit through their lending and investment activity.

*The Pauwels Model*

24.     Because energy-sector investments (particularly those based around renewable or alternative energy) implicate a host of potential revenue/support streams, including government subsidies, tax breaks, and other non-customer sources, valuing such an investment requires lengthy negotiation between the venture's sponsor and the investing bank.  All parties involved typically employ sophisticated financial models to determine an agreed-upon value for the investment.

25.     Rather than use an off-the-shelf solution, BNYM began relying on Pauwels to model, analyze, and value their energy-sector investments using the Pauwels Model.  This offered BNYM a bespoke solution that was difficult to replicate without access to the spreadsheets themselves and where the creator (Pauwels) could—and did—tailor the analysis to BNYM's proposed investments.

26.     Pauwels used his Pauwels Model to analyze BNYM's proposed investment and then provide guidance and analysis to the bank on various aspects of the proposed transaction, such as how the bank should optimally invest in an alternative energy project, whether counterparties or co-investors were being too aggressive in their own valuations, etc.

27.     The Pauwels Model was particularly useful in analyzing "tax equity investments"—that is, investments in alternative energy projects for which the primary return on the investment is expected to come in the form of tax benefits (*e.g.*, tax credits).  For example, if BNYM made a tax equity investment, they could expect to receive substantially all of the venture's tax credits for a number of years (typically for a decade) along with a portion of the revenue

generated by the venture.  Pauwels designed and built his Pauwels Model to evaluate and monitor this exact type of investment.  By looking to data—typically sourced from third parties, including the deal's sponsor—on aspects of a venture such as the projected energy production, asset depreciation, and operating expenses, the Pauwels Model would calculate how much BNYM could invest in light of the proposed project's value such that BNYM's initial investment could be repaid and achieve the desired return.

28.     This calculation is extremely complicated, as is the Pauwels Model.  Estimating the optimal investment size and a variety of other parameters for a project requires several layers of analysis.  For example, the Pauwels Model calculates the proposed project's tax credits, taxable income, and cash flow under various wind scenarios, combining the different results into a simple rate of return or, alternatively, outputs the expected date on which BNYM would achieve their target return on the investment.  Additionally, the Pauwels Model accounts for US tax benefits, which requires the calculation and evaluation of all income, expenses, depreciation, distributions, and excess distributions for a given project.

29.     The Pauwels Model also looks to and calculates a potential investment's Hypothetical Liquidation at Book Value (HLBV), which looks at how much BNYM could receive if the proposed venture (including all its equipment, *etc.*) was liquidated at book value, and which helped establish the accounting impact of the investment.  The HLBV *must* be modeled since it is not typically provided by a venture's sponsor and is calculated based on a multitude of different financial inputs.

30.     Implementing and using the Pauwels Model was a major undertaking that required a significant expenditure of Pauwels' labor and skill, including to ensure that the generated spreadsheets were tailored to BNYM's specific investments with all the relevant deal terms and

particularities.  Indeed, obtaining the necessary data and ensuring that it was loaded correctly into the Pauwels Model could take several months, with each BNYM investment requiring its own implementation of the Pauwels Model.  The data itself would come from third parties—*e.g.*, the sponsor, wind engineers, transmission specialists, market forecasts, etc.—and either would be provided directly to Pauwels or placed in a data room for Pauwels to access.

31.     After loading his model with data, Pauwels would generate an analysis of the proposed transaction.  He would provide BNYM with his analysis of the investment, which was sometimes accompanied by the resulting Pauwels Model spreadsheet, though most of the time Pauwels would provide BNYM only the with top-line results of his calculations, and not the entire system of formulas and computations from the Pauwels Model.

32.     Additionally, once a final version of the Pauwels Model was created for a particular transaction, Pauwels could then later update the Pauwels Model with new data to monitor and track the investment's performance.  By loading updated data from the investment's actual production, income, expenses, and cash distributions, Pauwels could provide monthly updates to BNYM's personnel.  Such performance tracking was useful for providing updates to the "flip date" of an investment (*i.e.*, the projected date on which BNYM achieved their investment return goal) and on periodic accounting impacts of the investment.

33.     In short, the Pauwels Model is an interconnected system of formulas and equations that Pauwels developed as a tool to help him analyze BNYM's alternative energy investments. The Pauwels Model was integrated into and implemented in Excel spreadsheets ("Pauwels Model Spreadsheets") that Pauwels—not BNYM—used to evaluate and value BNYM's various investments.  If BNYM elected to fund the investment, Pauwels—not BNYM—used the Pauwels Model Spreadsheet for that investment to monitor its progress and advise the bank accordingly.

*Keeping the Pauwels Model Confidential*

34.     During the term of his relationship with BNYM, Pauwels modeled more than twenty energy-sector projects (*i.e.*, windfarms): five in 2014, four in 2015, nine in 2016, and four in 2017.  Pauwels generated and used Pauwels Model Spreadsheets to analyze the proposed investments in these projects.  Because analysis of several windfarms was sometimes consolidated into a single Pauwels Model Spreadsheet, Pauwels' work from 2014–2017 resulted in twelve Pauwels Model Spreadsheets, half of which Pauwels later revised on a monthly basis to facilitate his monitoring work for BNYM.

35.     In the course of providing his analysis and guidance to BNYM, Pauwels would sometimes share the relevant Pauwels Model Spreadsheet with select individuals at BNYM when it was necessary to illustrate the basis for his expert advice and its implications.  More specifically, even though dozens of people (sometimes as many as a hundred) could work on any one wind-energy transaction (including employees for co-sponsors, arrangers, etc.), Pauwels sent his Pauwels Model Spreadsheets to three people in BNYM's tax accounting department: Martin Ruckel (a manager in the tax accounting department), Reza Sarmasti (a Managing Director in charge of the tax accounting department), and Laura Hegedus (a Managing Director in charge of wind investments).  Ruckel and Hegedus both reported to Sarmasti, who in turn reported to Kevin Peterson.  On rare occasions, Pauwels would also copy Peterson on his emails to Ruckel, Sarmasti, and Hegedus—but this was only to keep Peterson informed of what Sarmasti's team was doing.  The core group of BNYM recipients, however, was limited to Ruckel (and, in December 2017, Ruckel's replacement), Hegedus, and Sarmasti.

36.     Pauwels did not send the Pauwels Model Spreadsheets to anyone else in BNYM, and made sure that each of the recipients—particularly Sarmasti and Hegedus—understood that

the Pauwels Model Spreadsheets were confidential, should not be shared broadly within BNYM, and certainly should not be shared with third parties.

37.     Pauwels' made his position on the confidentiality of the Pauwels Model clear before BNYM made its first wind energy investment, establishing firm limits on who inside and outside of BNYM could receive (or even see) the Pauwels Model Spreadsheets.  In November 2014, while working to evaluate his first major energy-sector investment for BNYM, Pauwels found that the arranger's model for the investment was too optimistic in one scenario.  When BNYM notified the arranger of this issue, the arranger asked to see BNYM's analysis to compare. BNYM, in turn, asked whether Pauwels would share the relevant Pauwels Model Spreadsheet with the arranger.  Pauwels refused to share the Pauwels Model Spreadsheet or to allow BNYM to do so.  BNYM agreed and did not share the Pauwels Model with the arranger.  Instead, Pauwels created and permitted BNYM to send a separate spreadsheet that contained only the results of the relevant section of the Pauwels Model Spreadsheet (representing no more than 5% of the Pauwels Model Spreadsheet)—with no formulas, calculations, or other aspects of the Pauwels Model included.

38.     Specifically, in November 2014, Pauwels spoke with Reza Sarmasti and Laura Hegedus about BNYM's request for Pauwels to share the Pauwels Model Spreadsheet with the arranger.  Pauwels explained that the Pauwels Model (and resulting Pauwels Model Spreadsheets) were his proprietary work and property, that he would not share them with the arranger (or anyone outside BNYM at all), and that he considered them to be and that they were confidential.  Sarmasti and Hegedus agreed and confirmed, on behalf of BNYM, that the Pauwels Model and Pauwels Model Spreadsheets were confidential and proprietary and that they would not be shared outside of BNYM.  Indeed, Sarmasti was well aware of Pauwels' position against sharing his models

broadly (both within BNYM and with third parties) because Pauwels had similarly refused to share broadly models that he had developed for other BNYM investments prior to March 2014.  Both Reza Sarmasti and Kevin Peterson had agreed to keep those models private, too.

39.     There was therefore never a question of who owned the Pauwels Model or its confidentiality.  In correspondence sent by BNYM to Pauwels, it was referred to as "your model" (and conversely "my model" in correspondence from Pauwels to BNYM).  Pauwels also included his initials—"AP"—in most of the spreadsheets that he shared with BNYM.  All the BNYM recipients (*i.e.*, Sarmasti, Hegedus, and Ruckel) all knew and understood through repeated conversations and correspondence with Pauwels that the Pauwels Model belonged to him; Peterson also understood this.

40.     Moreover, because over the better part of a decade BNYM had always respected the proprietary nature of his models and spreadsheets (including the Pauwels Model and Pauwels Model Spreadsheets) and had always complied with his direction to keep them confidential, Pauwels did not encrypt or password-protect the Pauwels Model Spreadsheets.  Instead, Pauwels relied on the agreement and understanding with BNYM over the Pauwels Model Spreadsheets' confidentiality and trusted that BNYM—including his friend Kevin Peterson—would not betray his trust and would keep the Pauwels Model and Pauwels Model Spreadsheets confidential (both internally at BNYM and with third parties).

41.     Throughout the term of his relationship with BNYM, Pauwels continued to insist that BNYM never share or otherwise disseminate the Pauwels Model or Pauwels Model Spreadsheets to third parties, including to rival banks or accounting companies.  Thus, in addition to November 2014, BNYM only asked Pauwels to share the Pauwels Model Spreadsheets one other time: in December 2016, when BNYM wanted to share additional analysis with a

counterparty in an intended investment and with the arranger of the deal.  The counterparty and arranger were intransigent and BNYM was pushing for a deal modification that the official model being used for the investment could not properly analyze—but the Pauwels Model could.  During separate one-on-one calls, both Hegedus and Sarmasti pushed Pauwels for permission to share the Pauwels Model Spreadsheet.  Despite the pressure, Pauwels refused and reiterated that no one at BNYM could share either the Pauwels Model itself or the Pauwels Model Spreadsheets.  BNYM complied with Pauwels' directions.  Thus, while BNYM did ask on two occasions if they could share the Pauwels Model Spreadsheets more widely, Pauwels refused and did not allow the Pauwels Model to be shared.  BNYM complied with this refusal each time.

42.    On two other occasions—in 2015 and 2016—when BNYM was bidding on potential wind-energy investments involving the same sponsor, bidders were required to attach analytical spreadsheets to their bids.  Pauwels worked to ensure the continued confidentiality of the Pauwels Model (and prevent its dissemination to third parties) by providing BNYM with highly simplified Excel spreadsheets that included just a small section of the calculations that did not provide insight into the inner workings of the Pauwels Model.  These abbreviated spreadsheets, only shared with the same investment sponsor for both bids, contained solely the information helpful to BNYM's negotiations and could not be used to duplicate or otherwise reverse engineer the Pauwels Model.

*BNYM Brings in Deloitte*

43.    In the Spring of 2016, BNYM informed Pauwels that they had retained Deloitte to conduct a review and audit of the bank's procedures for analyzing wind-energy investments. Pauwels was asked to participate in a series of conference calls to discuss the investment evaluation process at a high level.  Because Pauwels believed that Deloitte was simply coming in to review

the overall process, he agreed to join four calls—one in March, one in April, and two in May.  On the calls, Pauwels was introduced as an independent consultant responsible for reviewing the "base case model" who had his own model for analyzing the BNYM investments.  At no time during these calls or as part Deloitte's alleged review did Pauwels share or authorize the sharing of the Pauwels Model or Pauwels Model Spreadsheets with Deloitte.  Deloitte was therefore aware and understood that the Pauwels Model (and the Spreadsheets) were confidential and could not be shared with Deloitte.

44.     Sarmasti, who ran the tax accounting department and with whom Pauwels often worked in evaluating BNYM's wind investments, knew about and participated in Deloitte's calls and knew that Deloitte was aware of the Pauwels Model (and its proprietary nature).

45.     On May 9, 2016, prior to the second conference call that month, Deloitte produced a document that it sent to Sarmasti, Hegedus, Ruckel, and Pauwels outlining BNYM's process for evaluating wind investments.  This document explicitly identified Pauwels by name (along with his model) as part of both the evaluation and monitoring process, including as part of "model review" during the due diligence work on a proposed investment.  After receiving comments from both Sarmasti and Hegedus, Deloitte revised the document and circulated an updated version on May 13, 2016 that no longer identified Pauwels by name but instead referred to him and his tasks as the work of an *external* financial modeling consultant.  Deloitte therefore knew, by mid-May 2016, about Pauwels' involvement with BNYM's wind-energy investments, about his use of the proprietary Pauwels Model (without, of course, knowing what the model itself was), and that his work was integral to BNYM's investment and monitoring process for wind energy projects.

46.     Despite what BNYM told Pauwels, Deloitte was not simply evaluating BNYM's investment process.  Rather, they were preparing to take over the modeling and monitoring work

for BNYM's wind investments—that is, to replace Pauwels.  To further facilitate this replacement, Deloitte seconded Amit Agarwal, a tax analyst and member of Deloitte Tax LLP's Partnership Solutions Group, to BNYM's tax department (*i.e.*, Sarmasti's department).  Agarwal's task was to learn how Pauwels modeled and monitored BNYM's wind-energy investments.

47.     Deloitte and BNYM knew that to fully replace Pauwels, Deloitte would need to have a model for BNYM's wind-energy investments.  To avoid the time and expense of developing a new model, BNYM provided the Pauwels Model and Pauwels Model Spreadsheets to Deloitte in direct contravention of the understanding between BNYM and Pauwels.  Agarwal, already seconded to BNYM, was tasked with duplicating and understanding the Pauwels Model.

48.     While the aforementioned scheme continued out of his view, BNYM informed Pauwels in late 2016 that he should stop tracking and monitoring BNYM's existing energy sector investments.  BNYM further informed Pauwels that they were in the process of engaging an outside consulting firm to take over such monitoring responsibilities.  In reality, BNYM had already engaged Deloitte, a fact BNYM confirmed several months later (in February 2017), when they notified Pauwels that Deloitte would be taking over the monitoring work.

49.     Indeed, after BNYM asked Pauwels to stop monitor their investments, the task transferred to Amit Agarwal, who was still seconded to BNYM.  Agarwal monitored BNYM's energy sector investments; though Pauwels was not aware of who took over the monitoring work. Notably, Agarwal boasts in his LinkedIn profile about "[c]reating excel based model for Wind Credit, which include financial analysis of the client wind portfolio, PTC and HLBV (Hypothetical Liquidation at Book Value) calculation [sic]."

50.     However, the model Agarwal refers to—and the model that Deloitte used in its monitoring work for BNYM—is, in sum and substance, the Pauwels Model.  This is no

coincidence.  Monitoring the investments was a simpler task as compared to modeling a new investment from scratch.  Deloitte did not need to know how to create new versions of the Pauwels Model for monitoring work—they could simply modify the existing versions that BNYM provided to them.  Thus, to monitor BNYM's energy sector investments, Deloitte (through Agarwal, among others) studied and copied the Pauwels Model Spreadsheets that BNYM provided.  All this, while BNYM adamantly assured Pauwels that they would do no such thing.

*BNYM Lies to Pauwels About Deloitte*

51.     In early 2017, Pauwels was continuing to model new wind-energy investments for BNYM and the bank was beginning work on the largest wind-energy investment that it had ever contemplated (a transaction that Pauwels would need to model once the process proceeded further along).

52.     Then, in March 2017, as Pauwels was working on his analysis, he received an invitation to participate in a conference call with Deloitte to provide his input on the projects that BNYM had invested in during 2016.  The invitation came from Mark Covey, who often worked with BNYM to provide business and legal guidance on potential investments.  Reza Sarmasti was also invited to the call.

53.     Pauwels refused to participate, and sent an email to Reza Sarmasti explaining that he considered Deloitte to be competition (in no small part because they had just taken over his work to monitor BNYM's investments), adding that he had developed the Pauwels Model himself and expected Deloitte to do the same.

54.     Unknown to Pauwels, of course, was the fact that Deloitte already had copies of the Pauwels Model Spreadsheets for BNYM's investments from 2014, 2015, and 2016.  The purpose of the call—the reason for asking Pauwels to share his input on BNYM's 2016 investments—was

so that Deloitte could better understand the transactions themselves by hearing about them from Pauwels, who had conducted the analysis on those investments.  Deloitte needed this information so that they could better use and understand the existing proprietary Pauwels Model Spreadsheets to monitor BNYM's 2016 investments.

55.     On March 10, 2017, Pauwels spoke with Sarmasti by phone.  During the call, Pauwels explicitly told Sarmasti:  "I hope they [Deloitte] are not using my spreadsheets."  Sarmasti falsely assured Pauwels that Deloitte had its own software and was not using the Pauwels Model or Pauwels Model Spreadsheets.

56.     As head of the tax accounting department who managed the relationship with Deloitte and other accounting firms, Sarmasti knew that he was lying to Pauwels.  Sarmasti knew that BNYM's tax accounting department deliberately gave the Pauwels Model Spreadsheets for the 2014, 2015 and 2016 investments to Deloitte (11 spreadsheets, covering 18 windfarm investments), betraying Pauwels' confidences and going against not only his repeated instructions to never share the Pauwels Model with third parties, but also the agreement and understanding that Pauwels had with BNYM through Sarmasti, Hegedus, and Peterson.  Sarmasti knew that Deloitte were well aware of the confidential and proprietary nature of the Pauwels Model and, despite this, had worked and continued to work on duplicating the Pauwels Model so that they could not only monitor BNYM's existing investments, but also model new investments.  Sarmasti also knew that Pauwels *did not know and did not suspect* that BNYM and Deloitte were doing any of this.

57.     Still, Sarmasti needed to keep Pauwels in the dark about the work that BNYM and Deloitte were doing to copy and exploit his proprietary Pauwels Model.  Pauwels was still working to analyze and model BNYM's new wind-energy investments and Sarmasti knew that he would soon need Pauwels to analyze and model the largest wind-energy investment that BNYM had

contemplated (in which, it should be noted, BNYM was to be the sole investor).  Sarmasti knew that if he told Pauwels the truth, Pauwels would likely terminate his relationship with BNYM, refuse to do any further work for the bank, and/or potentially commence legal proceedings. Sarmasti, on behalf of BNYM, wanted to avoid all those consequences—and particularly wanted Pauwels to finish his modeling work so that BNYM could surreptitiously send the Pauwels Model Spreadsheet to Deloitte for use and duplication in its own monitoring work.  Sarmasti therefore lied to Pauwels in order to keep Pauwels oblivious of what BNYM and Deloitte were doing and to ensure that Pauwels continued to work for BNYM and provide the bank with new spreadsheets for the new wind-energy investments.

58.     Because of Sarmasti's lies and false assurances—and because he had no way of knowing that BNYM and Deloitte had stolen the Pauwels Model—Pauwels did not take any further actions to prevent or remedy the theft of his work, such as terminating his relationship with BNYM, refusing to do any further work for the bank, and/or potentially commencing legal proceedings.  Thus, Sarmasti achieved his goal on behalf of BNYM: he successfully induced Pauwels into continuing work on new BNYM wind energy investments by lying about Deloitte's use of and access to the Pauwels Model.

*Pauwels Confronts BNYM, BNYM Retaliates*

59.     Throughout 2017 and the beginning of 2018, Pauwels remained unaware of BNYM's betrayal and the bad-faith conduct of BNYM and Deloitte.  His workload did not decrease from prior years, and he continued to work with BNYM to model and analyze new investments, including the large wind-energy investment that he worked on in 2017 (and which closed that year) along with a number of other, unrelated transactions.  He continued to believe that Deloitte was using its own software, as Sarmasti had assured him.  He continued to think that

BNYM had abided by its agreement and understanding and that the Pauwels Model remained a secret from Deloitte.

60.     This all changed on April 12, 2018, when a BNYM employee forwarded Pauwels a Deloitte monitoring spreadsheet and asked that he review some of the calculations and results therein.  Upon opening the file, it became clear to Pauwels that Deloitte's "model" was a copy of the Pauwels Model.  The structure, layout, design, row headings, column headings, sequencing of the calculations, and the formulas themselves were virtually identical to the Pauwels Model Spreadsheets.  Pauwels quickly realized that Deloitte was *not* using its own software, that the Pauwels Model had *not* remained a secret from Deloitte, and that BNYM had *not* abided by their agreement and understanding by giving Deloitte the Pauwels Model.  To put it bluntly: Pauwels realized soon after opening the received file that Deloitte was using the Pauwels Model in its monitoring work for BNYM.

61.     In early May 2018, Pauwels confronted both Sarmasti and Peterson about Deloitte's use of the Pauwels Model, expressed his disappointment and confusion over how this could have happened, and demanded an explanation.  Neither Sarmasti nor Peterson provided such an explanation.

62.     In a May 1, 2018 telephone call, Sarmasti noted that Pauwels was a "small advisor," that Sarmasti did not "take this shit" from even large advisors, and that BNYM had been doing a favor for Pauwels by offering him the opportunity to review Deloitte's copy of the Pauwels Model. When Pauwels pressed Sarmasti about the theft of the Pauwels Model, Sarmasti first claimed that BNYM had liked Pauwels' "presentation" and then admitted that BNYM had sent the Pauwels Model Spreadsheets to Deloitte so that they could copy that presentation.  When Pauwels pointed out that Deloitte had also copied the calculations and formulas in the Pauwels Model, Sarmasti

simply said that BNYM could do whatever they wanted with the Pauwels Model. Moreover, Sarmasti told Pauwels that Deloitte had advised him about certain perceived mistakes in the Pauwels Model Spreadsheet, and while these were not mistakes but intentional features of the Pauwels Model, Sarmasti's familiarity with Deloitte's use of the Pauwels Model was apparent. Sarmasti then terminated the conversation.

63.     On May 15, 2018, Pauwels spoke with Peterson, who also told Pauwels that he was a "small advisor" and rhetorically asked whether Pauwels thought his "spreadsheets [were] the Mona Lisa." Peterson also did not offer an explanation or justification for how and why BNYM and Deloitte stole the Pauwels Model.

64.     Two weeks after his conversation with Sarmasti, and on the same day that he spoke with Peterson, BNYM terminated their relationship with Pauwels, informing him that he should stop working on any current engagements and that his work would be transferred to others.

*An Ongoing, Damaging Use*

65.     Deloitte continues to use the Pauwels Model in performing tracking work for BNYM. Every month, it generates multiple tracking spreadsheets for BNYM's energy sector investments; the data for Deloitte's monthly spreadsheets is generated using the stolen Pauwels Model.

66.     BNYM's decision to terminate their relationship with Pauwels, meanwhile, has deprived him of the potential income he would otherwise earn by using his proprietary Pauwels Model to track and/or evaluate BNYM's energy sector investments. Moreover, by giving the Pauwels Model to Deloitte, BNYM has further damaged Pauwels by stealing his trade secret, providing it to Pauwels' competitor, and severely undercutting Pauwels' ability to use the Pauwels Model as his proprietary and unique tool for assessing energy sector investments.

*BNYM Refuses to Pay Pauwels' Invoices in Full*

67.    As a final indignity, BNYM has refused to pay Pauwels' invoices in full after terminating their relationship.

68.    Pauwels sent his last invoices to BNYM in late June 2018, covering work performed for the bank from January 1, 2018 to May 15, 2018.  The invoices sought compensation for work such as pricing large intercompany loans (over £1 billion), valuing investments, and other investment-related work for the bank.

69.    In total, the invoices sought £169,720 for Pauwels' 2018 work, using Pauwels' standard rates that he had used with (and been paid by) BNYM throughout his relationship with the bank.

70.    BNYM refused to pay the full amount of Pauwels' outstanding invoices.  Nearly a half-year after Pauwels had performed the work for BNYM, the bank suddenly claimed that some of Pauwels' valuation work should not have been charged at full price, that his research work (which had been explicitly requested by the bank) could not be charged at all, and that some of the work was duplicative (despite BNYM's explicit requests for analysis of multiple scenarios).  BNYM then demanded that Pauwels discount and/or otherwise strike off some of his time— BNYM had not previously asked for such reductions during their nine-year relationship with Pauwels.

71.    When Pauwels tried to argue that the discounts and offsets were unreasonable and unwarranted, BNYM simply paid him the amount that they wanted and left a shortfall of £34,941 (over $40,000).

72.    To date, the full amount of Pauwels' invoices remains unpaid.

## FIRST CAUSE OF ACTION
**Misappropriation of Trade Secrets**
**(All Defendants)**

73.     The foregoing allegations are incorporated here as if fully set forth herein.

74.     BNYM and Deloitte stole trade secrets from Pauwels—*i.e.*, they stole the Pauwels Model and Pauwels Model Spreadsheets (which contained the system of formulas and equations that make up the Pauwels Model).

75.     Pauwels possessed a trade secret and the course of dealing between BNYM and Pauwels indicates that they were in a relationship of trust and confidence.

76.     The Pauwels Model was a set of complex financial formulas, implemented in an Excel spreadsheet (a Pauwels Model Spreadsheet), and constituted a unique and proprietary method of tax equity investment analysis.  Pauwels used the Pauwels Model to help obtain an advantage over competitors in that (i) it allowed him to effectively evaluate potential investment opportunities and (ii) no one else had access to the model outside himself and a very limited number of people at BNYM (*i.e.*, the three main recipients—Ruckel, Hegedus, and Sarmasti— along with Peterson, on occasion, and Ruckel's replacement, in December 2017).  The model advantaged Pauwels.

77.     The Pauwels Model was a trade secret:

    a.     Only Pauwels and BNYM personnel knew of the model (it was, of necessity, implemented in evaluation spreadsheets used internally at BNYM), and Pauwels only shared it with very select people at BNYM (*i.e.*, the three main recipients—Ruckel, Hegedus, and Sarmasti—along with Peterson, on occasion, and Ruckel's replacement, in December 2017);

b. Pauwels is self-employed, so he was the only one who understood and knew about the Pauwels Model outside BNYM;

c. Pauwels repeatedly and explicitly made it clear to BNYM throughout the course of his dealings that the Pauwels Model and Pauwels Model Spreadsheets were to remain secret by (a) refusing every request to disclose the full Pauwels Model to outside parties and (b) allowing just the disclosure of a simplified version on only two occasions;

d. On multiple occasions, after admonishing Sarmasti and Hegedus that the Pauwels Model and the Pauwels Model Spreadsheet were proprietary and could not be shared broadly within BNYM or with third parties, Sarmasti and Hegedus agreed to Pauwels' confidentiality instructions; Peterson, too, understood and agreed that Pauwels' models were his property and were to remain confidential;

e. While BNYM paid Pauwels for his expertise and guidance, the Pauwels Model was a very effective tool in helping Pauwels perform his work for BNYM to value, assess, and monitor wind-energy investments (Pauwels' expertise in financial modeling was a core reason for Peterson approaching Pauwels about the collaboration with BNYM);

f. Pauwels developed the model on his own through months of effort and analysis;

g. As this is a proprietary set of formulas and incorporates Pauwels' unique insight into the alternative energy market, it would be extremely difficult to duplicate the Pauwels Model; and

h.   To the extent third parties were privy to the result of the Pauwels Model, they would at most see abbreviated, highly-excerpted versions of the Pauwels Model Spreadsheets.

78.   The course of dealing between Pauwels and BNYM indicates that they were in a relationship of trust and confidence.  Among other things:

a.   Pauwels worked with BNYM after being approached by Peterson, his friend and trusted colleague, whom Pauwels trusted to keep his proprietary and confidential models secret;

b.   In sharing his opinions and advice with BNYM, Pauwels only attached the Pauwels Model Spreadsheet when it was necessary to further help BNYM understand his expert guidance;

c.   BNYM respected Pauwels' decision, on multiple occasions, not to share the Pauwels Model with third parties;

d.   BNYM also, through Sarmasti, Peterson, Hegedus, and others, acknowledged and agreed with Pauwels' assertion of a confidential, proprietary interest in the Pauwels Model;

e.   Pauwels relied on BNYM's agreement and understanding regarding the proprietary and confidential nature of the Pauwels Model and Pauwels Model Spreadsheets; and

f.   Pauwels also relied on the fact that—as far as he knew—BNYM had abided by its agreement and understanding to keep all his models (including the Pauwels Model) confidential for more than half a decade.

79.    Despite this relationship and Pauwels' explicit instructions to the contrary, BNYM and Deloitte stole the Pauwels Model.

80.    BNYM took for its own and then gave to Deloitte the Pauwels Model Spreadsheets for use and duplication.

81.    Despite knowing about the confidential and proprietary nature of the Pauwels Model, Deloitte accepted the Pauwels Model Spreadsheets without permission from Pauwels, copied the Pauwels Model Spreadsheets, and used the Pauwels Model to act as a direct substitute for Pauwels—with whom they were competing for BNYM's business.

82.    Deloitte was aware that Pauwels developed and used the proprietary Pauwels Model, and was placed on notice of this by at least March 2016, when BNYM arranged for Pauwels to participate in a conference call with Deloitte to discuss BNYM's wind-energy investment evaluation process at a high level.

83.    As a result of Defendants' actions, Pauwels has suffered and will continue to suffer millions of dollars in damages in the form of lost earnings and a diminished ability to use his trade secret (the Pauwels Model) to obtain an advantage in the market for analyzing and monitoring energy sector investments.

## SECOND CAUSE OF ACTION
### Unfair Competition – Misappropriation of Labor, Skill, and Expenditure
### (All Defendants)

84.    The foregoing allegations are incorporated here as if fully set forth herein.

85.    Pauwels has a property interest in the Pauwels Model, which he developed through significant labor, skill, and expenditure:

     a.     The Pauwels Model was a set of complex financial formulas, implemented in an Excel spreadsheet, and constituted a unique and proprietary method of tax equity investment analysis;

     b.     Pauwels developed the model on his own through months of effort and analysis; and

     c.     As this is a proprietary set of formulas and incorporates Pauwels' unique insight into the alternative energy market, it would be extremely difficult to duplicate the Pauwels Model.

86.     The course of dealing between BNYM and Pauwels indicates that they were in a relationship of trust and confidence, in which Pauwels provided confidential information about the Pauwels Model to BNYM and insisted that they keep it confidential.

87.     Deloitte was aware that Pauwels developed and used the proprietary Pauwels Model, and was placed on notice of this by at least March 2016, when BNYM arranged for Pauwels to participate in a conference call with Deloitte to discuss BNYM's wind-energy investments at a high level.

88.     BNYM and Deloitte misappropriated the Pauwels Model in bad faith.

89.     BNYM gave the model to Deloitte, despite (a) repeated instructions from Pauwels that his Pauwels Model and Pauwels Model Spreadsheets should not be shared within BNYM or with third parties and (b) repeated assurances to Pauwels that they would keep his Pauwels Model and Pauwels Model Spreadsheet confidential.  BNYM provided the model to Deloitte so that Deloitte could use and copy it, and then provide the services that Pauwels was already providing BNYM.  That way, BNYM and Deloitte could avoid the time and expense of having Deloitte develop a substitute model; BNYM also deceived Pauwels to prevent Pauwels from taking any

actions that would have mitigated the damage resulting from BNYM and Deloitte stealing his Pauwels Model.

90.     Deloitte accepted and used the Pauwels Model in order to (a) acquire BNYM's business from Pauwels while (b) avoiding the time and expense of developing their own model or models through their own labor, skill, and expenditure.

### THIRD CAUSE OF ACTION
**Fraud**
**(BNYM)**

91.     The foregoing allegations are incorporated here as if fully set forth herein.

92.     Sarmasti, on behalf of BNYM (both BNY Mellon and the Bank), told Pauwels that Deloitte had its own software and was not using the Pauwels Model to monitor BNYM's energy sector investments.

93.     This was a false and misleading representation.

94.     Given (a) Sarmasti's role at BNYM as head of the tax accounting department, (b) his experience with Pauwels and the Pauwels Model, (c) his role overseeing the relationships between BYNM and accounting firms (such as Deloitte), (d) his relationship with Deloitte, and (e) his participation in telephone calls, discussions, and correspondence with Deloitte, Sarmasti knew that BNYM—in particular, BNYM's tax accounting department—had given Deloitte the Pauwels Model Spreadsheets and that Deloitte was copying and using the Pauwels Model.

95.     Sarmasti lied to Pauwels to induce Pauwels into continuing to work for BNYM, model BNYM's contemplated wind-energy investments, and continue providing BNYM with fresh analysis of its investments using the Pauwels Model (which BNYM could then hand over to Deloitte).

96.     The continued confidentiality of the Pauwels Model, along with Deloitte's use (or, rather, non-use) of the Pauwels Model, were important, material facts for Pauwels.

26

97.     Pauwels did not know and could not reasonably know that Sarmasti was lying and misleading him.

98.     In reasonable reliance on Sarmasti's material misrepresentation, Pauwels refrained from taking any action that would have mitigated the damage resulting from BNYM and Deloitte stealing his Pauwels Model, including terminating his relationship with BNYM, refusing to do any further work for the bank, and/or potentially commencing legal proceedings.

99.     As a result of his reasonable reliance, Pauwels has been damaged.

### FOURTH CAUSE OF ACTION
**Negligent Misrepresentation**
**(BNYM)**

100.    The foregoing allegations are incorporated here as if fully set forth herein.

101.    The course of dealing between Pauwels and BNYM indicates that they were in a special relationship so close as to approach that of privity, thereby imposing a duty on BNYM— and, by extension, their respective agents and employees, including Sarmasti—to impart correct information to Pauwels.  For example:

a.      Pauwels' role as an independent advisor to BNYM and his close, repeated dealings with BNYM regarding major financial transactions made it critical for BNYM to provide Pauwels with timely, accurate, and correct information;

b.      Pauwels' repeated, express instructions to BNYM to keep his proprietary Pauwels Model confidential likewise required BNYM to provide Pauwels with truthful information regarding what BNYM did with any spreadsheets generated by Pauwels using his Pauwels Model; and

       c.     BNYM, through Sarmasti, Peterson, Hegedus, and others, acknowledged and agreed with Pauwels' assertion of a confidential, proprietary interest in the Pauwels Model.

102.    BNYM knew that because of its relationship with Pauwels, any statements to Pauwels about the use, confidentiality, and dissemination of the Pauwels Model or Pauwels Model Spreadsheets would be relied upon and used by Pauwels to evaluate whether to take protective action (*e.g.*, terminate his relationship with BNYM and avoid providing any further Pauwels Model Spreadsheets to the bank).

103.    Sarmasti, on behalf of BNYM (both BNY Mellon and the Bank), told Pauwels that Deloitte had its own software and was not using the Pauwels Model to monitor BNYM's energy sector investments.

104.    This was an incorrect, false, and misleading representation.  Given Sarmasti's role at BNYM as head of the tax accounting department, his experience with Pauwels and the Pauwels Model, his role overseeing the relationships between BYNM and accounting firms (such as Deloitte), his relationship with Deloitte, and his participation in telephone calls, discussions, and correspondence with Deloitte, Sarmasti knew that BNYM—in particular, BNYM's tax accounting department—had given Deloitte the Pauwels Model Spreadsheets and that Deloitte was copying and using the Pauwels Model.

105.    Pauwels did not know and could not reasonably know that Sarmasti's statement to him was false and incorrect.

106.    In reasonable reliance on Sarmasti's misrepresentation, Pauwels refrained from taking any action that would have mitigated the damage resulting from BNYM and Deloitte

stealing his Pauwels Model, including terminating his relationship with BNYM, refusing to do any further work for the bank, and/or potentially commencing legal proceedings.

107.    As a result of his reasonable reliance, Pauwels has been damaged.

### FIFTH CAUSE OF ACTION
**Unjust Enrichment**
**(BNYM)**

108.    The foregoing allegations are incorporated here as if fully set forth herein.

109.    By taking the Pauwels Model and Pauwels Model Spreadsheets and giving them to Deloitte to use and copy, despite Pauwels' express admonition against doing so, BNYM enriched themselves by avoiding the time and expense of paying Deloitte to develop their own model for analyzing BNYM's wind-energy investments, which would have taken more time and been more expensive than just copying the Pauwels Model.  BNYM was therefore able to continue benefiting from the Pauwels Model (which Deloitte was now using, contrary to Pauwels' express instructions) despite terminating its relationship with Pauwels and replacing him with Deloitte.

110.    BNYM, in short, was able to terminate its relationship with Pauwels and replace him with Deloitte (first for monitoring and then altogether) without having to pay Deloitte for a new model or suffering delays in the analysis of their wind-energy investments, all because they could continue to benefit from Deloitte's use of the Pauwels Model.

111.    Because Pauwels (a) had his model taken from him against his instructions and wishes, (b) was deceived by BNYM as to their plans to give the Pauwels Model to Deloitte, and (c) was ultimately terminated after BNYM took what they wanted from Pauwels (*i.e.*, his model) surreptitiously, BNYM was enriched at Pauwels' expense.

112.   BNYM paid Pauwels for his analysis and advice, and knew and understood that if Pauwels ever sent them a Pauwels Model Spreadsheet, that it represented his proprietary property and was only being shared in confidence to help illustrate Pauwels' expert advice.

113.   By ignoring Pauwels' express instructions, breaching their understanding with Pauwels about the proprietary and confidential nature of the Pauwels Model and Pauwels Model Spreadsheets, and finally by lying to Pauwels about Deloitte's access to and use of the Pauwels Model and Pauwels Model Spreadsheets, BNYM unjustly enriched itself, and equity and good conscience cannot permit BNYM to retain their ill-gotten gains.

### SIXTH CAUSE OF ACTION
**Unjust Enrichment**
**(Deloitte)**

114.   The foregoing allegations are incorporated here as if fully set forth herein.

115.   By taking, using, and duplicating the Pauwels Model and Pauwels Model Spreadsheets, Deloitte enriched themselves by (a) being able to perform—and be compensated for—the monitoring work that Pauwels had previously performed for BNYM and (b) acquiring a fully developed financial model for BNYM's wind-energy investments without the time and expense of developing one for themselves.

116.   Because Pauwels (a) had his model taken from him against his instructions and wishes, (b) was unaware that Deloitte (with BNYM's blessing) had acquired, used, and duplicated the Pauwels Model, and (c) was ultimately terminated after Deloitte had what it needed to perform Pauwels' work for BNYM in his stead (*i.e.*, his model), Deloitte was enriched at Pauwels' expense.

117.   Deloitte knew—as early as March 2016—that Pauwels used his own, proprietary model to help analyze, evaluate, and monitor BNYM's wind-energy investments.  Deloitte knew that the Pauwels Model was confidential and was not to be shared broadly within BNYM or with third parties (including Deloitte).  Deloitte, nonetheless, seconded an employee with BNYM's tax

accounting department in order to study and duplicate the Pauwels Model, which BNYM provided to them in the Pauwels Model Spreadsheets that Pauwels had generated for the bank's 2014, 2015, 2016, and 2017 wind-energy investments.

118.    Because Deloitte deliberately took for their own, duplicated, and then used the Pauwels Model despite knowing that it was proprietary and confidential, Deloitte unjustly enriched itself, and equity and good conscience cannot permit Deloitte to retain their ill-gotten gains.

**SEVENTH CAUSE OF ACTION**
**Unjust Enrichment**
**(BNYM)**

119.    The foregoing allegations are incorporated here as if fully set forth herein.

120.    BNYM refused to pay the full £169,720 for Pauwels' final, June 2018, invoices.

121.    Instead, BNYM only paid him £134,779, leaving a shortfall of £34,941 (over $40,000).

122.    BNYM had never before demanded discounted rates or for Pauwels to not bill for work that the bank itself had requested.

123.    By failing to pay Pauwels in full for the work that he performed for BNYM from January 1, 2018 through May 15, 2018, BNYM were able to enrich themselves at Pauwels' expense.

124.    Specifically, BNYM received the benefit of Pauwels' continued analysis, research, valuations, and modeling work for less than the price that Pauwels and BNYM had agreed he would be paid.

125.    Despite express demands for a full payment, BNYM paid lower rates (based on a discount that BNYM themselves decided to impose) for Pauwels' valuable work, benefiting BNYM, denying Pauwels the full value of his work, and adding insult to injury.

126.    Pauwels deserves to be paid for the full value of his work, and equity and good conscience cannot permit BNYM to retain their ill-gotten gains.

## PRAYER FOR RELIEF

WHEREFORE, as redress for the foregoing legal violations, Pauwels respectfully requests that this Court, either cumulatively or in the alternative:

1.    Award Pauwels damages, including compensatory damages, damages in quantum meruit, and punitive damages, for Defendants' misappropriation of trade secrets (the Pauwels Model), misappropriation of labor, skills, and expenditures, termination of the BNYM-Pauwels relationship, fraud, negligent misrepresentation, unjust enrichment, and BNYM's failure to fully pay Pauwels' invoices;

2.    Issue an injunction against Defendants to halt the use of the proprietary Pauwels Model and all related spreadsheets;

3.    Award Pauwels reasonable attorneys' fees and his costs of suit; and

4.    Award Pauwels any such further relief as the Court may deem appropriate.

## DEMAND FOR A JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38 and to the extent that it is permitted by law, Plaintiff demands a trial by jury in this action of all issues so triable.

Dated: New York, New York
      March 19, 2020

                                        Respectfully submitted,

                                        */s/ Joshua I. Schiller*

                                        Joshua I. Schiller
                                        Benjamin Margulis
                                        BOIES SCHILLER FLEXNER LLP
                                        55 Hudson Yards
                                        New York, NY 10001
                                        Tel:    (212) 446-2300
                                        jischiller@bsfllp.com
                                        bmargulis@bsfllp.com

                                        *Counsel for Plaintiff André Pauwels*