UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANDRE PAUWELS,

                              Plaintiff,

            v.

BANK OF NEW YORK MELLON
CORPORATION, *et al.*,

                              Defendants.

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED:

19-CV-2313 (RA)

MEMORANDUM
OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Andre Pauwels brings this action against Defendants Bank of New York Mellon Corporation, Bank of New York Mellon (collectively, "BNYM"), Deloitte LLP, Deloitte USA LLP, and Deloitte Tax LLP (collectively, "Deloitte"), alleging misappropriation of trade secrets, unfair competition, negligent misrepresentation, fraud, and unjust enrichment.  While working as a consultant for BNYM, Pauwels developed an allegedly proprietary set of forecasting models and spreadsheets ("the Model" and "the Spreadsheets," respectively), which he now accuses BNYM of expropriating. According to Pauwels, BNYM gave this proprietary information to Deloitte, allowing Deloitte to provide for BNYM the same services Pauwels had previously provided, and thus allowing BNYM to cut Pauwels out of the picture.

After his First Amended Complaint was dismissed, Pauwels filed a Second Amended Complaint, bringing many of the same claims but supporting those claims with somewhat more fulsome factual pleadings.  Defendants moved to dismiss the Second Amended Complaint.  For the reasons that follow, Deloitte's motion is again granted in full, while BNYM's motion is granted in part and denied in part.

**BACKGROUND**

The Court assumes the parties' familiarity with the procedural history of this case, as well as the facts alleged in the First Amended Complaint, which this Court dismissed in its entirety on February 19, 2020. *See Pauwels v. Deloitte LLP*, 19-CV-2313 (RA), 2020 U.S. Dist. LEXIS 28736, 2020 WL 818742 (S.D.N.Y. Feb. 19 2020) (the "Prior Opinion"). As a result, the Court will not reiterate the facts alleged in the First Amended Complaint nor the analysis from the Prior Opinion, and will instead focus solely on Pauwels's new allegations.[1]

Although the Second Amended Complaint largely mirrors the First Amended Complaint, it does add some additional details. In particular, it expands upon the efforts Pauwels allegedly took to maintain the secrecy of the Model and the Spreadsheets while working at BNYM. Pauwels claims to have only sent BNYM the Spreadsheets when "necessary to better illustrate [a] point for the bank," SAC ¶ 16, and often, he "would provide BNYM only . . . the top-line results of his calculations, and not the entire system of formulas and computations from the Pauwels model," *id*. ¶ 31.[2] When he did permit BNYM to share the Spreadsheets with third parties, he provided abbreviated spreadsheets that "could not be used to duplicate or otherwise reverse engineer the Pauwels Model." *Id*. ¶ 42. He also limited the number of BNYM employees to whom he would send the Spreadsheets, only sharing them with five BNYM employees: Laura Hegedus (a managing director for wind investments), Reza Sarmasti (a managing director in charge of the tax accounting department), Kevin Peterson (to whom Sarmasti reported), Martin Ruckel (a manager in the tax accounting department), and an unnamed employee who replaced

---

[1] For the purposes of this motion to dismiss, the Court will "assum[e] that all the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[2] This memorandum opinion uses the following citations: "FAC" for Pauwels's First Amended Complaint, Dkt. 36; "SAC" for Pauwels's Second Amended Complaint, Dkt. 63; "BNYM Mem." for BNYM's memorandum of law in support of its motion to dismiss, Dkt. 69; "Deloitte Mem." for Deloitte's memorandum of law in support of its motion to dismiss, Dkt. 67; "BNYM Opp." for Pauwels's memorandum in opposition to BNYM's motion to dismiss, Dkt. 70; "Deloitte Opp." for Pauwels's memorandum in opposition to Deloitte's motion to dismiss, Dkt. 71; BNYM Reply" for BNYM's reply memorandum, Dkt. 73; and "Deloitte Reply" for Deloitte's reply memorandum, Dkt. 72.

Ruckel in 2017. *Id*. at ¶ 35. This list remained limited despite Pauwels's assertion that he worked on projects often involving "dozens of people (sometimes as many as a hundred)." *Id*. Pauwels allegedly "made sure" these five people "understood that the Pauwels Model Spreadsheets were confidential." *Id*. ¶ 36.

Additionally, the instant complaint elaborates on the reasons why Pauwels purportedly "trusted" BNYM to keep his Model and Spreadsheets confidential absent any protective measures like encryption or password protection. *Id*. ¶ 40. Pauwels now alleges he had an "agreement" with several BNYM employees to maintain the Model and Spreadsheets' confidentiality. *Id*. ¶ 38. In November 2014, after Pauwels refused to share the Model with a third-party, "Sarmasti and Hegedus agreed and confirmed, on behalf of BNYM, that the Pauwels Model and Pauwels Model Spreadsheets were confidential and proprietary and that they would not be shared outside of BNYM." *Id*. Sarmasti, Hegedus, and Ruckel also allegedly "knew and understood through repeated conversations" that the Model belonged to Pauwels. *Id*. ¶ 39. Pauwels does not claim to have had an agreement with Kevin Peterson, with whom he also shared the Model and Spreadsheets, but he says he trusted Peterson with his confidential work product because he "considered Peterson a close friend and trusted colleague" after working together multiple times over fourteen years. *Id*. ¶ 15.

The Second Amended Complaint also provides more information about Pauwels's alleged interactions with Deloitte in relation to the Model and Pauwels's work at BNYM. Pauwels participated in four conference calls with BNYM and Deloitte in the spring of 2016—a fact not previously asserted in the First Amended Complaint. *Id*. ¶ 43. He says agreed to participate in these calls because he "believed that Deloitte was simply coming in to review the overall process." *Id*. On these calls, Deloitte

was made aware of the Model, but the Model was not shared, nor did Pauwels authorize the sharing of the Model with Deloitte at that time.  *Id.*[3]

This complaint further presents more detailed allegations against Sarmasti, the BNYM employee Pauwels now accuses of fraudulently concealing Deloitte's use of the Model and Spreadsheets.  Sarmasti told Pauwels that Deloitte had found errors on the Spreadsheets, suggesting to him that Sarmasti not only knew that BNYM had given the Spreadsheets to Deloitte, but also knew that Deloitte was using them.  *Id.* ¶¶ 55–56, ¶ 62.  Sarmasti allegedly "lied" to Pauwels about this because he needed Pauwels to finish his modeling work for BNYM and knew that if Pauwels was aware of what BNYM and Deloitte were doing with the Model, that Pauwels would cease his work for BNYM.  *Id.* ¶¶ 57, 95.

Finally, the Second Amended Complaint further develops Pauwels's claims concerning the unpaid invoices he asserts that BNYM refuses to pay.  Pauwels sent BNYM invoices for his work from January through May 2018 for a total of £169,720.  *Id.* ¶ 69.  BNYM only paid him £134,779, leaving him with a shortfall of £34,941.  *Id.* ¶¶ 71, 121.  BNYM allegedly claimed that it need not pay him the full amount agreed to because "some of Pauwels's valuation work should not have been charged at full price, that his research work (which had been explicitly requested by the bank) could not be charged at all, and that some of the work was duplicative (despite BNYM's explicit requests for analysis of multiple scenarios)."  *Id.* ¶ 70.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  A claim has "facial plausibility" only when the plaintiff "pleads

---

[3] Pauwels now asserts that, based on these calls, Deloitte was "aware and understood that the Pauwels Model (and the Spreadsheets) were confidential and could not be shared with Deloitte."  SAC ¶ 43.  Pauwels further alleges— for the first time—that "Deloitte [was] well aware of the confidential and proprietary nature of the Pauwels Model."  *Id.* ¶ 56.

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678.  In reviewing a motion to dismiss, a court "constru[es] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  A court, however, need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.  Instead, allegations must cross "the line between possibility and plausibility." *Twombly*, 550 U.S. at 557.

When a plaintiff brings a claim of fraud, as Pauwels has here, those allegations are subject to the higher pleading standard set forth in Federal Rule of Civil Procedure 9(b), which requires a plaintiff to "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b); *see also Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1004 (2d Cir. 1988).  Specifically, Rule 9(b) requires a complaint to allege "(1) specific facts; (2) sources that support the alleged specific facts; and (3) a basis from which an inference of fraud may fairly be drawn." *Crystal v. Foy*, 562 F. Supp. 422, 425 (S.D.N.Y. 1983).  The pleadings must set forth facts "that give rise to a strong inference of fraudulent intent."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006).

## DISCUSSION

### I.   Trade Secret Misappropriation

In the Second Amended Complaint, Pauwels provides additional color to his trade secrets misappropriation claim through details about the persons with whom he shared his work and the ways in which he shared it.  Nonetheless, because he stills fails to plausibly plead that the Model and Spreadsheets qualify as a trade secret, this claim is again dismissed.

Courts consider several factors to determine whether information is a trade secret, including: "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to

guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Elsevier Inc. v. Doctor Evidence, LLC*, l7-CV-5540 (KBF), 2018 U.S. Dist. LEXIS 10730, 2018 WL 557906, at *3–4 (S.D.N.Y. Jan. 23, 2018). "[T]he extent of measures taken by the business to guard the secrecy of the information" is the most critical factor in this analysis. *Id.* at *4.

In the instant complaint, Pauwels attempts to bolster his trade secrets claim by alleging—for the first time—that he entered into an actual agreement with two BNYM employees to keep the Spreadsheets and Model confidential. *See* SAC ¶ 38 ("[I]n November 2014 . . . Sarmasti and Hegedus agreed and confirmed, on behalf of BNYM, that the Pauwels Model and Pauwels Model Spreadsheets were confidential and proprietary and that they would not be shared outside of BNYM."); *id*. at ¶ 40 (asserting that the reason Pauwels did not encrypt or password-protect his Spreadsheets was because he "relied on the agreement and understanding with BNYM over the Pauwels Model Spreadsheets' confidentiality"). Even accepting this allegation as true, it does not suffice to render the Spreadsheet and Model a trade secret. Pauwels asserts that he entered this agreement with Sarmasti and Hegedus in November 2014, five years into his working relationship with BNYM and eight months after he began his work using the Model and Spreadsheets to value alternative energy sector investments for the company. *Id*. ¶¶ 16, 18, 22, 38. Moreover, Pauwels has not pled that he made corresponding agreements with the other three BNYM employees with whom he shared the Spreadsheets – Ruckel, Ruckel's 2017 replacement, and Peterson. Nor has he pled that either Sarmasti or Hegedus was in the position to bind the entire company through the informal agreements they made. Indeed, the Amended Complaint seems to contemplate that Peterson was not bound by the Hegedus or Sarmasti agreements, but instead by his own "understanding" with Pauwels. *See id*. ¶¶ 56, 77.

As noted in the Prior Opinion, "disclos[ing] [a] trade secret to others who are under no obligation to protect the confidentiality of the information" ultimately "extinguishe[s]" that property right. *Structured Capital Sols., LLC v. Commerzbank AG*, 177 F. Supp. 3d 816, 832 (S.D.N.Y. 2016).  It is thus fatal to Pauwels's claim that he shared his Spreadsheets and Model with three individuals at BNYM with whom he had no confidentiality agreement.

Nor do the remaining facts alleged in support of this claim support a finding that the Model and Spreadsheets were a trade secret.  While Pauwels's assertion that he often "would provide BNYM only . . . the top-line results of his calculations, and not the entire system of formulas and computations from the Pauwels model," SAC ¶ 31, suggests a certain level of expected secrecy, it is counterbalanced by the acknowledgement that on other occasions, Pauwels *did* provide BNYM with the entire system of formulas and computations.  *Id.*  Moreover, the fact remains that Pauwels sent the Spreadsheets freely on BNYM's email server, without encryption, password protection, or any indication that the Spreadsheets were confidential.  *Big Vision Private Ltd*. *v. E.I. Dupont De Nemours & Co.*, 1 F. Supp. 3d 224, 253 n.32 (finding "particularly noteworthy" on a motion for summary judgment a plaintiff's "failure to designate as Confidential anything disclosed").  On these facts, the Court cannot conclude that Pauwels has plausibly pled that his Model or Spreadsheets constituted a trade secret.

Even if the Court were to deem Pauwels's Model and Spreadsheets a trade secret, Pauwels further fails to plausibly allege the second prong of a claim for misappropriation of trade secrets: "that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as the result of discovery by improper means."  *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009).  For the reasons explained in Section IV below, Pauwels has not plausibly pled that BNYM had a confidential relationship with or duty to him.  *See* SAC ¶ 78.  Moreover, although Pauwels asserts that Deloitte obtained the Model and Spreadsheets through improper means, he has pled no facts that support this assertion.  *Id*. ¶ 81.  *See Kavanagh v. Zwilling,* 578 F. App'x 24, 24 (2d Cir. 2014) ("We

do not accept as true conclusions unsupported by the facts alleged, legal conclusions, bald assertions, or unwarranted inferences.").

Accordingly, Pauwels's trade secret misappropriation claim is dismissed.

## II.    Unfair Competition

As it did in the First Amended Complaint, Pauwels's unfair competition claim rests on the same facts as does his misappropriation of trade secrets claim.  "An unfair competition claim can only survive dismissal of a duplicative misappropriation claim if the two rest on different factual predicates." *Ferring B.V. v. Allergan, Inc.*, 4 F. Supp. 3d 612, 629 (S.D.N.Y. 2014).  For this reason, the claim cannot survive.

Pauwels contests this conclusion by referencing several cases in which "New York courts have applied unfair competition law to misappropriation of property that does not rise to the level of trade secrets."  Deloitte Opp. at 16–18 (citing *Salonclick LLC v. SuperEgo Mgmt. LLC*, 16-CV-2555 (KMW), 2017 U.S. Dist. LEXIS 69960, 2017 WL 1906865 (S.D.N.Y. May 8, 2017); *LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492 (S.D.N.Y. 2002); *Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.*, 871 F. Supp. 709 (S.D.N.Y. 1995)); *see also* BNYM Opp. at 25 (citing *LinkCo*, 230 F. Supp. 2d 492; *Innovative Networks*, 871 F. Supp. 709).  Pauwels argues that these cases permit him to proceed with his unfair competition claim even if his misappropriation of trade secrets claim is dismissed.  The Court disagrees.  In each of the decisions on which Pauwels relies, no trade secret claim was made, only a claim for unfair competition.  *See Salonclick*, 2017 WL 1906865 at *1 (raising an unfair competition claim but not a misappropriation of trade secrets claim); *Innovative Networks*, 871 F. Supp. at 729–30 (same); *see also LinkCo*, 230 F. Supp. 2d at 501 (recognizing that if the basis of a plaintiff's unfair competition claim is a misappropriated trade secret, then the claims are duplicative and should be treated as a single cause of action).  And in those cases where plaintiffs have brought duplicative claims for both trade secret misappropriation and unfair competition, courts have consistently dismissed the latter upon dismissing the former on the basis that they rested on the same factual predicate.  *See*, *e.g.*, *Faiveley*

*Transp.*, 758 F. Supp. 2d at 221.  Pauwels's unfair competition claim is thus dismissed as duplicative of the now-dismissed trade secrets misappropriation claim.

### III.    Fraud

In the Second Amended Complaint, like the first, Pauwels's fraud claim is based on the contention that Sarmasti, on behalf of BNYM, made a purportedly "false and misleading representation" when he told Pauwels that Deloitte was not using the Pauwels's Model despite the fact that he "knew" that BNYM had given Deloitte the Model and that Deloitte was in fact using it.  SAC ¶¶ 92–93; *see* FAC ¶¶ 80 –81.  In the Second Amended Complaint, Pauwels pleads additional facts to support this claim, including further allegations about Sarmasti's knowledge and purported intent.  Even with the additional allegations, however, the pleadings still fail to "give rise to a strong inference of fraudulent intent" and thus do not meet the stringent pleading standards set by Federal Rule of Civil Procedure 9(b).  *Lerner*, 459 F.3d at 290.

As a threshold matter, Pauwels has failed to plausibly plead facts to support his assertion that that Sarmasti knew Deloitte was using the Model and Spreadsheets.  As he did in the First Amended Complaint, Pauwels alleges that "Deloitte had advised [Sarmasti] about certain perceived mistakes in the Pauwels Model Spreadsheet."  SAC ¶ 62; *see*  FAC ¶ 45.  Yet in the instant complaint, he claims for the first time that this allegation establishes "Sarmasti's familiarity with Deloitte's use of the Pauwels Model."  SAC ¶ 62; *see*  FAC ¶ 45.  While Deloitte's identification of errors may imply its familiarity with the Model, this fact does not support the inference that Deloitte actually *used* the Model.  Indeed, the discovery of flaws in the Model may well have provided the basis for Deloitte to decide not to use the Pauwels Model.  Pauwels has thus failed to plausibly plead that Sarmasti knew his representation to Pauwels was false.  As was the case in the First Amended Complaint, this deficiency is fatal to Pauwels's fraud claim.  *See Pauwels*, 2020 WL 818742 at *13.

Additionally, Pauwels has failed to account for those facts alleged in the complaint that contradict his assertion that Sarmasti acted with scienter.  For example, by Pauwels's own admission, BNYM invited Pauwels to participate in telephone calls about modeling with Deloitte, FAC ¶¶ 36, SAC ¶¶ 43, 52, and BNYM asked Pauwels to review calculations performed by Deloitte on what Pauwels describes as "a copy of the Pauwels Model."  FAC ¶ 43, SAC ¶ 60.  As noted in the Prior Opinion, these "allegations seem to contradict [Pauwels's] assertion that Sarmasti had the requisite scienter . . . [and] do[] not reflect any intent by Sarmasti to hide Deloitte's work or to deceive" Pauwels.  *Pauwels*, 2020 WL 818742 at *13.[4]  Because a fraud claim must be supported by "facts that give rise to a strong inference of fraudulent intent" in order to survive a motion to dismiss, this deficiency is also fatal to Pauwels's claim of fraud.  *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)

To overcome these deficiencies, the instant complaint articulates—for the first time—a theory as to *why* Sarmasti would be motivated to lie to Pauwels.  *See* SAC ¶ 57 (alleging that "Sarmasti needed to keep Pauwels in the dark" because he needed Pauwels to continue the work he was doing at that time for BNYM and "knew that if he told Pauwels the truth, Pauwels would likely terminate his relationship with BNYM, refuse to do any further work for the bank, and/or potentially commence legal proceedings").  This theory, however, is not supported by any facts pled in the complaint.  It thus amounts to no more than speculation and cannot form the basis of a well-pleaded claim of fraud.  *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir. 1994) (holding that scienter cannot be "base[d] . . . on speculation and conclusory allegations"); *see also Crystal*, 562 F. Supp. at 425 (stating that Rule 9(b) requires a complaint to allege "(1) specific facts; (2) sources that support the alleged specific facts; and (3) a basis from which an inference of fraud may fairly be drawn").  Moreover, even if the Court accepted

---

[4] Pauwels's claim of scienter is arguably even weaker here than it was in the First Amended Complaint, now that it has been revealed that Sarmasti invited Pauwels to engage in multiple conversations with Deloitte about his work, not just one.  *See* SAC ¶¶ 43, 52.

this theory as true for the purposes of this motion, it continues to be contradicted by the above-cited facts suggesting a lack of fraudulent intent.  *See* SAC ¶¶ 43, 52, 60.

In sum, Pauwels has failed to plausibly plead that Sarmasti, on behalf of BNYM, committed fraud and this claim is thus dismissed.

## IV.    Negligent Misrepresentation

The Court previously dismissed Pauwels's negligent misrepresentation claim upon finding that he failed to plausibly plead the first element of a negligent misrepresentation claim: that BNYM had "a duty, as a result of a special relationship, to give correct information."  *Pauwels*, 2020 WL 818742 at *14 (recognizing that "under New York law, a plaintiff may recover for negligent misrepresentation only where the defendant owes her a fiduciary duty" (quoting *Stewart v. Jackson & Nash*, 976 F.2d 86, 90 (2d Cir. 1992))).  The instant complaint fails to overcome this deficiency once again.

To support his claim that BNYM owed him a fiduciary duty, Pauwels points to the following allegations: (1) "his close, repeated dealings with BNYM regarding major financial transactions [that] made it critical for BNYM to provide Pauwels with timely, accurate, and correct information" (2) his "repeated, express instructions" to keep the spreadsheets private, which he alleges "required BNYM to provide [him] with truthful information" about what it did with the Spreadsheets, and (3) Sarmasti and Hegedus's agreement to maintain the confidentiality of the Spreadsheets and the Model.  SAC ¶ 101. Pauwels made essentially the same factual allegations in the First Amended Complaint.  *See* FAC at ¶¶ 88–89.[5]  The only change between the First and Second Amended Complaints is that Pauwels now

---

[5] In his First Amended Complaint, Pauwels cited as evidence of BNYM's fiduciary duty to him (1) that "his position and dealings with BNYM made it critical for BNYM to provide Pauwels with timely, accurate, and correct information" and (2) that his "repeated, express instructions to BNYM to keep the Pauwels Model confidential likewise required BNYM to provide Pauwels with truthful information regarding what BNYM did with any spreadsheets generated by Pauwels using his model."  FAC ¶ 88.  He similarly highlighted Sarmasti's statement that Deloitte "would not be using the Pauwels Model to monitor BNYM's energy sector investments." *Id*. at ¶ 89.

alleges that Sarmasti and Hegedus "agreed and confirmed" to maintain the confidentiality of the Spreadsheets and the Model. SAC ¶¶ 101, 38. While this purported agreement lends some support to Pauwels's negligent misrepresentation claim, it is insufficient to constitute a plausibly pled allegation of fiduciary duty.

By his own account, Pauwels did not obtain Sarmasti and Hegedus's purported agreement to maintain the confidentiality of the Spreadsheets until November 2014, SAC ¶ 38, eight months *after* Pauwels began working on the project, *id*. ¶¶ 18, 20. To establish a fiduciary relationship, however, a plaintiff must show "the requisite confidential relationship existed prior to their disclosure to the defendants of confidential information and that such relationship was the ambience or impetus for the disclosure." *Rodgard Corp. v. Miner Enters.*, 914 F. Supp. 907, 925 (W.D.N.Y. 1995); *aff'd in part, rev'd in part*, 108 F.3d 1394 (Fed. Cir. 1997) (unpublished table decision); *see also United States v. Kosinski*, 976 F.3d 135, 146 (2d Cir. 2020) (finding a relationship of "trust and confidence" where the plaintiff "would not have provided . . . information had [the defendant] not agreed to keep the information confidential"); *SEC v. Lyon*, 605 F. Supp. 2d 531, 545 (S.D.N.Y. 2009) (finding that a duty of confidentiality existed between two parties when "defendants received information . . . only after agreeing to keep that information confidential"). This is because "'[a]t the heart of the fiduciary relationship' lies 'reliance.'" *United States v. Chestman*, 947 F.2d 551, 568 (2d Cir. 1991) (citing *United States v. Margiotta*, 688 F.2d 108, 125 (2d Cir. 1982)). Pauwels could not have relied on Sarmasti and Hegedus's confidentiality agreement in disclosing the Model and Spreadsheets to BNYM when that promise was not made until after he made the disclosures to BNYM. *Compare* SAC ¶ 38 (alleging that Pauwels entered into the purported confidentiality agreement with Hegedus and Sarmasti after an

arranger asked for the Model and Spreadsheets); *with* SAC ¶ 37 (indicating that BNYM already had possession of the Models and Spreadsheet at the time the arranger's request was made).[6]

Accordingly, Pauwels's negligent misrepresentation claim is dismissed.

## V.    Unjust Enrichment

### A.    The Spreadsheets and Models

Pauwels's unjust enrichment claim against Deloitte—as well as his unjust enrichment claim against BNYM pertaining to the Spreadsheets and Model—are duplicative of his misappropriation of trade secrets claim.  As the Court recognized in the Prior Opinion, "where an unfair competition claim and a misappropriation claim arise from the same factual predicate . . .  the two claims generally rise or fall together."  *Pauwels*, 2020 WL 818742 at *10 (quoting *Faiveley Transp.*, 758 F. Supp. 2d at 221); *see also Nelson v. MillerCoors, LLC*, 246 F. Supp. 3d 666, 679 (E.D.N.Y. 2017) ("Even pleaded in the alternative, claims for unjust enrichment will not survive a motion to dismiss where plaintiffs fail to 'explain how their unjust enrichment claim is not merely duplicative of their other causes of action.'"). Accordingly, Pauwels's unfair competition claim is dismissed for the same reason as was his misappropriation claim.

### B.    Backpay

Pauwels's claim for backpay does not suffer from the same fatality, and must be analyzed independently.

An unjust enrichment claim requires plausible allegations that "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover."  *Briarpatch Ltd v. Phx. Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004).  Critically, "in order to state an unjust enrichment claim, a plaintiff must show that the defendant

---

[6] It is similarly implausible that Pauwels relied on Sarmasti and Hegedus's confidentiality agreement when he shared the Model and Spreadsheets with Peterson, Ruckel, and Ruckel's replacement, with whom Pauwels does not claim to have entered into such a confidentiality agreement.

actually received a benefit. Such a benefit must be both 'specific' and 'direct.'" *Regnante v. Securities & Exch. Officials*, 134 F. Supp. 3d 749, 772 (S.D.N.Y. 2015) (internal citations omitted).

In the First Amended Complaint, Pauwels asserted that "[b]y failing to pay Pauwels in full for the work that he performed for BNYM in the final months of their relationship with him, BNYM were able to enrich themselves at Pauwels's expense." FAC ¶ 99.  In the Prior Opinion, this Court found this allegation deficient because it "d[id] not clearly allege (1) the basis for the alleged missing payments, (2) how much money Plaintiff was not paid, or (3) what the difference between the full and discounted rates are." *Pauwels*, 2020 WL 818742 at *15.  Pauwels provides these details in the Second Amended Complaint: he explains the difference between the full and discounted rates of pay (£169,720 vs. £134,779), SAC ¶ 120–21; he specifies how much was not paid (£ 34,941), *id*. ¶ 121; and he articulates the alleged basis for the missed payments (BNYM claimed that "some of Pauwels's valuation work should not have been charged at full price, that his research work . . . could not be charged at all, and that some of the work was duplicative"), *id*. ¶ 70.

BNYM asserts that despite these additional facts pled, Pauwels still fails to plausibly plead a claim for unjust enrichment "because [the] alleged work covered by [Pauwels's] final invoices—'pricing large intercompany loans . . . valuing investments, and other investment-related work for the bank'— fails to allege a 'specific' or 'direct' benefit that BNYM 'actually received' beyond that for which it paid."  BMNY Mem. at 19 (citing SAC ¶ 68; *Regnante*, 134 F. Supp. 3d at 772).  To support this argument, BNYM cites two decisions from this district in which an unjust enrichment claim was dismissed for "fail[ure] to provide any explanation of the nature of [the defendant's] enrichment."  *Id*. (citing *Washington v. Kellwood Co*., 05-CV-10034 (DAB), 2009 U.S. Dist. LEXIS 32565, 2009 WL 855652, at *11 (S.D.N.Y. Mar. 24, 2009); *Mina Inv. Holdings, Ltd. v. Lefkowitz*, 51 F. Supp. 2d 486, 490 (S.D.N.Y. 1999)).  These cases, however, are distinguishable.  In *Washington*, for example, the plaintiffs failed to "explain how Defendant was enriched, how the alleged enrichment came at Plaintiffs'

expense, or why this alleged enrichment was inequitable." 2009 WL 855652 at *11. Pauwels, by contrast, has clearly pled as much. The motion to dismiss the unjust enrichment claim against Defendant BNYM is thus denied.

## CONCLUSION

For the foregoing reasons, Pauwels's claims are dismissed with prejudice with the exception of his seventh cause of action for unjust enrichment against BNYM. The Clerk of Court is respectfully directed to terminate the motions pending at docket entries 66 and 68 and terminate defendants Deloitte LLP, Deloitte Tax LLP, and Deloitte USA LLP from this case.

Pauwels and BNYM shall submit a joint letter to the Court no later than April 2, 2021, proposing next steps for this litigation.

SO ORDERED.

Dated:     March 26, 2021
           New York, New York

_____
RONNIE ABRAMS
United States District Judge