1:19-cv-02313-RA

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2022

(Argued: September 27, 2022    Decided: October 6, 2023)

Docket No. 22-21-cv

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/6/2023 __

_____

ANDRE PAUWELS,

*Plaintiff-Appellant*,

v.

DELOITTE LLP, DELOITTE TAX LLP, DELOITTE USA LLP, BANK OF NEW YORK
MELLON CORPORATION, LLP, THE BANK OF NEW YORK MELLON,
*Defendants-Appellees*.

_____

Before:        JACOBS, SACK, AND ROBINSON, *Circuit Judges*.

In 2009, defendants-appellees Bank of New York Mellon Corporation, LLP and its subsidiary, The Bank of New York Mellon (collectively, "BNYM") retained plaintiff-appellee Andre Pauwels as an independent contractor to work on an investment valuation project. BNYM and Pauwels continued to work together in the following years on a deal-by-deal basis. In 2014, to facilitate his work for BNYM, Pauwels developed the so-called Pauwels Model, a bespoke valuation tool that he used to evaluate BNYM's potential energy-sector investments and to monitor existing ones. At various times between 2014 and the end of his working relationship with BNYM in 2018, Pauwels shared spreadsheets derived from the Pauwels Model with various employees and executives at BNYM.

In 2016, BNYM retained defendants-appellees Deloitte LLP, Deloitte Tax LLP, and Deloitte USA LLP (collectively, "Deloitte") to take over the work that Pauwels had been performing for BNYM. In 2018, Pauwels learned that BNYM had shared his spreadsheets with Deloitte without his consent. Pauwels alleges that Deloitte used the spreadsheets to reverse engineer the Pauwels Model and was using the model to conduct the services it provided to BNYM. After Pauwels confronted BNYM about its alleged unauthorized disclosure to Deloitte, BNYM terminated its relationship with Pauwels.

CERTIFIED COPY ISSUED ON 10/06/2023

Pauwels then brought suit against BNYM and Deloitte in the United States District Court for the Southern District of New York alleging, *inter alia*, that the Pauwels Model embodied a trade secret that they misappropriated. Pauwels also raised several other claims arising under New York law.

BNYM and Deloitte moved to dismiss all of Pauwels's claims. The district court (Abrams, *J.*) granted the motion and entered a final judgment dismissing the claims. Pauwels now appeals.

For the reasons set forth below, we

REVERSE AND REMAND the district court's judgment insofar as it dismissed Pauwels's unjust enrichment claim. We AFFIRM the remainder of the judgment.

Judge Jacobs concurs in part and dissents in part in a separate opinion.

JOSHUA I. SCHILLER, Boies Schiller Flexner LLP, New York, NY, *for Plaintiff-Appellant*;

JOHN F. HARTMANN, Kirkland & Ellis LLP, Chicago, IL; (John P. Del Monaco, Kirkland & Ellis LLP, New York, NY; Matthew D. Rowan, Kirkland & Ellis LLP, Washington, DC, *on the brief*), *for Defendants-Appellees* Deloitte LLP, Deloitte Tax LLP, and Deloitte USA LLP;

MICHAEL L. BANKS, Morgan, Lewis & Bockius LLP, Philadelphia, PA (Keri L. Engelman, Morgan, Lewis & Bockius LLP, Boston, MA; Catherine L. Eschbach, Morgan, Lewis & Bockius, Houston, TX, *on the brief*), *for Defendants-Appellees* Bank of New York Mellon Corporation and The Bank of New York Mellon.

22-21-cv
*Pauwels v. Deloitte LLP*

SACK, *Circuit Judge*:

In 2009, defendants-appellees Bank of New York Mellon Corporation, LLP and its subsidiary, The Bank of New York Mellon (collectively, "BNYM") retained plaintiff-appellee Andre Pauwels as an independent contractor to work on an investment valuation project. BNYM and Pauwels continued to work together in the following years on a deal-by-deal basis. In 2014, to facilitate his work for BNYM, Pauwels developed the so-called Pauwels Model, a bespoke valuation tool that he used to evaluate BNYM's potential energy-sector investments and to monitor existing ones. At various times between 2014 and the end of his working relationship with BNYM in 2018, Pauwels shared spreadsheets derived from the Pauwels Model with various employees and executives at BNYM.

In 2016, BNYM retained defendants-appellees Deloitte LLP, Deloitte Tax LLP, and Deloitte USA LLP (collectively, "Deloitte") to take over the work that Pauwels had been performing for BNYM. In 2018, Pauwels learned that BNYM had shared his spreadsheets with Deloitte without his consent. Pauwels alleges that Deloitte used the spreadsheets to reverse engineer the Pauwels Model and was using the model to conduct the services it provided to BNYM. After

3

Pauwels confronted BNYM about its alleged unauthorized disclosure to Deloitte,

BNYM terminated its relationship with Pauwels.

Pauwels then brought suit against BNYM and Deloitte in the United States

District Court for the Southern District of New York alleging, *inter alia*, that the

Pauwels Model embodied a trade secret that they misappropriated.  Pauwels

also raised several other claims arising under New York law.

BNYM and Deloitte moved to dismiss all of Pauwels's claims.  The district

court (Abrams, *J.*) granted the motion and entered a final judgment dismissing

the claims.  Pauwels now appeals.

For the reasons set forth below, we REVERSE AND REMAND the district

court's judgment insofar as it dismissed Pauwels's unjust enrichment claim and

AFFIRM the remainder of the judgment.

## BACKGROUND

We review *de novo* a district court's grant of a motion to dismiss pursuant

to Federal Rule of Civil Procedure 12(b)(6).  *Cornelio v. Connecticut*, 32 F.4th 160,

168 (2d Cir. 2022).  To survive a motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to "state a claim to relief that is

plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and internal quotation marks omitted).

We may affirm a district court's grant of a motion to dismiss "on any basis supported by the record," *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020) (citation omitted), "including grounds upon which the district court did not rely," *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir. 1993).

Pauwels's allegations, and other relevant undisputed facts, are as follows:

## I. The Pauwels Model

Pauwels, a "citizen of Belgium, residing in London, United Kingdom," Jt. App'x 45 ¶ 5, describes himself as having "years of experience and expertise in evaluating complex financial transactions," *id.* at 48 ¶ 21. In 2009, Kevin Peterson, a BNYM executive, approached Pauwels with an offer to work with BNYM as an "independent advisor" to help BNYM analyze potential investments. *Id.* at 46 ¶ 14. Pauwels began providing his services to BNYM in

April 2009 on a deal-by-deal basis. At no point relevant to this litigation did BNYM and Pauwels enter into a written contract that governed the parties' working relationship.

In March 2014, BNYM engaged Pauwels to evaluate a potential investment in the alternative energy sector. As part of his work on the project, Pauwels developed the so-called "Pauwels Model," a "proprietary model to value BNYM's proposed energy sector investments." Jt. App'x 48 ¶ 21. "The Pauwels Model served as both a direct valuation tool for Pauwels and as a means to check spreadsheets and proposals sent to BNYM by investment sponsors and arrangers." *Id.* "In short, the Pauwels Model is an interconnected system of formulas and equations . . . . The Pauwels Model was integrated into and implemented in Excel spreadsheets ('Pauwels Model Spreadsheets') . . . ." *Id.* at 51 ¶ 33. The Pauwels Model Spreadsheets had a distinctive structure, layout, and design, and included formulas and a calculation sequencing structure.

After Pauwels completed the March 2014 project, the scope of his work for BNYM expanded. Pauwels used the Pauwels Model to, among other things, analyze more than twenty potential energy-sector investments and to monitor BNYM's existing investments.

## II.    Pauwels's Disclosure of the Pauwels Model Spreadsheets to BNYM

Pauwels would typically send only the top-line outputs generated by the Pauwels Model to his points of contact at BNYM.  These figures, importantly, were abbreviated.  They did not disclose the "entire system of formulas and computations from the Pauwels Model."  Jt. App'x 51 ¶ 31.

However, unlike the top-line figures Pauwels typically sent to BNYM, Pauwels considered the Pauwels Model Spreadsheets to be confidential and proprietary, in part because the Pauwels Model Spreadsheets could be, and indeed ultimately were, used to reverse engineer the Pauwels Model and thereby disclose the model to persons who otherwise would not have access to it.

At various times over the course of their working relationship, Pauwels sent Pauwels Model Spreadsheets to BNYM "when it was necessary to illustrate the basis for his expert advice and its implications."  Jt. App'x 52 ¶ 35. Specifically, Pauwels sent Pauwels Model Spreadsheets to (1) Peterson, the BNYM executive who had hired him; (2) Martin Ruckel, a manager in BNYM's tax accounting department; (3) an unnamed individual who replaced Ruckel in December 2017; (4) Reza Sarmasti, a managing director in charge of BNYM's tax accounting department; and (5) Laura Hegedus, a managing director in charge of

22-21-cv
*Pauwels v. Deloitte LLP*

BNYM's wind-energy investments.  Although Pauwels did not send Pauwels

Model Spreadsheets to anyone else at BNYM, he acknowledges that up to one

hundred people could work on any single energy transaction.

Pauwels alleges that he established "firm limits on who inside and outside

of BNYM could receive (or even see) the Pauwels Model Spreadsheets."  Jt.

App'x 53 ¶ 37.  Pauwels "included his initials—AP—in most of the Pauwels

Model Spreadsheets that he shared with BNYM."  *Id.* at 54 ¶ 39.  However, these

spreadsheets did not contain any other indication that Pauwels considered them

to be confidential or to contain trade secret information.  Moreover, Pauwels

neither encrypted nor password-protect the materials that he sent to BNYM.

In November 2014, Pauwels had a conversation with Sarmasti and

Hegedus in which Pauwels said that he considered the Pauwels Model and the

Pauwels Model Spreadsheets to be proprietary and confidential.  Pauwels alleges

that "Sarmasti and Hegedus agreed and confirmed, on behalf of BNYM, that the

Pauwels Model and Pauwels Model Spreadsheets were confidential and

proprietary and that they would not be shared outside of BNYM."  Jt. App'x 53 ¶

38.  However, Pauwels and BNYM never entered into a written confidentiality or

non-disclosure agreement regarding the model or the spreadsheets.  Instead,

Pauwels relied on his oral agreement with Sarmasti and Hegedus regarding the

model and spreadsheets' confidentiality and trusted that BNYM—including

Kevin Peterson, whom he regarded as a friend—would not betray his trust and

instead would keep the materials confidential.

On two occasions—first in November 2014 and then in December 2016—

BNYM personnel, including Hegedus and Sarmasti, requested Pauwels's

permission to share the Pauwels Model Spreadsheets with third parties to

facilitate various transactions. Both times, Pauwels refused. BNYM complied

with Pauwels's wishes.

### III.   BNYM Retains Deloitte

In the spring of 2016, BNYM informed Pauwels that it had retained

Deloitte to conduct a review and audit of BNYM's procedures for analyzing

wind-energy investments. Around this time, Pauwels joined four calls with

Deloitte, during which Deloitte was made aware of the Pauwels Model's

existence. At no point during those calls did Pauwels authorize the disclosure of

the Pauwels Model Spreadsheets to Deloitte.

Pauwels alleges that contrary to what BNYM disclosed to him at the time,

BNYM brought in Deloitte to replace Pauwels. As part of this process, Deloitte

seconded one of its employees to BNYM's tax department. BNYM provided the

Deloitte employee with "the Pauwels Model and the Pauwels Model Spreadsheets." Jt. App'x 57 ¶ 47. He "was tasked with duplicating and understanding the" model. *Id.*

Later in 2016, BNYM told Pauwels that he should stop tracking and monitoring BNYM's existing energy sector investments because BNYM had engaged an outside consulting firm to take over those responsibilities. But as of early 2017, Pauwels continued to model new alternative energy investments for BNYM. And in March 2017, he was invited to participate in a conference call with Deloitte to discuss some of BNYM's investments. At this time, though, Pauwels was unaware that BNYM had already given "the Pauwels Model Spreadsheets for [BNYM's] 2014, 2015 and 2016 investments to Deloitte (11 spreadsheets, covering 18 windfarm investments)." Jt. App'x 59 ¶ 56. He refused to participate in the call, nevertheless emailing Sarmasti explaining that he considered Deloitte to be his competitor, that he had developed the Pauwels Model himself, and that expected Deloitte to do the same.

On March 10, 2017, Pauwels spoke with Sarmasti and told him: "I hope they [Deloitte] are not using my spreadsheets." Jt. App'x 59 ¶ 55. In response, "Sarmasti falsely assured Pauwels that Deloitte had its own software and was

not using the" spreadsheets. *Id.* at 59 ¶ 55. Sarmasti allegedly lied to Pauwels because BNYM needed him to conduct work on ongoing projects and because Sarmasti knew that if he told Pauwels the truth—that BNYM had already given Deloitte the spreadsheets—he would refuse to do further work for BNYM.

Throughout 2017 and the beginning of 2018, Pauwels continued to work with BNYM to model and analyze new investments, believing that Deloitte was using its own software. Then, on April 12, 2018, a BNYM employee sent Pauwels a Deloitte spreadsheet that revealed that Deloitte was not using its own software, but instead had copied the Pauwels Model using the Pauwels Model Spreadsheets.

In early May 2018, Pauwels confronted Sarmasti and Peterson about Deloitte's use of the Pauwels Model. Sarmasti admitted to Pauwels that BNYM had disclosed the Pauwels Model Spreadsheets to Deloitte. On May 15, 2018, BNYM terminated its relationship with Pauwels.

## IV.     The Current Lawsuit

On March 14, 2019, Pauwels initiated this action against BNYM and Deloitte in the United States District Court for the Southern District of New York, advancing claims of, *inter alia*, trade secret misappropriation, unfair competition, and unjust enrichment. Pauwels also brought claims of fraud and negligent

misrepresentation against BNYM only.  The district court's jurisdiction was

based on diversity of citizenship.

BNYM and Deloitte moved to dismiss all of Pauwels's claims.  The district

court granted the motion in its entirety and dismissed the complaint without

prejudice.  After Pauwels filed his second amended complaint ("SAC"), BNYM

and Deloitte again moved to dismiss all his claims.  The district court granted the

motion in relevant part and entered a judgment dismissing Pauwels's claims

with prejudice.[1]  Pauwels appeals.

## DISCUSSION

### I.  Trade Secret Misappropriation

Pauwels alleges that the Pauwels Model is a trade secret that BNYM and

Deloitte misappropriated in violation of New York law.  To state a claim for

trade secret misappropriation under New York law, a plaintiff must adequately

allege "(1) that it possessed a trade secret, and (2) that the defendants used that

trade secret in breach of an agreement, confidential relationship or duty, or as a

result of discovery by improper means."  *Faiveley Transp. Malmo AB v. Wabtec

Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) (citation omitted).  Because we conclude

---

[1] Pauwels also brought a claim against BNYM alleging it that had failed to pay one of his invoices.  The
district court denied BNYM's motion to dismiss this claim.  After the parties settled this claim, the district
court entered its final judgment.

that the district court correctly determined that Pauwels failed to plausibly allege

that the Pauwels Model was a trade secret and that either BNYM or Deloitte

misappropriated it, we affirm the dismissal of these claims.

A.

Under New York law, the first element of trade secret misappropriation—

possession of a trade secret—is generally evaluated with reference to six factors,

including, critically, "the extent of measures taken by [the plaintiff] to guard the

secrecy of the information." *Ashland Mgmt. v. Janien,* 82 N.Y.2d 395, 407 (1993)

(citation omitted).[2]  "[A] trade secret must first of all be secret . . . ." *Schroeder v.*

*Pinterest Inc.,* 17 N.Y.S.3d 678, 691 (1st Dep't 2015) (alteration in original) (citation

omitted); *see also Lehman v. Dow Jones & Co., Inc.,* 783 F.2d 285, 298 (2d Cir. 1986)

("[T]he most important consideration remains whether the information was a

secret.").  Accordingly, in order to successfully state a claim for trade secret

misappropriation, "courts require that the [plaintiff-]possessor of a trade secret

---

[2] The full list of factors is as follows:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Ashland Mgmt. Inc.,* 82 N.Y.2d at 407 (alterations adopted) (citation omitted).

22-21-cv
*Pauwels v. Deloitte LLP*

take reasonable measures to protect its secrecy." *Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1063 (2d Cir. 1985) (citation omitted). And "[a]bsent such measures," the information "will cease to be a trade secret and will lose the protections of trade secret law." *Id.*

In arguing that he took sufficient steps to keep the Pauwels Model secret, Pauwels asserts that 1) he sent the Pauwels Model Spreadsheets only to a core group of individuals at BNYM, and only when necessary to illustrate the basis for his advice; 2) two of the BNYM employees with whom he shared the spreadsheets orally agreed to keep them and the model secret; 3) in many instances, he placed his initials on the spreadsheets that he provided to BNYM; and 4) on two occasions, when he refused BNYM's request to share the spreadsheets with third parties, BNYM complied. Construing the allegations in the SAC in the light most favorable to Pauwels, as we must, we nonetheless find these arguments unpersuasive.

First, although Sarmasti and Hegedus orally agreed that the "Pauwels Model and Pauwels Model Spreadsheets were confidential and proprietary and that they would not be shared outside of BNYM," Jt. App'x 53 ¶ 38, Pauwels alleges that he sent the Pauwels Model Spreadsheets to three other individuals at

14

BNYM from whom he did not receive any similar assurances, *id.* at 52 ¶ 35. This severely undercuts Pauwels's assertion that he took reasonable measures to safeguard the secrecy of the Pauwels Model and the spreadsheets. *See, e.g.*, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the trade secret, his property right is extinguished."); *Defiance Button*, 759 F.2d at 1063 ("[T]he owner is entitled to such protection only as long as he maintains the [alleged trade secret] in secrecy; upon disclosure, even if inadvertent or accidental, the information ceases to be a trade secret and will no longer be protected.").

Second, Pauwels's allegations relating to Sarmasti and Hegedus's oral agreement depict at most an informal understanding among them. Pauwels does not adequately allege facts to support the inference that these individuals had the authority to bind all of BNYM to a non-disclosure agreement and he acknowledges that this agreement was not reflected in writing. He also does not plausibly allege concrete facts concerning the scope of this alleged promise, including any steps required of BNYM to ensure compliance. In any event, the

alleged agreement was an inadequate measure to safeguard the secrecy of the

model or spreadsheets because the agreement did not prevent Sarmasti or

Hegedus from circulating those materials throughout the entirety of BNYM,

including to individuals from whom Pauwels received no such promises.  Jt.

App'x 53 ¶ 38 ("Pauwels explained that he would not share [the model or

spreadsheets with] anyone *outside BNYM* at all . . . .  Sarmasti and Hegedus

agreed and confirmed, on behalf of BNYM, that the Pauwels Model and Pauwels

Model Spreadsheets were confidential and proprietary and that they would not

be shared *outside of BNYM*." (emphases added)); *see Ruckelshaus*, 467 U.S. at 1002;

*cf. Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174

(2d Cir. 1990) (concluding that a party took sufficient measures to protect secrecy

of its product architecture where, among other things, it required employees to

sign non-disclosure agreements).

Third, the SAC is devoid of allegations that Pauwels password protected,

encrypted, or expressly labeled the Pauwels Model Spreadsheets—from which

the Pauwels Model could be and ultimately was reverse engineered—as

"confidential."  *Cf. Turret Labs USA, Inc. v. CargoSprint, LLC*, No. 21-952, 2022 WL

701161, at *3 (2d Cir. Mar. 9, 2022) (summary order) ("reasonable measures" to

safeguard a trade secret include "encrypt[ing] [the alleged trade secret] and

require[ing] licensees to agree to confidentiality." (quoting *InteliClear, LLC v. ETC*

*Glob. Holdings, Inc.*, 978 F.3d 653, 660 (9th Cir. 2020)). Instead, Pauwels contends

that his placement of his initials on some of the Pauwels Model Spreadsheets was

a sufficient measure to protect the secrecy of the alleged trade secret. But even if

placing initials on spreadsheets is an appropriate way to protect their

confidentiality, Pauwels's argument fails inasmuch as he concedes that he

sometimes sent Pauwels Model Spreadsheets that did not include his initials to

BNYM personnel. *See, e.g.*, *Universal Processing LLV v. Weile Zhuang*, No. 17-cv-

10210, 2018 WL 4684115, at *3 (S.D.N.Y. Sept. 28, 2018) (concluding that the

plaintiff failed to take reasonable measures to safeguard the secrecy of an alleged

trade secret, even where the plaintiff used "passwords, security timeouts and

confidentiality policies and non-disclosure agreements," in part because the

defendant had access to files with the alleged trade secret that "were not

encrypted"); *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 521 (S.D.N.Y. 2017)

(software was not a trade secret in part because the plaintiff did not "mark its

training materials, emails about the software's functionalities, or the software

itself with confidentiality legends.").

Finally, in light of the foregoing, Pauwels's refusal to share the Pauwels Model Spreadsheets with third parties on two occasions is insufficient to render the Pauwels Model a secret because he disclosed the spreadsheets to individuals at BNYM who were not obligated to keep his materials secret and because his agreement with Sarmasti and Hegedus allowed them to do so the same.

In sum, because we agree with the district court that Pauwels failed to adequately plead the existence of a trade secret, Pauwels's trade secret claims fail.

## B.

We also agree with the district court that Pauwels failed to adequately plead that either BNYM or Deloitte misappropriated the Pauwels Model, which independently supports dismissal of his claims. As noted, under New York law, a defendant misappropriates a trade secret by using it "in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *Faiveley*, 559 F.3d at 117 (citation omitted).

### i.    *BNYM*

22-21-cv
*Pauwels v. Deloitte LLP*

Pauwels alleges that he was in a fiduciary-like relationship of trust and confidence with BNYM and that BNYM breached that relationship by sharing the Pauwels Model Spreadsheets with Deloitte.

"[A] fiduciary relationship arises between two persons when one of them is under a duty to act for or to give guidance for the benefit of another upon matters within the scope of the relation." *Oddo Asset Mgmt. v. Barclays Bank PLC*, 19 N.Y.3d 584, 592-93 (2012) (citation and internal quotation marks omitted). "In New York, 'a conventional business relationship, without more, is insufficient to create a fiduciary relationship. Rather, a plaintiff must show special circumstances that transformed the parties' business relationship into a fiduciary one.'" *Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 273 n.57 (S.D.N.Y. 2014) (alteration adopted) (quoting *Legend Autorama, Ltd. v. Audi of Am., Inc.*, 954 N.Y.S.2d 141, 144 (2d Dep't 2012)), *aff'd sub nom. Big Vision Priv. Ltd. v. E.I. du Pont de Nemours & Co.*, 610 F. App'x 69 (2d Cir. 2015) (summary order); *In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002) ("When parties deal at arm[']s length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." (alteration adopted) (citation

22-21-cv
*Pauwels v. Deloitte LLP*

omitted)). Moreover, "employment relationships," without more, "do not create fiduciary relationships." *Rather v. CBS Corp.*, 886 N.Y.S.2d 121, 125 (1st Dep't 2009) (concluding that employer did not owe an employee fiduciary duties notwithstanding the employee's "four-decade history" with the employer); *Freedman v. Pearlman*, 706 N.Y.S.2d 405, 409 (1st Dep't 2000) (allegations that an employee trusted the defendant "as his employer to treat him fairly . . . does not give rise to a fiduciary duty").

Special circumstances giving rise to a fiduciary duty may be present where the party that relied on the relationship "reposed confidence in [the other party] and reasonably relied on the other's superior expertise or knowledge." *Wiener v. Lazard Freres & Co.*, 672 N.Y.S.2d 8, 14 (1st Dep't 1998); *see, e.g., L. Magarian & Co. v. Timberland Co.*, 665 N.Y.S.2d 413, 414 (1st Dep't 1997) (special circumstances include "control by one party of the other for the good of the other or creation of an agency relationship" (citations omitted)); *Kern v. Robert Currie Assocs.*, 632 N.Y.S.2d 75, 76 (1st Dep't 1995) (allegations that the plaintiffs "relied on defendants' expert advice [and] entrusted them with their money" supported the existence of a fiduciary duty in the context of a commercial relationship). However, the "mere communication of confidential information [is not]

22-21-cv
*Pauwels v. Deloitte LLP*

sufficient in and of itself to create a fiduciary relationship" between two parties.
*Wiener*, 672 N.Y.S.2d at 14.

Pauwels argues that he had a years-long relationship with BNYM that
pre-dated his creation of the Pauwels Model during which "BNYM had always
respected the proprietary nature of his [previous] models and spreadsheets . . .
and had always complied with his direction to keep them confidential."
Appellant's Br. at 18 (quoting Jt. App'x 54 ¶ 40). According to Pauwels, the
parties' successful historic working relationship reflects special or exceptional
circumstances that imposed a duty on BNYM to act as a fiduciary to Pauwels.

We disagree. Pauwels does not allege anything to suggest that BNYM was
required to act on his behalf, exercised control over him, or that Pauwels sought
or relied upon BNYM's expert advice or knowledge with respect to matters
within the scope of their relationship. The non-conclusory allegations in the SAC
demonstrate that Pauwels's relationship with BNYM was no more than a
standard business relationship of mutual economic benefit, comparable to an
employer-employee relationship negotiated at arm's length. *See, e.g.*, Jt. App'x 47
¶ 17 (Pauwels "worked as an independent advisor, providing BNYM with
outside expertise and analysis; he was compensated for his services based on

21

invoices that he would periodically submit to BNYM for processing").

Accordingly, under these circumstances, Pauwels's "subjective claims of

reliance" on his relationship with BNYM are inadequate to transform a standard

business relationship into something more.  *See SNS Bank, N.V. v. Citibank, N.A.*,

777 N.Y.S.2d 62, 65 (1st Dep't 2004) (citation omitted).

In sum, the SAC does not adequately allege that BNYM misappropriated

the Pauwels Model because Pauwels failed to plead BNYM owed him any

fiduciary-like duties.

### ii.   Deloitte

Pauwels argues that Deloitte misappropriated the Pauwels Model by

obtaining it through "improper means."[3]  "Improper means" include "fraudulent

misrepresentations to induce disclosure, tapping of telephone wires,

eavesdropping or other espionage. . . .  In general they are means which fall

below the generally accepted standards of commercial morality and reasonable

conduct."  Restatement (First) of Torts § 757 cmt. f (Am. L. Inst. 1939).

---

[3] The parties have not cited, and we are not aware of, any case in which a New York court has defined "improper means" under New York law.  "New York courts have, however, looked to the Restatement of Torts in defining the various elements of the [trade secret misappropriation] cause of action.  Accordingly, the Restatement is an appropriate source of guidance here."  *Balance Point Divorce Funding, LLC v. Scrantom*, 978 F. Supp. 2d 341, 353-54 (S.D.N.Y. 2013) (citations omitted).

Pauwels contends that Deloitte "requested the Pauwels Model [from BNYM] with the intent to use it with full knowledge of the Model's proprietary and confidential nature," Appellant's Br. at 21, and that this conduct fell "below the generally accepted standards of commercial morality and reasonable conduct," *id*. (citation omitted). But even assuming that this conduct constitutes "improper means," the argument finds no factual support in the SAC. To the contrary, the SAC repeatedly alleges that BNYM "gave" the spreadsheets to Deloitte, and that Deloitte "accepted" them. *See, e.g.*, Jt. App'x 67 ¶¶ 80-81 (BNYM "gave to Deloitte the Pauwels Model Spreadsheets for use and duplication" and Deloitte "accepted the Pauwels Model Spreadsheets"); *id.* at 68 ¶¶ 89-90 (same). Pauwels does not allege that Deloitte "requested" the model or spreadsheets at any time. Therefore, the facts alleged in the SAC establish that BNYM chose, on its own, to give the Pauwels Model Spreadsheets to Deloitte as part of an ordinary business arrangement, which forecloses Pauwels's argument that Deloitte used improper means to obtain the spreadsheets or model. *Schroeder*, 17 N.Y.S.3d at 691 (an allegation that a party—here, BNYM—gave an alleged trade secret to a defendant—here, Deloitte—without more, was

22-21-cv
*Pauwels v. Deloitte LLP*

insufficient to give rise to an inference that the defendant used improper means

to obtain the alleged trade secret).

\*   \*   \*

The district court correctly determined that Pauwels failed to plausibly

allege that the Pauwels Model was a trade secret or that BNYM or Deloitte

misappropriated it.  We therefore affirm the district court's dismissal of

Pauwels's trade secret misappropriation claims against BNYM and Deloitte.

## II.    Unfair Competition

Pauwels brought a claim for unfair competition under New York law

against BNYM and Deloitte, alleging that irrespective of whether the Pauwels

Model was a trade secret, BNYM and Deloitte misappropriated his labor, skills,

and expenditures by using the Pauwels Model.  The district court concluded that

these claims should be dismissed for the same reasons that Pauwels's claims for

trade secret misappropriation failed.  We agree.

 "The essence of an unfair competition claim under New York law is that

the defendant misappropriated the fruit of plaintiff's labors and expenditures by

obtaining access to plaintiff's business idea either through fraud or deception, or

an abuse of a fiduciary or confidential relationship."  *Telecom Int'l Am., Ltd. v. AT*

*& T Corp.*, 280 F.3d 175, 197 (2d Cir. 2001) (citation omitted).  "Under New York

24

law, where an unfair competition claim and a misappropriation claim arise from

the same factual predicate . . . the two claims generally rise or fall together."

*Faiveley Transp. USA, Inc. v. Wabtec Corp.*, 758 F. Supp. 2d 211, 221 (S.D.N.Y. 2010)

(citation and internal quotation marks omitted) (collecting cases).

Here, Pauwels's unfair competition and trade secret misappropriation

claims arise from the same factual predicate—that BNYM gave Deloitte the

Pauwels Model Spreadsheets in breach of BNYM's fiduciary and confidential

duties to Pauwels and that Deloitte accessed the spreadsheets through improper

means.  But, for the reasons explained above, BNYM did not owe Pauwels any

fiduciary-like duties.  And BNYM did not "obtain[] access to [the Pauwels

Model] either through fraud or deception," *Telecom*, 280 F.3d at 197,  because

Pauwels freely sent the spreadsheets to BNYM personnel, including to those

from whom he did not have any promise that they would keep the spreadsheets

confidential.  Likewise, as discussed above, Deloitte did not obtain the Pauwels

Model through fraud or deception—to the contrary, BNYM chose to give

Deloitte the Pauwels Model Spreadsheets as part of an ordinary business

arrangement.

22-21-cv
*Pauwels v. Deloitte LLP*

We therefore affirm the district court's dismissal of Pauwels's unfair

competition claim against BNYM and Deloitte.

### III.    Unjust Enrichment

Pauwels brought a claim for unjust enrichment against BNYM and

Deloitte, alleging that they unjustly enriched themselves at his expense through

their use of the Pauwels Model.  Pauwels alleges that "BNYM paid for Pauwels'

advice and expertise, not for his models," Jt. App'x 47 ¶ 16, but despite this,

BNYM took the Pauwels Model Spreadsheets and gave them to Deloitte "to use

and copy," *id.* at 72 ¶ 109.  According to Pauwels, this conduct enriched BNYM

by enabling them to "avoid[] the time and expense of paying Deloitte to develop

their own model . . . which would have taken more time and been more

expensive than just copying the Pauwels Model." *Id.* at 72 ¶ 109; *see also id.* at 73

¶ 112 (alleging that BNYM "paid Pauwels for his analysis and advice" and that

BNYM knew that the Pauwels Model Spreadsheets "represented [Pauwels's]

proprietary property and was only being shared in confidence to help illustrate

Pauwels' expert advice").  Pauwels further alleges that, by using and duplicating

the Pauwels Model, Deloitte was enriched by "(a) being able to perform—and be

compensated for—the monitoring work that Pauwels had previously performed

for BNYM and (b) acquiring a fully developed financial model for BNYM's

wind-energy investments without the time and expense of developing one for themselves."  *Id.* at 73 ¶ 115.

The district court determined that Pauwels's unjust enrichment claims should be dismissed because they were duplicative of his claims of trade secret misappropriation.  We disagree.

"The basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover."  *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004).

The district court erred by concluding that Pauwels's unjust enrichment claim should be dismissed as "duplicative of his misappropriation of trade secrets claims."  *Pauwels v. Bank of N.Y. Mellon Corp.*, No. 19-cv-2313, 2021 WL 1164501, at *7 (S.D.N.Y. Mar. 26, 2021).  In so holding, the district court relied on inapposite caselaw that explained that "where an *unfair competition* [*not* unjust enrichment] claim and a misappropriation claim arise from the same factual predicate . . . the two claims generally rise or fall together."  *Id.* (emphasis added) (quoting *Faiveley*, 758 F. Supp. 2d at 221).

As illustrated above, that unfair competition and trade secret misappropriation claims typically rise or fall together follows from the fact that the two causes of action share the common element of misappropriation. *Compare, e.g., Telecom*, 280 F.3d at 197 ("The essence of an unfair competition claim under New York law is that the defendant *misappropriated* the fruit of plaintiff's labors and expenditures . . . ." (emphasis added) (citation omitted)), *with Faiveley*, 559 F.3d at 117 ("To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate . . . that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." (citation omitted)). Accordingly, if a plaintiff cannot adequately allege that a defendant misappropriated the plaintiff's property or trade secret, the plaintiff cannot state a claim for either unfair competition or trade secret misappropriation.

By contrast, however, misappropriation is not an element of a claim for unjust enrichment under New York law. *See Briarpatch Ltd.*, 373 F.3d at 306. Therefore, a plaintiff's claim for unjust enrichment does not necessarily rise or fall with a claim of trade secret misappropriation.

Here, the crux of Pauwels's unjust enrichment claim is that BNYM

compensated him solely for his expert consultation but BNYM took more than

what it bargained for when it shared the Pauwels Model Spreadsheets with

Deloitte in order to have them reverse engineer the Pauwels Model.  Because this

theory of liability is distinct from those underpinning Pauwels's claim for trade

secret misappropriation, we conclude that Pauwels's claim for unjust enrichment

should not have been dismissed as duplicative of his claim for trade secret

misappropriation.

   i.  *BNYM*

BNYM argues that we should nevertheless affirm the district court's

dismissal of Pauwels's claim for unjust enrichment because the claim is

precluded by a valid and enforceable contract between Pauwels and BNYM.[4]

Pauwels does not dispute that he entered into a valid and enforceable oral or

implied-in-fact contract with BNYM to provide consulting services to BNYM.  He

contends, however, that because the contract did not contemplate Pauwels

---

[4] Although BNYM did not raise this argument in its appellee's brief, after oral argument, we ordered the parties to submit supplemental briefing on the following question: "Did a valid and enforceable contract exist between Pauwels and BNYM? If so, what is the impact of that contract on Pauwels's unjust enrichment claim?  *See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 521 N.Y.S.2d 653, 656 (1987)."  Docket No. 79.  In its supplemental brief, BNYM argued that a valid and enforceable contract exists and that the existence of that contract bars recovery on Pauwels's unjust enrichment claim.

22-21-cv
*Pauwels v. Deloitte LLP*

selling his underlying intellectual property to BNYM, the contract does not

preclude his claim for unjust enrichment.  We agree.

Under New York law, "the existence of a valid and enforceable written

contract governing a particular subject matter ordinarily precludes recovery in

quasi contract for events arising out of the same subject matter."

*Clark-Fitzpatrick*, 521 N.Y.S.2d at 656; *accord Beth Israel Med. Ctr. v. Horizon Blue*

*Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006) (explaining that

this rule applies to written, oral, and implied-in-fact contracts).  "If, however,

there is a bona fide dispute as to the existence of a contract or whether the scope

of an existing contract covers the disagreement between the parties, a party will

not be required to elect his or her remedies and may proceed on both quasi

contract and breach of contract theories."  *M/A-Com, Inc. v. State*, 910 N.Y.S.2d

246, 247 (3d Dep't 2010).

BNYM contends that it entered into an oral or implied contract with

Pauwels pursuant to which it engaged him "to develop spreadsheets and deliver

them to BNYM" and committed to pay Pauwels "for the services rendered and

the spreadsheets that were delivered."  BNYM Supp. Br. at 1; *see also id.* at 3 ("[A]

contract existed limited solely to an agreement to pay Mr. Pauwels for the

spreadsheets . . . .").  Therefore, according to BNYM, because this contract

provides that BNYM would pay Pauwels for the Pauwels Model Spreadsheets, it

addresses the same subject matter of, and therefore precludes, Pauwels's unjust

enrichment claim.

BNYM's argument fails.  BNYM's contention that it entered into a contract

pursuant to which it agreed to pay Pauwels for the Pauwels Model Spreadsheets

and the right to obtain the Pauwels Model therefrom is contradicted by the

well-pleaded allegations in the SAC that "BNYM paid for Pauwels' advice and

expertise, *not for his models.*"  Jt. App'x 47 ¶ 16 (emphasis added).  Taking these

allegations in the SAC as true, as of course we must at this stage in the litigation,

we conclude that the contract entered into by Pauwels and BNYM did not

address the sale or transfer of Pauwels' underlying intellectual property to

BNYM, as opposed to his advice that he derived from using the Pauwels Model.

Indeed, BNYM acknowledges that it has a different position than Pauwels does

as to the subject matter that the contract governed and concedes that the "dispute

that gave rise to this litigation" is "whether the arrangement prevented BNYM

from using the spreadsheets or sharing them with Deloitte.  *In other words, the*

*issue was the scope of the contract*, not whether a contract existed."  BNYM Supp.

22-21-cv
*Pauwels v. Deloitte LLP*

Br. at 3 (emphasis added).  Because, as BNYM concedes, there is a bona fide

dispute as to whether the contract governed the subject matter underlying

Pauwels's claim for unjust enrichment, we conclude that the existence of the

contract does not preclude the unjust enrichment claim against BNYM at this, the

motion-to-dismiss stage.[5]  *See M/A-Com, Inc.*, 910 N.Y.S.2d at 247.

We further conclude that Pauwels adequately pleaded a claim for unjust

enrichment against BNYM.  Pauwels alleged that BNYM paid him strictly for his

consulting services, only to then use the Pauwels Model Spreadsheets for its own

benefit by sharing them with Deloitte.  In other words, BNYM financially

benefitted from its use of the Pauwels Model Spreadsheets and model even

though it failed to compensate Pauwels for BNYM's (or Deloitte's) unfettered use

of those materials.  These allegations are sufficient to state a claim for unjust

enrichment.  *See, e.g., Nakamura v. Fujii*, 677 N.Y.S.2d 113, 116 (1st Dep't 1998)

("To state a cause of action for unjust enrichment, a plaintiff must allege that it

conferred a benefit upon the defendant, and that the defendant will obtain such

benefit without adequately compensating plaintiff therefor."); *Alpert v. M.R. Beal*

---

[5] We respectfully disagree with the dissent's view that "it cannot plausibly be said that the dispute over BNYM's use of the spreadsheets is separate from the 'subject matter' of the contract."  Dissent at 3.  Drawing all reasonable inference in favor of plaintiff Pauwels, the scope of the contract, the majority concludes that Pauwels is entitled to proceed to discovery on his theory that the use of his spreadsheets fell outside the scope of his contract with BNYM.

22-21-cv
*Pauwels v. Deloitte LLP*

& *Co.*, 79 N.Y.S.3d 142, 143 (1st Dep't 2018) (elements of unjust enrichment were met when the plaintiff, an employee of the defendant-employer, "rebuilt a [department of the firm], and . . . brought significant new clients to the firm, for which [the plaintiff] received no incentive compensation").

For these reasons, we reverse the district court's dismissal of Pauwels's claim for unjust enrichment against BNYM and remand to the district court for further proceedings consistent with this opinion.

    *ii.*    *Deloitte*

Although the district court erred by dismissing Pauwels's unjust enrichment claim against Deloitte as duplicative of his trade secret misappropriation claim, we nevertheless conclude that Pauwels failed to state a claim against Deloitte for a different reason.  *See Dane*, 974 F.3d at 188.

Under New York law, a "plaintiff cannot succeed on an unjust enrichment claim unless it has a sufficiently close relationship with the other party." *Ga. Malone & Co, Inc. v. Rieder*, 19 N.Y.3d 511, 516 (2012).  "[W]hile a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment, there must exist a relationship or connection between the parties that is not too attenuated." *Id.* (citation and quotation marks omitted).

33

22-21-cv
*Pauwels v. Deloitte LLP*

The allegations in the SAC reflect only minimal contacts between Pauwels and Deloitte, including a handful of phone calls in spring of 2016. There are no non-conclusory allegations that Deloitte was aware of the specific nature of the arrangement between BNYM and Pauwels with respect to who had the right to use the Pauwels Model or the spreadsheets. And even if Deloitte knew that it was Pauwels who had developed the model, "mere knowledge that another entity [here, Pauwels] created [the allegedly proprietary information] is insufficient to support a claim for unjust enrichment." *Ga. Malone*, 19 N.Y.3d at 517. At bottom, Pauwels's claim for unjust enrichment against Deloitte "falls short of stating facts establishing a sufficient relationship to impose potential liability against that party." *Id.* at 519.

We therefore affirm the district court's dismissal of Pauwels's claim for unjust enrichment against Deloitte.

### IV. Fraud

Pauwels brought a claim for fraud against BNYM only, alleging that BNYM defrauded him when, during a phone call on March 10, 2017, Sarmasti assured him that Deloitte was not using the Pauwels Model Spreadsheets. Pauwels contends that when Sarmasti made this statement, he knew that Deloitte was in fact using the spreadsheets and that Sarmasti made this misrepresentation

34

22-21-cv
*Pauwels v. Deloitte LLP*

with fraudulent intent. The district court dismissed this claim, concluding that Pauwels failed to adequately allege that Sarmasti knew that Deloitte was using the Pauwels Model Spreadsheets and that Sarmasti acted with scienter. We need not address whether Pauwels adequately pleaded knowledge or scienter because the SAC does not plausibly allege that Pauwels suffered any damages from the alleged fraud.

"To state a claim for fraud under New York law, a plaintiff must allege (1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402 (2d Cir. 2015). Failure to adequately plead damages is fatal to a claim of fraud. *Sw. Invs. Grp., LLC v. JH Portfolio Debt Equities, LLC*, 93 N.Y.S.3d 775, 777 (4th Dep't 2019).

In the SAC, Pauwels alleged that he suffered damages because Sarmasti's misrepresentation caused him to "refrain[] from taking any action that would have mitigated the damage resulting from BNYM and Deloitte stealing his Pauwels Model, including terminating his relationship with BNYM, refusing to do any further work for the bank, and/or potentially commencing legal

35

22-21-cv
*Pauwels v. Deloitte LLP*

proceedings." Jt. App'x 70 ¶ 98. These allegations are inadequate to state a claim

for fraud under New York law.

First, we do not think it plausible that Pauwels suffered any cognizable

injury by failing to refuse to do further work or terminate his relationship with

BNYM sometime before their relationship ultimately dissolved in May 2018.

BNYM compensated Pauwels for the services that he rendered through the end

of their working relationship.[6] We therefore cannot see how Sarmasti's alleged

misrepresentation caused Pauwels—who was being paid for his work after

March 2017—to suffer any damages by continuing to perform that work.[7]

Second, Pauwels's theory that he suffered damages because, but for the

alleged fraud, he would have commenced legal proceedings against BNYM at

some earlier time, is foreclosed by New York law. *RKA Film Fin. LLC v.

Kavanaugh*, 99 N.Y.S.3d 267, 270 (1st Dep't 2019) ("To the extent plaintiff claims

that these defendants' misrepresentations caused it to abstain from taking legal

---

[6] Although Pauwels alleged in the SAC that BNYM failed to pay one of his invoices, as noted above, the parties settled that dispute before this appeal.

[7] Furthermore, when given an opportunity to discuss Pauwels's fraud claim at oral argument, Pauwels's counsel was unable to persuasively explain how the allegations in the SAC satisfied the element of damages. *See generally* Oral Arg. R. at 27:30-31:04.

action, plaintiff has not demonstrated that it sustained damages as a result of

such forbearance, an essential element of its claim [of fraud].").

Following oral argument, we ordered the parties to submit supplemental

briefing on the question of whether Pauwels adequately alleged fraud damages.

In that submission, Pauwels appeared to abandon the damages theories

previously articulated in the SAC. Instead, he argued that, but for Sarmasti's

alleged misrepresentation, he would not have continued sharing Pauwels Model

Spreadsheets with BNYM between March 2017 and April 2018 and that, by

continuing to send those materials to BNYM, Pauwels suffered fraud damages.

This argument fails because, even if it were supported by the allegations in

the SAC,[8] we find it to be implausible. Pauwels had already sent eleven Pauwels

Model Spreadsheets to several individuals at BNYM before Sarmasti made the

alleged misrepresentation to Pauwels in March 2017. Even granting that

Pauwels would have stopped sending additional spreadsheets to BNYM after

March 2017 if Sarmasti did not lie to him as alleged, it would have been far too

---

[8] Although we address this novel theory of damages on the merits, we note that it was first articulated by
Pauwels in his supplemental submission. It was not included in the SAC and is not supported by the
factual allegations therein. Because Pauwels cannot add new factual allegations to the SAC in his
supplemental appellant's brief, we would reject this theory of damages even if it were viable. *Gamma
Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 80 (2d Cir. 2022) ("[T]he law is clear that a
party may not amend pleadings through a brief." (citation and internal quotation marks omitted)).

22-21-cv
*Pauwels v. Deloitte LLP*

late because BNYM already possessed spreadsheets which Deloitte was able to use to copy the Pauwels Model.

In sum, we conclude that Pauwels failed to plead that BNYM's alleged fraud caused him to suffer any cognizable damages. We therefore affirm the district court's dismissal of this claim.

### V.     Negligent Misrepresentation

Pauwels brought a claim for negligent misrepresentation against BNYM arising from the same alleged March 2017 misrepresentation that underpinned his claim for fraud. Pauwels's theory of damages in support of his claim for negligent misrepresentation is identical to the theory of fraud damages that he advanced in the SAC.

However, for the reasons explained above with respect to the allegations of fraud, Pauwels's failed to adequately plead that Sarmasti's alleged misrepresentation caused him to suffer any cognizable injury. For this reason, we affirm the district court's dismissal of the claim for negligent misrepresentation against BNYM. *See, e.g., Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 114 (2d Cir. 2012) (to state a claim for negligent misrepresentation under New York law, the plaintiff must allege, *inter alia*, that the plaintiff reasonably relied on the misrepresentation "to his or her detriment" (citation

omitted)); *White v. Guarente*, 43 N.Y.2d 356, 362-63 (1977) ("[A] negligent

statement may be the basis for recovery of damages, where there is a carelessness

in imparting words upon which others were expecting to rely and upon which

they did act or failed to act to their damage . . . ."); *Pappas v. Harrow Stores, Inc.*,

528 N.Y.S.2d 404, 407 (2d Dep't 1988) ("As with all negligence actions, the

[negligent misrepresentation] on which the plaintiff relies must be a proximate

cause of the injury for which he or she seeks recovery.").

## CONCLUSION

We have considered the parties' remaining arguments on appeal and

conclude that they are without merit. For the reasons set forth above, we

REVERSE the district court's judgment insofar as it dismissed Pauwels's claim

for unjust enrichment and REMAND the case for further proceedings consistent

with this opinion with respect to that issue. We AFFIRM the district court's

judgment in all other respects.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

39