UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANDRÉ PAUWELS,

                Plaintiff,

      v.

BANK OF NEW YORK MELLON
CORPORATION and THE BANK OF NEW
YORK MELLON,

                Defendants.

No. 19-cv-2313 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

    Plaintiff André Pauwels brings this action against Defendants Bank of New York Mellon Corporation and the Bank of New York Mellon (together, "BNY"), alleging that BNY misappropriated Pauwels' financial modeling spreadsheets and unjustly enriched itself by sharing those spreadsheets with another contractor so it could copy Pauwels' work. After prior decisions by this Court and the Second Circuit eliminated all but Pauwels' unjust enrichment claim, BNY now moves for summary judgment. While it concedes that it shared Pauwels' spreadsheets with the other contractor, it asserts that the other contractor extracted only basic data from the spreadsheets and did not copy or otherwise use Pauwels' underlying calculations or modeling. BNY further asserts that even if the other contractor had copied that underlying analysis, it had the right to do so pursuant to an implied in-fact contract between BNY and Pauwels. For the reasons that follow, BNY's motion for summary judgment is denied.

## BACKGROUND[1]

### I.   Pauwels' Consulting Work for BNY

Pauwels is an investment analyst who often provides consulting services for banks and other financial institutions.  BNY first engaged him as an independent consultant in 2009, assigning him to work on various transactions and investments under consideration by BNY.  Dkt. No. 156 ("BNY Rule 56.1") ¶ 8.  Although the parties never entered into a written contract, it was understood that BNY would pay Pauwels on an hourly basis, which it consistently did.  *Id.* ¶¶ 10, 21.  Around 2014, BNY began to explore various wind-energy projects and called on Pauwels to assist in evaluating them.  *Id.* ¶ 11.  Pauwels was tasked with both assessing the financials of potential investments and monitoring the progress of those that BNY chose to pursue.  *Id.* ¶ 9.  When a sponsor or arranger first pitched a new investment to BNY, they would provide a "base case model" that analyzed the deal's economic viability and projected its returns.  *Id.* ¶ 3.  Pauwels helped BNY analyze these base case models for around twenty potential wind-energy investments.  *Id.* ¶ 19.  To perform this so-called "deal work," Pauwels scrutinized the data and assumptions underlying the base case model to ensure the financial projections were accurate.  *Id.* ¶ 12.  Using the base case model as a starting point, Pauwels created his own financial model for the transaction in a separate spreadsheet.  *Id.* ¶ 13.  According to Pauwels, he also drew on other sources to create his spreadsheet models, including "independent reports" from the sponsor or arranger and other information obtained in "due diligence."  Dkt. No. 169 ("Pauwels Rule 56.1") ¶ 13.  In his own words, the models he created were "independent" from the base case model, *id.* ¶ 53, and relied heavily on his own "expertise," *id.* ¶ 54.  Using his model spreadsheets, Pauwels then advised BNY about the viability of the proposed investments, including by pointing out discrepancies and

---

[1] The following facts are undisputed unless otherwise noted.

other aspects where his model departed from the base case. *Id.* ¶ 55. Pauwels was paid at an hourly rate, which by 2017 reached £290 GBP per hour. BNY Rule 56.1 ¶ 14.

Once BNY decided to make an investment, Pauwels' role transitioned to "monitoring" work. *Id.* ¶ 15. As the project unfolded, the sponsor or arranger provided data tracking its real-life progress. *Id.* ¶ 17. Pauwels then updated his model spreadsheet using this data, including by performing one or more calculations. *Id.* (accounting calculation known as Hypothetical Liquidation at Book Value); *see also* Pauwels Rule 56.1 ¶ 17 (Pauwels asserting that he also calculated the "flip date" for each investment, i.e. the date on which BNY would achieve its return). BNY also paid Pauwels by the hour for this monitoring work, albeit at a lower rate of £125 GBP per hour. BNY Rule 56.1 ¶ 18.

In total, Pauwels created twelve spreadsheets to analyze and track about twenty wind investments. *Id.* ¶ 19. Although Pauwels claims that these spreadsheets themselves were confidential, he sent eleven of them to several employees at BNY. *Id.* (identifying the employees as Reza Sarmasti, Laura Hegedus, Martin Ruckel and Josephine Herbert). Pauwels says that he did this only when necessary, such as when he needed to illustrate his underlying analysis or trace the real-life progress of a given investment. Pauwels Rule 56.1 ¶ 59. He did not mark the spreadsheets as "confidential," BNY Rule 56.1 ¶ 20, although he maintains that there was a "clear understanding" that they were, Pauwels Rule 56.1 ¶ 20.

## II.     BNY's Replacement of Pauwels with Deloitte

In September 2016, Pauwels stopped performing monitoring work for BNY and was replaced by Deloitte LLP, Deloitte Tax LLP and Deloitte USA LLP (together, "Deloitte"). BNY Rule 56.1 ¶ 22. Pauwels says that BNY transitioned him off monitoring work because it had always intended to replace him with another firm. Pauwels Rule 56.1 ¶ 22. By contrast, BNY

3

claims that it hired Deloitte only because Pauwels "was falling behind" on monitoring due to his heavy stream of deal work, which often took up more than forty hours per week. BNY Rule 56.1 ¶ 23.

In any event, Deloitte began handling the monitoring for BNY's wind farm investments in September 2016. As with Pauwels, Deloitte was asked to generate and deliver reports on those ongoing investments, covering various topics about their income, tax credits and valuations. *Id.* ¶ 32. While that much is agreed, the parties sharply dispute how Deloitte performed that work—and whether it copied Pauwels' spreadsheet models along the way. According to BNY, Deloitte had a preexisting tool called "iPACS" (or "internet-based Process and Compliance System") that it had used to analyze wind tax credits and investments for other clients. *Id.* ¶ 33. After noticing purported "errors" in Pauwels' spreadsheet models, Deloitte allegedly "used its iPACS tool to create its models from scratch." *Id.* ¶ 35. Although BNY denies that Deloitte copied Pauwels' calculations or modeling analysis, it admits that Deloitte referenced Pauwels' spreadsheets when it customized its iPACS tool. *Id.* ¶¶ 36–37. Since Deloitte needed the "base case" and "performing" data in order to model the progress of each investment, BNY claims that Deloitte merely "extracted" that "basic information" from Pauwels' spreadsheets. *Id.* ¶ 37. BNY further maintains that Deloitte did not consult the spreadsheets once it had tailored its iPACS software, as it could perform the monitoring with its own tool from then on out. *Id.* ¶ 39. BNY ultimately paid Deloitte approximately $455,000 to develop and customize iPACS for this wind modeling work. *Id.* ¶ 35.

Pauwels tells a far different story: that BNY copied his model outright. By his account, Deloitte had not done this sort of wind investment analysis previously, and its preexisting iPACS tool was only a generic system for tax filing. Pauwels Rule 56.1 ¶ 33. Since Deloitte was

4

effectively starting from scratch, BNY gave it Pauwels' modeling spreadsheets so Deloitte could replicate them in its iPACS model. *Id.* ¶ 35. As a result, the iPACS model was essentially a "copy" of Pauwels' spreadsheets, with the "same layout, same formulas and same sequencing of calculations." *Id.* ¶ 68 (internal quotation marks omitted). This saved considerable time and money for BNY, as it avoided having to pay Deloitte to create a full wind investment model from the ground up. *Id.* ¶ 67. Beyond replicating his modeling analysis, Pauwels says that Deloitte further shaved off time by extracting the base case and performance data from his spreadsheets, rather than compiling that information from the documents provided by the sponsors and arrangers as Pauwels had done. *Id.* ¶ 68.

After Deloitte took over the monitoring work, Pauwels continued to assist with deal work for a short time. The parties give differing accounts, however, as to how their relationship finally ended. In BNY's telling, Pauwels continued to perform deal work on new investments through the end of 2017, at which point BNY stopped making wind investments and their relationship fizzled out. BNY Rule 56.1 ¶¶ 41–42. But according to Pauwels, their arrangement came to a acrimonious end once he discovered that Deloitte was using his spreadsheets. Upon learning in March 2017 that Deloitte had replaced him, Pauwels says he told BNY's Reza Sarmasti that he "hope[d] they are not working on [his] spreadsheets." Pauwels Rule 56.1 ¶ 64. Sarmasti assured him that "Deloitte has its own software and is not working on [his] spreadsheets." *Id.* ¶ 65. In April 2018, however, Pauwels received an email from another BNY employee, Laura Hegedus, asking him to review a "Deloitte model" for a particular wind investment. *Id.* ¶ 69. Pauwels says he immediately recognized that model as a "copy" of his own spreadsheets. *Id.* ¶ 70. He then emailed Kevin Peterson, BNY's Global Head of Corporate Tax, saying "I was under the understanding that Deloitte had its own independent model. Seeing their model now I would say

5

that is not the case. They have substantially copied my model and are working on my model. This is very disappointing." *Id.* ¶ 73. Pauwels also emailed Sarmasti with similar concerns, stating "I have noticed, while reviewing the Deloitte tracking spreadsheet, that they copy/pasted substantial sections of my spreadsheet. As you will understand, I am not too happy with this." *Id.* ¶ 74.

According to Pauwels, he spoke with Sarmasti again by phone in May 2018. *Id.* ¶ 75. Sarmasti reportedly admitted that BNY had asked Deloitte to "follow" Pauwels' format, which it preferred. *Id.* After Pauwels pointed out how similar the formulas and calculations were, Sarmasti allegedly asserted that BNY "had the right to do whatever it is that [it] want[ed]" and confirmed that Deloitte was "working on" Pauwels' spreadsheets. *Id.* ¶ 75. Pauwels further alleges that Sarmasti "berated" him during the call, declaring that he did not "take this shit from small advisers" like Pauwels. *Id.* ¶ 76. Sarmasti then terminated Pauwels' relationship with BNY. *Id.*

### III. Legal Proceedings

Pauwels filed this suit against BNY and Deloitte in March 2019, asserting claims of trade secret misappropriation, unfair competition, unjust enrichment, fraud and negligent misrepresentation. Dkt. No. 1. After the Court granted BNY's and Deloitte's motions to dismiss, Pauwels filed a second amended complaint, Dkt. No. 63, which BNY and Deloitte again moved to dismiss. The Court granted that motion in relevant part and dismissed Pauwels' claims with prejudice. *See Pauwels v. Bank of N.Y. Mellon Corp. ("Pauwels I")*, No. 19-cv-2313, 2021 WL 1164501, at *7–8 (S.D.N.Y. Mar. 26, 2021), *aff'd in part and rev'd in part*, *Pauwels v. Deloitte LLP ("Pauwels II")*, 84 F.4th 171 (2d Cir. 2023).[2]

---

[2] The Court denied BNY's motion to dismiss one of Pauwels' backpay claims alleging that BNY had failed to pay his invoices. *See Pauwels I*, 2021 WL 1164501, at *7. The parties then settled this claim, after which the Court entered final judgment. *See* Dkt. Nos. 99–101.

Pauwels then appealed to the Second Circuit, which affirmed the dismissal of all but his claim for unjust enrichment against BNY. *See Pauwels II*, 84 F.4th at 191. As the Circuit explained, Pauwels could not assert a trade secret misappropriation claim against BNY or Deloitte because he did not take reasonable measures to keep his modeling spreadsheets confidential. *See id.* at 181 ("[C]ourts require that the plaintiff-possessor of a trade secret take reasonable measures to protect its secrecy." (internal quotation marks omitted)). Pauwels failed this threshold requirement of trade secret protection because he willingly shared his spreadsheets with multiple people at BNY without any password protection, "confidential" labeling or other assurances that they would be kept confidential. The panel further agreed that Pauwels had not pled the "misappropriation" element, as neither defendant had improperly obtained the spreadsheets or otherwise breached a duty to Pauwels when using them. *See id.* at 183–85 (rejecting arguments that BNY breached fiduciary duty and that Deloitte improperly procured spreadsheets). The Circuit also affirmed the dismissal of several more of Pauwels' claims, including those for unfair competition, fraud and negligent misrepresentation.

In a split ruling, however, the Circuit revived Pauwels' claim that BNY had unjustly enriched itself by giving his spreadsheets to Deloitte for copying. *See id.* at 187. In so holding, the majority acknowledged the rule that a plaintiff may not bring an unjust enrichment claim for conduct that was governed by a "valid and enforceable" contract. *See id.* (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (1987)). But while Pauwels and BNY had entered into an oral or implied contract, there remained a "bona fide dispute" over whether that contract permitted BNY to use the spreadsheets for its own purposes. *Id.* at 188. Because it was not clear whether the contract indeed "governed the subject matter" at issue, the majority found that Pauwels could proceed on his unjust enrichment claim against BNY. *Id.*

Following remand, the parties conducted discovery on Pauwels' sole remaining claim for unjust enrichment. BNY filed a motion for summary judgment on November 7, 2024. Dkt. No. 154. The Court heard oral argument on June 12, 2025.

## LEGAL STANDARD

Summary judgment must be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit'" and genuinely in dispute if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In deciding whether a material dispute exists, courts must "resolve all ambiguities and draw all permissible inferences in favor of the party against whom summary judgment is sought." *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (internal quotation marks omitted). "Assessments of credibility and choices between conflicting versions of events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). For that reason, "[s]ummary judgment is inappropriate when the admissible materials in the record make it arguable that the claim has merit." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (internal quotation marks omitted). "[E]vidence of the non-movant is to be believed," *id.* (quoting *Anderson*, 477 U.S. at 255), and the moving party bears the burden of showing that, despite the evidence against it, a reasonable jury would have to find in its favor, *see Anderson*, 477 U.S. at 256.

## DISCUSSION

The sole claim remaining in this action is Pauwels' claim for unjust enrichment against BNY. Pauwels asserts that BNY unduly enriched itself by giving his modeling spreadsheets to

8

Deloitte, which then copied them in substantial part. *See* Dkt. No. 168 ("Pauwels Opp.") at 10. This arrangement saved BNY considerable time and expense, as it avoided having to pay Deloitte to develop a new model from scratch.

BNY offers several responses. Although it concedes that Deloitte was given Pauwels' spreadsheets, it insists that Deloitte "extracted only raw data" from them, and did not copy any of the underlying calculations or financial modeling. *See* Dkt. No. 176 ("BNY Reply") at 2. Separately, it argues that even if Deloitte had copied more extensively, BNY would still escape liability because the parties' implied-in-fact contract authorized it to use Pauwels' spreadsheets—including by replicating the methodology underlying them. *See* Dkt. No. 155 ("BNY Br.") at 14.

Neither argument is persuasive. While a reasonable factfinder could find that Deloitte extracted only basic data from the spreadsheets, it could conclude otherwise on this record as well. As for BNY's contractual argument, there remains a genuine dispute as to the scope of the implied-in-fact contract, which precludes a finding that the contract permitted BNY to give the spreadsheets to others for copying.

I.     **Deloitte's Use of the Spreadsheets**

The Court starts with BNY's argument that Deloitte's use of the spreadsheets did not constitute unjust enrichment. Unjust enrichment is a quasi-contract claim in which "an obligation [is] imposed by equity to prevent injustice, in the absence of an actual agreement between the parties concerned." *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142 (2009). "The basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Pauwels II*, 83 F.4th at 186 (quoting *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 273 F.3d 196, 306 (2d Cir. 2004)). "The

9

essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." *Paramount Film. Dist. Corp. v. State*, 30 N.Y.2d 415, 421 (1972).  Notably, unjust enrichment applies not only where the defendant "receives money or property, but also where he otherwise . . . is saved expense or loss."  *Blue Cross of Cent. N.Y., Inc. v. Wheeler*, 461 N.Y.S.2d 624, 626 (4th Dep't 1983).  "The court must decide whether the facts as alleged bring the case within the legal definition of unjust enrichment, as the [factfinder] determines only whether the facts are as claimed."  *Mandarin Trading Ltd. v. Wildenstein*, 851 N.Y.S.2d 71, 71 (Sup. Ct. 2007) (citing *Donemar, Inc. v. Molloy*, 252 N.Y. 360 (1916) and *Shapira v. United Med. Serv., Inc.*, 15 N.Y.2d 200 (1965)).[3]

BNY argues that Pauwels' claim falls short of this standard because no reasonable factfinder could conclude that Deloitte copied anything beyond "raw data" from Pauwels' spreadsheets.  BNY Reply at 2.  While it concedes that Deloitte extracted the "base case" and "performance" data for each investment from the spreadsheets, it flatly denies that Deloitte copied any of Pauwels' underlying methodology or calculations.  *Id.*

Those arguments fail.  On this record, a reasonable factfinder could conclude that Deloitte copied the data, formatting and underlying methodology from Pauwels' spreadsheets—which, if true, could have unjustly enriched BNY by sparing it expense.  *See Blue Cross*, 461 N.Y.S.2d at 626.  Significantly, BNY openly admits that it sent Pauwels' spreadsheets to Deloitte, and that it instructed Deloitte to build its iPACS model using the same format as Pauwels' spreadsheets.  *See* BNY Br. at 2.  BNY further concedes that Deloitte accessed and extracted data from the

---

[3] The Court has reserved decision on whether this case is to be tried by a jury or the bench.  *See* Dkt. No. 113 at 1.

spreadsheets, including the base case data from Pauwels' deal work and the performance data from his follow-on monitoring work. *See id.*

Evidence in the record further suggests that more extensive copying may well have occurred. Visually, the model produced by Deloitte appears strikingly similar to the Pauwels spreadsheets that inspired them. As excerpts of the two models show, both include sheets for calculating a key metric called Hypothetical Liquidation at Book Value ("HLBV") that are all but identical, with the same rows, columns and formatting:



Dkt. No. 172 ("Schiller Decl.") Ex. 13 at 2 (excerpt from Pauwels model).

11



*Id.* Ex. 14 at 2 (excerpt from Deloitte model).

Moreover, as Pauwels points out, several of the formulas in the cells are near-perfect replicas. *See* Pauwels Rule 56.1 ¶ 71. This includes the formulas used to perform calculations such as "Hypothetical gain enough to cover all deficits in capital accounts," *compare id.* ¶ 71(a)(i) (Pauwels formula), *with id.* ¶ 71(a)(ii) (Deloitte formula), as well as the formula for "Required hypothetical gain in cover deficit tax equity capital account, *compare id.* ¶ 71(b)(i) (Pauwels formula), *with* ¶ 71(b)(ii) (Deloitte formula).

Given these undeniable similarities, a reasonable factfinder could conclude that Deloitte replicated significant portions of Pauwels' spreadsheets, including by re-using the same formatting

and at least some of the underlying calculations. This would satisfy the first two elements of an unjust enrichment claim, as it would mean that BNY avoided having to pay Deloitte to develop its own modeling spreadsheet from scratch. *See Blue Cross*, 461 N.Y.S.2d at 626 ("A person may be unjustly enriched . . . where he is saved expense or loss."). While BNY has factual arguments to the contrary—such as that Deloitte did not copy any of the calculations, or that they were only "standardized accounting calculations" or that any copying was minimal—those must be made to the factfinder at trial. *See* BNY Reply at 4–5.

The record also would permit the conclusion that it would offend "equity and good conscience" to permit BNY to avoid liability—the third and final element of an unjust enrichment claim. *Pauwels II*, 83 F.4th at 186 (internal quotation marks omitted). Factors relevant to this inquiry are "if [the] benefit has been conferred on the defendant under mistake of fact or law, if the benefit still remains with the defendant, if there has been otherwise a change of position by the defendant, and whether the defendant's conduct was tortious or fraudulent." *Paramount Film*, 30 N.Y.2d at 421. A reasonable factfinder could find multiple of these factors present here. Pauwels conferred the benefit—his spreadsheet models—under the mistaken understanding that they would not be shared with others, and certainly not with his competitors. Pauwels further alleges that BNY falsely told him in March 2017 that Deloitte "is not working on [his] spreadsheets" and "has its own software"—an allegation that BNY has yet to refute. Pauwels Rule 56.1 ¶ 64–65. Given these disputed allegations of factual mistakes and false statements, there remains an open question as to whether it would offend "equity and good conscience" to permit BNY to retain the benefit it apparently received. The Court thus denies its motion for summary judgment on this ground.

## II. BNY's Contractual Rights

The Court also rejects BNY's argument that it is entitled to summary judgment because it entered into an implied-in-fact contract that permitted its use of Pauwels' spreadsheets. *See* BNY Br. at 14–15. In its view, the parties' "course of conduct" established an implied contract between BNY and Pauwels, which entitled BNY to continue to use the spreadsheets for monitoring its investments—including by allowing a third-party like Deloitte to copy them to assist in monitoring work. *Id.* at 15. This contractual right, BNY says, defeats Pauwels' claim for unjust enrichment, since such claims cannot be brought when the parties had a contract "governing" the "subject matter" at issue. *Id.* at 16 (quoting *Clark-Fitzpatrick, Inc.*, 70 N.Y.2d at 388).

BNY is correct that parties may form an implied contract through their course of conduct, and may not later sue for unjust enrichment over conduct that falls within the scope of their implied contractual duties. *See Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006). But in order to determine whether an implied contract exists and covers a dispute, a court must first examine the "facts and circumstances" surrounding the "conduct of the parties"—an inherently fact-intensive inquiry. *Id.* at 582 (quoting *Jemzura v. Jemzura*, 36 N.Y.2d 496, 503–04 (1975)). For that reason, courts routinely deny summary judgment when there are open disputes as to the parties' conduct, and whether it was meaningful and consistent enough to form the implied contract asserted. *See Cap. Med. Sys. Inc. v. Fuji Med. Sys., U.S.A. Inc.*, 658 N.Y.S.2d 475, 477 (3d Dep't 1997) (reversing grant of summary judgment "because issues of fact existed as to whether an implied-in-fact contract existed between plaintiff and Fuji by virtue of the conduct and business activities of the parties and as to what were the terms of the implied contract"); *Manning v. Cigna Corp.*, 807 F. Supp. 889, 895 (D. Conn. 1991) ("A similar approach has been taken in federal courts, where the courts generally do not take this

14

issue away from the trier of fact if there is a dispute as to the existence and terms of an implied employment contract." (citing *Heller v. Champion Int'l Corp.*, 891 F.2d 432, 435 (2d Cir. 1989)); *see also Pauwels II*, 83 F.4th at 188 (denying motion to dismiss due to "bona fide dispute as to whether the contract governed the subject matter underlying Pauwels' claim for unjust enrichment").

    Factual disputes doom BNY's argument here as well. A reasonable factfinder might find that BNY bargained for broad usage of Pauwels' spreadsheets, or it might not. On one hand, BNY puts forth evidence that Pauwels freely sent his monitoring spreadsheets to several BNY employees, never included a confidentiality designation on them and billed for and was paid for providing those spreadsheets. *See* BNY Br. at 8. But while this evidence could support BNY's argument that it bargained for plenary rights to use the spreadsheets, other evidence cuts the other way. As Pauwels points out, he repeatedly warned BNY to keep his spreadsheets secret, and at one point explicitly sought confirmation from Sarmasti that Deloitte was not using his spreadsheets. *See* Pauwels Rule 56.1 ¶¶ 56–61, 64–65. Given this course of conduct, it is far from clear that Pauwels implicitly agreed to allow BNY to share his spreadsheets with others like Deloitte. "[B]ecause issues of fact exist[] as to . . . what were the terms of the implied contract," the Court may not grant summary judgment on this basis here. *Cap. Med. Sys.*, 658 N.Y.S.2d at 477.

15

## CONCLUSION

For these reasons, BNY's motion for summary judgment is DENIED. The Clerk of Court is respectfully directed to terminate the motion pending at docket entry 154.

SO ORDERED.

Dated:   July 8, 2025
         New York, New York

Ronnie Abrams
United States District Judge