UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANDRE PAUWELS,

                              Plaintiff,

                v.

BANK OF NEW YORK MELLON
CORPORATION, THE BANK OF NEW YORK
MELLON, DELOITTE LLP, DELOITTE USA
LLP, and DELOITTE TAX LLP,

                              Defendants.

---

19-CV-2313 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Andre Pauwels's sole surviving claim in this matter is for unjust enrichment against Defendants The Bank of New York Mellon Corporation and The Bank of New York Mellon (together, "BNYM"). *See Pauwels v. Deloitte LLP*, 83 F.4th 171, 188–89 (2d Cir. 2023). Pauwels is an investment analyst who developed a financial model (the "Pauwels Model") for BNYM's tax-equity investments in wind energy projects. Pauwels used this model to advise BNYM about the viability of proposed investments, and to monitor the performance of the investments BNYM chose to pursue. Dkt. 156 ("BNYM Rule 56.1") ¶ 9. In total, Pauwels created twelve spreadsheets to analyze and track about twenty investments. *Id.* ¶ 19.

In September 2016, Pauwels stopped performing monitoring work for BNYM and was replaced by Deloitte LLP, Deloitte Tax LLP, and Deloitte USA LLP (together, "Deloitte"), *id.* ¶ 22, although Pauwels continued to help BNYM evaluate new investments. The parties dispute the extent to which Deloitte used the Pauwels Model when customizing its own tool, called iPACS, to monitor BNYM's investments, though BNYM admits that Deloitte referenced Pauwels's spreadsheets when it tailored its iPACS tool to these investments. *Id.* ¶¶ 36–37. Pauwels alleges

that Deloitte's iPACS model was essentially a "copy" of Pauwels's spreadsheets, Dkt. 169 ("Pauwels Rule 56.1") ¶ 68, and that BNYM saved money because it avoided paying Deloitte to create a full model from scratch, *id.* ¶ 67, in addition to otherwise benefitting from the model.

Pauwels eventually stopped advising BNYM on new investments, although the parties disagree about how their relationship ended. BNYM claims that the arrangement had concluded by the end of 2017, when it stopped making new tax-equity investments in wind projects. BNYM Rule 56.1 ¶¶ 41–42. Pauwels claims that BNYM terminated the relationship after he complained about Deloitte's use of his spreadsheets in its monitoring work. Pauwels Rule 56.1 ¶¶ 70–76. While the parties never entered into a written contract governing Pauwels's work, BNYM consistently paid Pauwels on an hourly basis. BNYM Rule 56.1 ¶¶ 10, 21. On October 6, 2023, the Second Circuit affirmed this Court's dismissal of Pauwels's trade secret claims based on the "oral or implied-in fact" contract between Pauwels and BNYM. *Pauwels*, 83 F.4th at 182, 187. Consistent with the Second Circuit's opinion, however, there remains a "bona fide dispute" over whether the oral or implied contract between the parties governed whether BNYM may use the Pauwels Model spreadsheets for its own purposes. *Id.* at 188. The essence of Pauwels's unjust enrichment claim is that BNYM paid Pauwels "strictly for his consulting services," but that BNYM continued to use Pauwels's spreadsheets following the termination of the parties' relationship, and was thus unjustly enriched. *Id.*

Pauwels now demands a jury trial on his unjust enrichment claim or, in the alternative, seeks for the Court to appoint an advisory jury. Dkt. 188. BNYM opposes, urging a bench trial instead. Dkt. 186. For the reasons that follow, the Court agrees with Pauwels that he is entitled to a jury trial on his unjust enrichment claim.

## BACKGROUND[1]

Count V of Pauwels's Second Amended Complaint ("SAC") alleges that "[b]y taking the Pauwels Model and Pauwels Model Spreadsheets and giving them to Deloitte to use and copy, despite Pauwels' express admonition against doing so, BNYM enriched themselves by avoiding the time and expense of paying Deloitte to develop their own model for analyzing BNYM's wind-energy investments, which would have taken more time and been more expensive than just copying the Pauwels Model." Dkt. 63 ¶ 109. It further asserts that "[b]ecause Pauwels (a) had his model taken from him against his instructions and wishes, (b) was deceived by BNYM as to their plans to give the Pauwels Model to Deloitte, and (c) was ultimately terminated after BNYM took what they wanted from Pauwels (i.e., his model) surreptitiously, BNYM was enriched at Pauwels' expense." *Id.* ¶ 111. The SAC seeks "damages, including compensatory damages in quantum meruit, and punitive damages, for Defendants' . . . unjust enrichment." *Id.* at 32. Pauwels argues that he is entitled to a jury trial on this unjust enrichment claim; BNYM disagrees.

By order dated July 9, 2025, the Court directed the parties to file briefing on the question of whether Pauwels's remaining claim should be tried by a jury or by bench trial. Dkt. 180. Pauwels and BNYM submitted letter briefs on this question, Dkt. 186 ("Def's Br."), 188 ("Pl's Br."), and responses thereto, Dkt. 194 ("Def's Reply"), 195 ("Pl's Reply"), as well as supplemental briefing requested by the Court, Dkt. 212 ("Def's Suppl. Br."), 213 ("Pl's Suppl. Br."), and further responses. Dkt. 216 ("Pl's Suppl. Reply"); Dkt. 217 ("Def's Suppl. Reply"). The Court heard oral argument on October 20, 2025 ("Oral Arg. Tr."), after which Pauwels and BNYM submitted additional letters. Dkt. 225, 226.

---

[1] The Court assumes the parties' familiarity with the facts and procedural history of this case, and sets forth only those facts necessary for the instant Opinion and Order.

In his briefing on these issues, Pauwels initially stated that he is seeking "damages in the amount of the benefit that BNYM received as a result of its decision to take the Pauwels Model without authorization, including, for example, the savings BNYM realized by not having to pay Deloitte to develop a new model from scratch."  Pl's Br. at 3 n.3.  But in the course of further briefing and related pretrial motions, Pauwels has narrowed his damages theory to clarify that he is no longer seeking "the savings BNYM realized by not having to pay Deloitte to develop a new model from scratch," and is therefore not seeking "restitution of specific property."  Pl's Suppl. Br. at 3.  Rather, he is now seeking only to recover the intrinsic value of the Pauwels Model at the time he alleges it was wrongfully taken by BNYM.  *Id.*; Oral Arg. Tr. 4:15–5:16, 10:3–8.

This narrowing is relevant for two reasons.  First, the original remedy that Pauwels appeared to seek—"restitution" of BNYM's avoided third-party costs from the use of the Pauwels Model[2]—is barred by the New York Court of Appeals's decision in *E.J. Brooks Co. v. Cambridge Sec. Seals ("Brooks II")*, 31 N.Y.3d 441, 455–57 (2018).  *Brooks II*, however, does not bar Pauwels's revised articulation of his damages theory, which seeks to recover the value of the Pauwels Model itself.  Second, as the Court discusses further below, the civil jury trial right depends in part on whether the remedy sought by a party "is legal or equitable in nature." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 (1989).[3]  A party seeking a legal remedy is more likely to be entitled to try their case to a jury.  Restitution of BNYM's profits from the use of the Pauwels Model constitutes an equitable remedy, while restitution of the value of the Pauwels

---

[2] This type of restitutionary remedy is also called an "accounting for profits," *see, e.g.*, *Pender v. Bank of Am. Corp.*, 788 F.3d 354, 364 (4th Cir. 2015), which "requires the disgorgement of profits produced by property which in equity and good conscience belonged to the plaintiff."  *Id.* (quoting 1 D. Dobbs, *Law of Remedies* § 4.3(5) (2d ed. 1993)).

[3] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, omissions, and alterations.

Model when it was taken by BNYM constitutes a legal one.  Given that Pauwels's revised damages theory seeks legal relief, the Court concludes he has a right to a jury trial.

## LEGAL STANDARD

The right to a jury trial in a civil case was created by the Seventh Amendment, which provides, in relevant part, that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ."  U.S. Const. amend. VII. As the Supreme Court has explained, "[t]he thrust of the Seventh Amendment was to preserve the right to jury trial as it existed in 1791.  At common law, a litigant was not entitled to have a jury determine issues that had been previously adjudicated by a chancellor in equity."  *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 333 (1979).  Pauwels's right to a jury trial therefore hinges on whether his unjust enrichment claim would have been considered, as a historical matter, a suit at law seeking a legal remedy, rather than an equitable claim seeking an equitable remedy.

Nearly a century ago, the Federal Rules of Civil Procedure merged law and equity into the "civil action."  Fed. R. Civ. P. 2; *see id.* advisory committee's note to 1937 amendment.  But "[b]y preserving the right to a jury trial only in suits at common law," the Seventh Amendment "perpetuates the law/equity dichotomy." *Pereira v. Farace*, 413 F.3d 330, 337 (2d Cir. 2005).  This is because "suits at common law" have been defined to mean "suits in which *legal* rights [are] to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered." *Granfinanciera,* 492 U.S. at 41 (emphasis in original).

In a diversity case such as this, "a federal court must first consider state law to determine the nature of the action and the remedies provided under that law; then the court should turn to federal law to characterize the action and remedies as either legal or equitable."  *FTC v. Quincy*

*Bioscience Holding Co., Inc.*, 17 Civ. 124 (LLS), 2021 WL 1608953, at *1 (S.D.N.Y. Apr. 26, 2021). The Court will thus look to New York law to determine the remedies available to Pauwels under his unjust enrichment claim, though it is bound to classify his suit as one at law or in equity through reference to federal common law.

Federal characterization of a state-law action as either legal or equitable proceeds in two steps. "First, we compare the . . . action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature." *Granfinanciera*, 492 U.S. at 42 (quoting *Tull v. United States*, 481 U.S. 412, 417–18 (1987)); *see Design Strategy Inc. v. Davis* ("*Design Strategy II*"), 469 F.3d 284, 299 (2d Cir. 2006) (reaffirming *Granfinanciera*). This second inquiry has "greater weight" than the first, *Germain v. Conn. Nat'l Bank*, 988 F.2d 1323, 1328 (2d Cir. 1993), and thus "is more important in our analysis." *Chauffers, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 565 (1990). [4]

At bottom, a plaintiff is entitled to a jury trial if his claims "involve rights and remedies of the sort traditionally enforced in an action at law, rather than in an action in equity." *SEC v. Commonwealth Chem. Secs., Inc.*, 574 F.2d 90, 95 (2d Cir. 1978). And the Court is bound, when

---

[4] The Supreme Court articulated a slightly different two-part test for the jury-trial right in *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 376 (1996): "[W]e ask, first, whether we are dealing with a cause of action that either was tried at law at the time of the founding or is at least analogous to one that was. If the action in question belongs in the law category, we then ask whether the particular trial decision must fall to the jury in order to preserve the substance of the common-law right as it existed in 1791." This test, however, is relevant primarily when the Court is asked to resolve "whether a particular issue occurring within a jury trial . . . is itself necessarily a jury issue." *Id.* at 377. The Court shares Judge Ho's view, articulated in *Trott v. Deutsche Bank, AG*, 20 Civ. 10299 (DEH), 2024 WL 1313040, at *2 (S.D.N.Y. Mar. 26, 2024), that the test articulated in *Granfinanciera* and *Tull* encompasses the first *Markman* factor and should be used when deciding whether a plaintiff's claim affords a right to a jury trial. Indeed, the Second Circuit and courts in this District have continued to use the *Granfinanciera* test in similar circumstances. *See Pereira*, 413 F.3d at 337; *Design Strategy Inc. v. Davis* ("*Design Strategy II*"), 369 F.3d 284, 299 (2d Cir. 2006); *see, e.g., Khan v. Bd. of Dirs. of Pentegra Defined Contribution Plan*, 20-CV-7561 (PMH), 2023 WL 6237862, at *2 (S.D.N.Y. Sept. 26, 2023).

evaluating the nature of a plaintiff's claims, to "resolve any doubts in favor of the right to a jury trial." *Lee Pharms. v. Mishler*, 526 F.2d 1115, 1117 (2d Cir. 1975).

## DISCUSSION

Under New York law, "[i]n order to sustain an unjust enrichment claim, a plaintiff must show that (1) the other party was enriched, (2) at the plaintiff's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Brooks II*, 31 N.Y.3d at 455. Restitution is the typical remedy for a claim of unjust enrichment. *See, e.g.*, *Slater v. Gulf, Mobile & Ohio Ry. Co.*, 307 N.Y. 419, 421 (1954); *Brown v. Sandimo Materials*, 250 F.3d 120, 126 (2d Cir. 2001); Restatement (Third) of Restitution and Unjust Enrichment § 1 ("A person who is unjustly enriched at the expense of another is subject to liability in restitution."); Colleen P. Murphy, *Misclassifying Monetary Restitution*, 55 S.M.U. L. Rev. 1577, 1589 (2002) ("If the substantive law of unjust enrichment constitutes the sole basis of liability, then the monetary remedy would be for restitution, not damages.").

Pauwels asserts that "as a federal court sitting in diversity, this court must apply New York's substantive law," Pl's Br. at 1, and further appears to suggest that the Court is bound to follow certain New York lower-court cases holding that "unjust enrichment claims are legal claims and therefore should be submitted to a jury." Pl's Suppl. Br. at 4. New York courts have, however, consistently characterized unjust enrichment as an inherently equitable action, and restitution as an inherently equitable remedy. The New York Court of Appeals, for example, has held that unjust enrichment is an "undoubtedly equitable" claim. *Paramount Film Distrib. Corp. v. State of New York*, 30 N.Y.2d 415, 421 (1972). In any event, as Pauwels appears to recognize, *see* Pl's Br. at 2, "[w]hether a suit is legal or equitable is determined by federal law, even while the cause of action is created by state law." *Geneva Pharms. Tech. Corp. v. Barr Lab'ys*, No. 98 Civ. 861

(RWS), 2003 WL 1345136, at *2 (S.D.N.Y. Mar. 19, 2003). New York law merely defines the nature of the action and the remedies to which Pauwels is entitled. *Quincy Bioscience Holding Co.*, 2021 WL 1608953, at *1; *see Simler v. Conner*, 372 U.S. 221, 222 (1963) (holding that the "characterization of . . . [a] state-created claim as legal or equitable for [the] purposes of whether a right to jury trial is indicated must be made by recourse to federal law").

New York law does, however, limit the remedies available to Pauwels. Notably, in *Brooks II*, the New York Court of Appeals narrowed the scope of remedial relief in unjust enrichment actions. Because an unjust-enrichment plaintiff may only recover a benefit held "at the plaintiff's expense," such a plaintiff may only recover benefits to which she has a "preexisting right." *Brooks II*, 31 N.Y.3d at 455. As a consequence, "where a defendant saves, through its unlawful activities, costs and expenses that otherwise would have been payable to third parties, those avoided third-party payments do not constitute funds held by the defendant at the expense of the plaintiff." *Id.* at 456–57. In other words, under New York law, "a plaintiff bringing an unjust enrichment action may not recover as compensatory damages the costs that the defendant avoided due to its unlawful activity in lieu of the plaintiff's own losses." *Id.*

The parties do not dispute that *Brooks II* cabins the kind of benefits a plaintiff may recover in an unjust enrichment action. The case makes clear that where a party seeks to recover profits from a defendant's unjust use of a plaintiff's property, the costs a defendant avoided paying third parties from the use of that property cannot be recovered unless the plaintiff can establish a preexisting entitlement to those payments. *Id.* Here, Pauwels does not allege that BNYM profited from its use of the Pauwels Model in any way other than avoiding additional fees from Deloitte. He also does not allege that he had a "preexisting right" to BNYM's payments to Deloitte. *Id.* Pauwels is therefore barred from recovering the profits attributable to BNYM's avoided third-

party costs, as quantified by the savings BNYM realized by sharing the Pauwels Model with Deloitte.

In apparent recognition of *Brooks II*'s holding, and as noted above, Pauwels has refined his damages theory to no longer seek BNYM's profits from the use of the Pauwels Model. Rather, he seeks to recover the value of the Pauwels Model, standing alone, when BNYM terminated its relationship with Pauwels but retained the Pauwels Model. Pl's Suppl. Br. at 3; Oral Arg. Tr. 10:3–8. This type of restitution is not barred by *Brooks II*. Because the Court must look to federal law to determine whether Pauwels has a jury-trial right for his state-law claim, its analysis is guided by the two factors articulated in *Granfinanciera* and *Tull*, which require courts to ask (1) whether Plaintiff's claim is similar to legal or equitable claims brought in 18th-century English courts, and (2) whether the remedy sought by plaintiff is legal or equitable. *Granfinanciera*, 492 U.S. at 42. Finding that Pauwels's unjust enrichment claim is similar to historical, quasi-contractual claims at law, and that he is seeking a legal remedy, the Court concludes that Pauwels is entitled to a jury trial on that claim.

## I.    Pauwels's Claim is Similar to Legal Actions in 18th-Century English Courts

The Court begins by examining the first *Granfinanciera* factor, which asks the court to "compare the . . . action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity." *Granfinanciera*, 492 U.S. at 42.

As a cause of action, unjust enrichment has a mixed heritage. In the first Restatement of Restitution, drafted in 1937, the American Law Institute (ALI) synthesized doctrine drawing from historical courts of law and courts of equity to pronounce the principle that "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." Restatement of Restitution § 1 (1937); *see Dastgheib v. Genentech, Inc.*, 457 F. Supp. 2d 536, 542

(E.D. Pa. 2006) (explaining this history); Emily Sherwin, *Restitution and Equity: An Analysis of the Principle of Unjust Enrichment*, 79 Tex. L. Rev. 2083 (2001) ("The law of restitution, as we know it, was invented in 1937 with the publication of the Restatement of Restitution. . . . [The ALI reporters] assembled a variety of doctrinal rules—not previously linked—which, in their view, were connected by the principle of unjust enrichment.").

This cause of action merges disparate strands of law sounding in both law and equity.  One such strand deals with the law of implied promises, predicated on the "restitution to the plaintiff of something that came into defendant's hands but in justice belongs to the plaintiff."  D. Dobbs, *Law of Remedies*, § 4.2(3) at 580 (2d ed. 1993).  These quasi-contract cases, although brought at law, had "a kind of equitable character," and would "award restitution in cases where neither tort nor contract necessarily existed," *Id.* at 581, and do so exclusively in the form of a money judgment. *Id.* § 4.3(2) at 590.  Another strand arises out of the law of property and fiduciary duties, and is based on the "notion that the defendant has legal title" to an asset "but that the plaintiff has the superior moral and equitable claim."  *Id.* at 597.  These cases relied on equity's power, which the courts of law did not have, to compel a defendant to convey rights in specific property to a plaintiff through the constructive trust and related equitable remedies.  *Id.* at 587.  The modern doctrine of unjust enrichment, which restores to a plaintiff both wrongfully taken money and property, is thus a "unifying principle" for all cases seeking restitution. *Id.* § 4.1(3) at 564.

Pauwels's claim is best analogized to this first type of action:  a legal, quasi-contractual claim.  *See* Compl. ¶ 113 ("By ignoring Pauwels' express instructions, breaching their understanding with Pauwels about the proprietary and confidential nature of the Pauwels Model and Pauwels Model Spreadsheets, and finally by lying to Pauwels about Deloitte's access to and use of the Pauwels Model and Pauwels Model Spreadsheets, BNYM unjustly enriched itself.").

Such a claim was historically pled at law when a plaintiff was able to show "just grounds for recovering money to pay for some benefit the defendant had received from him." Dobbs, *supra*, § 4.2(1) at 571. It would have been addressed on the law side of English courts under the writ of assumpsit, the "common-law form of action by which contract claims were redressed." *Id.*; *see also Archawski v. Hanioti*, 350 U.S. 532, 534 (1956) ("As Mr. Justice Holmes once put it, 'An obligation to pay money generally is enforced by an action of assumpsit, and to that extent is referred to a contract, even though it be one existing only by fiction of law.'" (quoting *Thomas v. Matthiessen*, 232 U.S. 221, 234 (1914)). Other federal courts considering historical analogues to an unjust enrichment claim have arrived at a similar conclusion. *Heritage Disposal & Storage, L.L.C. v. VSE Corp.*, No. 15-CV-1484, 2017 WL 361547, at *9 (E.D.V.A. Jan. 24, 2017) ("Although courts often refer to unjust enrichment as a doctrine based on equity, there was, at the time the Seventh Amendment was ratified, a general recognition that the action of assumpsit was premised on a legal obligation to pay under an implied contract."); *Telewizja Polksa USA, Inc. v. EchoStar Satellite Corp.*, No. 02-C-2393, 2005 WL 2405797, at *3 (N.D. Ill. Sept. 28, 2005) (similar); *Medtronic, Inc. v. Intermedics, Inc.*, 725 F.2d 440, 443 (7th Cir. 1984) ("The origins of unjust enrichment are both legal and equitable—but more the former.").

The parties agree that unjust enrichment has its roots in both legal and equitable actions but disagree on the proper analogy for Pauwels's claims. In particular, they advance differing interpretations of *Moses v. Macferlan*, 97 Eng. Rep. 676 (K.B. 1760), in which Lord Mansfield, Lord Chief Justice of the King's Bench, described how quasi-contract actions had an equitable flavor: "the gist" of "[t]his kind of equitable action, to recover back money, . . . [is] that the defendant, up on the circumstance of the case, is obliged by the ties of natural justice and equity to refund the money." *Id.* at 680–81. Nonetheless, as Pauwels observes, the King's Bench was a

historical court *at law* hearing an action *at law* and was not, as BNYM argues, creating a "new . . . equitable" cause of action. Indeed, as Lord Mansfield noted, quasi-contract "lies only for money." *Id.* That is because "quasi-contract was tied to the action in assumpsit and to the limited judicial powers of the law judges. *Macferlan* itself was an action in assumpsit for money had and received, a claim that a defendant received money belonging to the plaintiff. *Macferlan*, 97 Eng. Rep. at 676. Lord Mansfield was, in other words, providing legal relief for a legal cause of action, despite the equitable framing of his broad policy statement. *See Hughes v. Priderock Cap. Partners, LLC*, 812 F. App'x 828, 834 (11th Cir. 2020) (noting that Lord Mansfield's statement "merely refers to the way in which" a quasi-contract claim "should be approached since it is clear the action is at law and the relief given is a simple money judgment"); Murphy, *supra*, at 1599 ("Although Mansfield employed the terms 'equity' and 'equitable' throughout his opinion in *Moses v. Macferlan*, he used those terms in a nontechnical way to connote fairness.").[5]

The Court thus finds that "when compared to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity," *Granfinanciera*, 492 U.S. at 42, Pauwels's unjust enrichment claim is best analogized to a claim at law.

## II. Pauwels' Claim Seeks Legal Relief

The second *Granfinanciera* factor asks the court to "examine the remedy sought and determine whether it is legal or equitable in nature." *Granfinanciera*, 492 U.S. at 42. As discussed above, the Court must determine the remedy available to Pauwels through reference to state law, but must characterize it as either legal or equitable through reference to federal common law.

---

[5] Furthermore, certain "claims in equity were traditionally dismissed" if a plaintiff had an adequate remedy at law, particularly those "based on rights the law courts recognized or created in the first place." Dobbs, *supra*, § 4.3(2) at 595; *accord Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962) (noting that the "necessary prerequisite" for a suit seeking equitable remedies is "the absence of an adequate remedy at law"). That is further evidence that Pauwels's claim would have been brought at law, as law would provide an adequate remedy.

*Simler v. Conner*, 372 U.S. 221, 222 (1963); *see Quincy Bioscience Holding Co.,* 2021 WL 1608953, at *1.

The parties dispute whether Pauwels is seeking compensatory damages or monetary restitution. The difference between the two is straightforward: compensatory damages are measured by a plaintiff's loss, while monetary restitution made by a money judgment is typically measured by a defendant's gain. Dobbs, *supra*, § 4.1(1) ("Restitution measures the remedy by the defendant's gain . . . . It differs in its goal or principle from damages, which measures the remedy by the plaintiff's loss and seeks to provide compensation for that loss."). Pauwels relies on *Chauffers, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 570 (1990), to cast his preferred remedy as a legal one for "money damages," Pl's Br. at 3, Pl's Suppl. Reply at 3. BNYM counters that Pauwels is really asking for the disgorgement of BNYM's profits, which is a type of restitution, rather than compensatory damages as restitution, in their view, is an inherently equitable remedy. Def's Br. at 3. Now, Pauwels frames his request for money damages as restitution in the form of a money judgment, Pl's Suppl. Br. at 3–4, while BNYM maintains that Pauwels is seeking equitable restitution in the form of disgorgement. Def's Suppl. Br. at 3–4.

The Court concludes that Pauwels is seeking restitution in this case, rather than compensatory damages. In urging otherwise, Pauwels misreads *Terry*. That case stands for the anodyne proposition that a "request for compensatory damages" is typically legal relief, while restitutionary damages are typically equitable. *Terry*, 494 U.S. at 570. Critically, though, despite Pauwels's initial effort to seek compensatory damages rather than restitution, "the constitutional right to trial by jury cannot be made to depend upon the choice of words used in the pleadings." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477–78 (1962).

13

Accordingly, the Court holds that under New York law, Pauwels is seeking monetary restitution, as his preferred measure of damages seeks to account for BNYM's "wrongful gains" rather than "compensate [him] for his losses." *Brooks II*, 31 N.Y.3d at 456 n.7; *see also id.* at 472 ("[R]ecovery of the benefit obtained by the defendant is the definition of an action for unjust enrichment.") (Wilson, J., dissenting).[6]  Pauwels's claim for "the amount of the benefit that BNYM *received*," Pl's Br. at 3 n.3, Pl's Suppl. Br. at 3, squarely seeks restitution, rather than traditional compensatory damages.

### A. Restitution Can Be Legal or Equitable

The Court next addresses whether the restitution Pauwels seeks is legal or equitable. BNYM argues that Pauwels seeks equitable relief because he seeks restitution.  This argument, however, is overly simplistic as restitution is not always an equitable remedy.  Def's Br. at 3. Historically, "not all relief falling under the rubric of restitution [was] available in equity."  *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002); *SEC v. Jarkesy*, 603 U.S. 109, 123 (2024) ("[M]onetary relief can be legal or equitable.").  As the Supreme Court observed in *Knudson*, "whether [restitution] is legal or equitable depends on the basis for the plaintiff's claim and the nature of the underlying remedies sought."  534 U.S. at 213; *see also* Restatement (Third) of Restitution and Unjust Enrichment § 4 cmt. c. ("The most widespread error is the assertion that a claim in restitution or unjust enrichment is by its nature equitable rather than legal.").

One line of cases interpreting federal statutes authorizing "appropriate equitable relief" have held that restitution measured by a defendant's wrongful gain—termed as an "accounting," "disgorgement," or otherwise— is typically an equitable remedy.  *E.g.*, *Liu v. SEC*, 591 U.S. 71,

---

[6] New York courts appear to use "unjust enrichment" and "restitution" to refer both to a remedy and a cause of action. But the New York Court of Appeals has made clear that "[a]s a *remedy*, unjust enrichment, in contrast to damages, is designed to avoid wrongful gains rather than compensate the plaintiff for its losses." *Brooks II*, 31 N.Y.3d at 456 n.7.

81 (2020); *CIGNA Corp. v. Amara*, 536 U.S. 421, 440 (2011); *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993).  These cases inquire into "those categories of relief that, traditionally speaking (*i.e.*, prior to the merger of law and equity) were *typically* available in equity."  *Amara*, 563 U.S. at 439 (emphasis in original).  These cases work, however, against the background principle that "[r]estitution claims for money are usually claims 'at law,'" absent additional relief consisting of some coercive "judicial action that is historically 'equitable,'" or where the parties' relationship gives rise to an equitable right of action.  Dobbs, *supra*, § 4.1(2), at 556; *see* Murphy, *supra*, at 1604 ("Although the general rule is that recovery of a defendant's gain of money is not available in equity, there are important exceptions: when the money was obtained by abuse of a fiduciary or confidential relationship; when the defendant is insolvent; and when the plaintiff seeks to trace her property into another form or into the hands of a third person.").  This coercive judicial action could consist of an equitable device such as a constructive trust or equitable lien that conveys rights in specific property or money held by a defendant to a plaintiff.

In *Knudson*, the Supreme Court provided essential guidance, in the context of an ERISA case, on when a restitution claim for money should be considered legal or equitable.  The Court held there that where a plaintiff cannot show "title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him," restitution is properly considered a legal remedy.  *Knudson*, 534 U.S. at 213.  Put differently, where restitution serves to "impos[e] a merely personal liability upon the defendant to pay a sum of money," it is legal, rather than equitable, relief.  *Id.*; *cf. Hughes*, 812 F.App'x at 836 ("Because [the plaintiff] sought to recover only the value of the benefit he conferred on [the defendant]—not to obtain any profits [the defendant] received—his remedy was not disgorgement but rather restitution in a purely legal sense."); *Dastgheib*, 457 F.

Supp. 2d at 544 (disgorgement of profits not specifically identifiable because they "have not yet been earned" was a legal remedy).

For "restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff *particular funds or property* in the defendant's possession." *Knudson*, 534 U.S. at 214 (emphasis added); *see AMW Mats. Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 451–52 (2d Cir. 2009) (discussing *Knudson*). In this sense, restitution is an equitable remedy when it is functionally similar to "a constructive trust or an equitable lien, where money . . . identified as belonging in good conscience to the plaintiff could clearly be traced" to particular accounts." *Knudson*, 534 U.S. at 214. Equitable restitution of money thus typically requires recovery to be sought through "a constructive trust or equitable lien on a specifically identified fund," that is "within the possession and control of" a defendant. *Sereboff v. Mid Atlantic Medical Servs.*, 547 U.S. 356, 362–63 (2006); Murphy, *supra*, at 1637 (noting that "rather than addressing whether the plaintiff seeks restitution or damages, one could go directly to the question [of] whether the remedy sought requires equitable tracing" to determine whether monetary relief is equitable).

The *Knudson* court also described how an accounting for profits, the remedy Pauwels initially appeared to seek, was a type of "equitable restitution": "If, for example, a plaintiff is entitled to a constructive trust on particular property held by the defendant, he may also recover profits produced by the defendant's use of that property, even if he cannot identify a particular *res* containing the profits sought to be recovered." *Knudson*, 534 U.S. at 214 n.2; *see also Hard Candy LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1355 (11th Cir. 2019) ("The remedy sought by [the plaintiff], an accounting and disgorgement of profits, was historically a matter for courts of equity."). In an equitable accounting, "defendant must show what benefits were derived from

the use of plaintiff's property." *Wilde v. Wilde*, 576 F. Supp. 2d 595, 604 (S.D.N.Y. 2008). Here, too, Pauwels initially sought restitution of the profits produced by his property, allegedly wrongfully held by BNYM. But because Pauwels may not seek such a remedy under New York law, he is left, as the Court will discuss, with a claim for legal relief.

### B. Pauwels Seeks Legal Restitution

The gravamen of *Knudson*, and the other cases mentioned above, is that restitution of money is usually considered to be an equitable remedy when it is achieved through an equitable device such as a constructive trust, which requires the identification of specific proceeds. However, where a defendant does not seek profits traceable to a defendant's use of a particular asset—and, instead, requests an award of money equivalent to the value of the property taken— that remedy is appropriately considered legal relief. The bulk of BNYM's briefing takes aim at Pauwels's former damages theory, namely, that Pauwels is seeking "disgorgement of BNYM's" profits "traceable to its use of the Pauwels Model, over which Plaintiff claims ownership." Def's Suppl. Br. at 3.[7] The Court agrees that this is properly considered equitable relief, but it is not the relief that Pauwels is now seeking. As noted above, Pauwels is foreclosed by *Brooks II* from seeking the profits BNYM received from the use of the Pauwels Model. But because he is now

---

[7] Although BNYM characterizes Pauwels's refined theory as an "eleventh-hour about-face," Def's Suppl. Reply at 4 (cleaned up), the Court disagrees. Pauwels has narrowed, rather than expanded, his damages theory. BNYM points to the *Speedfit* case to argue that Pauwels's refined theory should not be considered by the Court. *Speedfit LLC v. Woodway USA, Inc.*, 13-CV-1276 (KAM), 2020 WL 3051511, at *5 (E.D.N.Y. June 8, 2020). But there, by contrast, the court rejected a belated request, on a motion for a jury trial, to recharacterize an unjust enrichment claim as a similar, but meaningfully different, cause of action under New York law: that of money had and received. *Id.* Here, Pauwels is simply narrowing his damages theory, under the same cause of action, in a way that is consistent with how it was pled in his Second Amended Complaint. *See* SAC ¶¶ 111–113 ("Because Pauwels . . . had his model taken from him against his instructions and wishes . . . BNYM was enriched at Pauwels' expense.").

seeking a monetary award only in the amount of the value of the Pauwels Model, he is properly seeking legal relief.[8]

This is a key difference, and the basis on which the case at bar may be distinguished from the cases in this Circuit denying jury trials for unjust enrichment claims. *Design Strategy, Inc. v. Davis*, 367 F. Supp. 2d 630 (S.D.N.Y. 2005) ("*Design Strategy I*"), *aff'd* 439 F.3d 284 (2d Cir. 2006) is most instructive as a contrast. There, the court analyzed whether a plaintiff was entitled to a jury trial on his unjust enrichment claim. The plaintiff in that case sought, in addition to "the value of all confidential information taken and/or used and disclosed by [the defendant]," tracing of proceeds, such as "the total compensation [the defendant] received . . . from any [particular] transactions commenced prior and subsequent to his resignation from [the plaintiff], . . . which belonged to [the plaintiff], had the Defendants not diverted the corporate opportunity from [the plaintiff]." *Id.* at 645. Because the plaintiff sought, the court reasoned, to "trace . . . profits from any corporate opportunities that [the defendant] allegedly misappropriated," the "appropriate remedy" would be the imposition of a constructive trust or equitable lien over those proceeds— both equitable remedies.[9] Here, by contrast, no equitable tracing must take place under Pauwels's new damages theory: he simply seeks a money judgment in the amount the factfinder values the Pauwels Model at the time it was wrongfully taken.

---

[8] At oral argument, counsel for Pauwels articulated the relief he is seeking this way: "the benefit that [BNYM] obtained by failing to pay . . . André Pauwels for the unfettered use[,] or the continued unfettered use[,] of his model after they got rid of him." Oral Arg. Tr. 5:12–15.

[9] The Court departs from the *Design Strategy I* court's careful analysis in one respect. The holding in that case was based in part on a determination that the plaintiff "[sought] to restore funds to [itself] on the grounds that Defendants do not possess them in good conscience," and that, as a result, "those remedies are, under these circumstances, more appropriately classified as equitable than legal." *Design Strategy I*, 367 F. Supp. at 645. It did so cognizant of the fact that, in *Knudson*, the Supreme Court instructed lower courts to consider "the basis for the plaintiff's claim" in addition to "the nature of the underlying remedies sought" in order to categorize restitution as either legal or equitable. *Id.* at 644. But this excerpt from *Knudson* solely appears to provide general guidance that equitable forms of restitution were historically available for equitable causes of action, and vice versa, rather than license to recharacterize legal restitution as equitable based on a contemporaneous understanding of plaintiff's cause of action. Here, the Court was required to examine plaintiff's claim in the context of 18th-century rights of action, and did so, concluding that it is more analogous to a complaint at law.

The remedy sought by Pauwels is most similar to one analyzed by the Eleventh Circuit in *Hughes v. Priderock Capital Partners, LLC*. 812 F. App'x 828 (11th Cir. 2020). In that case, the plaintiff sought to receive compensation for certain financial models and expert advice he had provided to the defendant under an unjust enrichment theory. *Id.* at 830. Relying heavily on the Supreme Court's distinction between legal and equitable restitution developed in *Knudson*, the *Hughes* court reasoned that because the plaintiff did not seek to recover any of the defendant's profits from his financial models—and instead sought only "the value of the benefit he conferred on [defendant]"—his remedy was "restitution in a purely legal sense." *Id.* at 836. So too here.

Some of the cases cited by BNYM fail to fully grapple with the distinction between legal and equitable restitution in their analysis. For example, in *Golden Pacific Bancorp v. Federal Deposit Insurance Company*, the court considered whether an unjust enrichment claim that the FDIC improperly "passed off corporate expenses to be borne by . . . [a bank] receivership estate" was entitled to a jury trial. 95 Civ. 9281 (NRB), 2002 WL 31875395, at *7 (S.D.N.Y. Dec. 26, 2002). The court reasoned that because the plaintiff sought restitution, and restitution is "traditionally an equitable remedy," the plaintiff was not entitled to a jury trial. *Id.* at *15. But the Supreme Court's caselaw requires the Court to take one step further and analyze whether the type of restitution sought by a plaintiff is "legal in nature." *Terry*, 494 U.S. at 573.

Other cases cited by BNYM are either inapposite or involve plaintiffs who seek the disgorgement of profits, a typically equitable remedy. In *Securities and Exchange Commission v. Commonwealth Chemical Securities*, for example, the Second Circuit held that a public enforcement action by the SEC seeking the "[d]isgorgement of profits" and an injunction did not give rise to a right to a jury trial. 574 F.2d 90, 95 (2d Cir. 1978); *accord Liu*, 591 U.S. at 81 (disgorgement of profits by the SEC is a traditionally equitable remedy). Beyond seeking profit-

based restitution, *Commonwealth* was analyzing restitution pursuant to public enforcement of the securities laws, a decidedly different context from the case at hand.  And *Empresa Cubana*, a trademark infringement case, also stands for the generally-accepted proposition that the restitution of profits is a typically equitable remedy.  *Empresa Cubana Del Tabaco v. Culbro Corp.*, 123 F. Supp. 2d 203, 206-07 (S.D.N.Y. 2000); *see also Speedfit LLC v. Woodway USA, Inc.*, 13-CV-1276 (KAM), 2020 WL 3051511, at *4 (E.D.N.Y. June 8, 2020) (similar).  In short, these cases speak to meaningfully different relief than that sought by Pauwels at this point in time.

Finally, the Court is mindful that the Second Circuit instructs courts to "resolve any doubts" in this matter "in favor of the right to a jury trial."  *Lee Pharms.*, 526 F.2d at 1117.  Accordingly, and given that it has determined both that Pauwels's claim is most similar to a claim at law in 18th-century English courts, and that Pauwels seeks legal relief, the Court holds that Pauwels's claim is "analogous to [a] suit at common law."  *Tull*, 481 U.S. at 417.  Pauwels thus has the right to try his unjust enrichment claim before a jury.

## CONCLUSION

Under the test articulated in *Granfinanciera* and *Tull*, Pauwels has a right to a jury trial on his unjust enrichment claim.  The Clerk of Court is respectfully directed to terminate the motions pending at Dkt. 186 and Dkt. 188.

SO ORDERED.

Dated:    October 30, 2025
          New York, New York

_____
Ronnie Abrams
United States District Judge