**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ANDRÉ PAUWELS,

      Plaintiff,

  v.

THE BANK OF NEW YORK MELLON CORPORATION, THE BANK OF NEW YORK MELLON, DELOITTE LLP, DELOITTE USA LLP, and DELOITTE TAX LLP,

      Defendants.

Civil Action No. 1:19-cv-02313

---

## DEFENDANTS' PRETRIAL MEMORANDUM

**MORGAN, LEWIS & BOCKIUS LLP**

Michael L. Banks (*admitted pro hac vice*)
1701 Market Street
Philadelphia, PA 19103-2921
215.963.5000

Keri L. Engelman (*admitted pro hac vice*)
1 Federal Street
Boston, MA 02110-1726
617.341.7700

Elisa C. Egonu
101 Park Avenue
New York, NY 10178-0060
T: 212.309.6000
elisa.egonu@morganlewis.com

*Attorneys for Defendants The Bank of New York Mellon and The Bank of New York Mellon Corporation*

## TABLE OF CONTENTS

Page

I. INTRODUCTION ....................................................................................................... 1

II. RELEVANT FACTUAL BACKGROUND .................................................................. 3

    A. Plaintiff Created Excel Spreadsheets For BNY To Analyze Wind Investments BNY Was Considering And Monitor Wind Investments BNY Had Made. ........................................................................................................ 3

    B. The Parties Had An Implied-In-Fact Contract By Which BNY Could Use The Spreadsheets Plaintiff Created. ..................................................................... 4

    C. BNY Hired Deloitte To Continue Plaintiff's Monitoring Work When Plaintiff Experienced Delays In Completing Both Monitoring And Deal Work. ..................................................................................................................... 4

    D. The End Of Plaintiff's Working Relationship With BNY. .................................... 6

III. PLAINTIFF DOES NOT HAVE A VIABLE UNJUST ENRICHMENT CLAIM OR A CLAIM FOR DAMAGES. .................................................................................. 7

    A. A Finding For BNY Does Not Offend Equity And Good Conscience. ................. 9

    B. New York Law Bars Plaintiff's Demand For Damages. ...................................... 10

IV. CONCLUSION ............................................................................................................ 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*,
   448 F.3d 573 (2d Cir. 2006) ................................................................................................. 9

*Maple Med., LLP v. Scott*,
   191 A.D.3d 81 (2020), *aff'd sub nom. Columbia Mem'l Hosp. v. Hinds*,
   38 N.Y.3d 253 (2022) ......................................................................................................... 10

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*,
   70 N.Y.2d 382 (1987) ........................................................................................................... 8

*Corsello v. Verizon N.Y., Inc.*,
   18 N.Y.3d 777 (2012) ......................................................................................................... 10

*Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*,
   No. 07-cv-9580, 2009 WL 2514033 (S.D.N.Y. Aug. 18, 2009), *aff'd in part*,
   *rev'd in part*, 631 F.3d 42 (2d Cir. 2011) ........................................................................... 10

*E.J. Brooks Co. v. Cambridge Sec. Seals*,
   31 N.Y. 3d 441 (N.Y. 2018) ................................................................................. 3, 7, 10, 11

*Gameologist Grp.v. Scientific Games Int'l. Inc.*,
   838 F. Supp. 2d 141 ............................................................................................................. 7

*Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*,
   767 F. Supp. 1269 (S.D.N.Y. 1991), *aff'd in part, rev'd in part*, 970 F.2d 1138 ................ 10

*Kottler v. Deutsche Bank AG*,
   607 F. Supp. 2d 447 (S.D.N.Y. 2009) ................................................................................. 10

*MacIntyre v. Moore*,
   335 F. Supp. 3d 402 (W.D.N.Y. 2018) ................................................................................. 9

*Pauwels v. Deloitte LLP*,
   83 F.4th 171 (2d Cir. 2023) .................................................................................................. 4

*Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy*,
   449 F. App'x 57 (2d Cir. 2011) ............................................................................................ 9

*Vista Food Exchange, Inc., v. Comercial De Alimentos Sanchez S De R L De C.V.*,
   627 F. Supp. 3d 408 (Abrams, J.) ......................................................................................... 9

**I.     INTRODUCTION**

This case presents a single claim for unjust enrichment. Plaintiff was hired as an independent contractor to provide spreadsheets that were used by The Bank of New York Mellon ("BNY" or the "Bank") in considering whether to make wind energy investments and then in monitoring wind energy investments after they were made. He was paid in full for his services, and he delivered the spreadsheets to the Bank without any restrictions on the Bank's use of the documents. Plaintiff now contends, however, that BNY improperly shared the monitoring spreadsheets with Deloitte, which, he says, unfairly duplicated his model in connection with its monitoring work. He claims that BNY was unjustly enriched by not having to pay Deloitte to develop its own model for tracking the Bank's wind energy investments.

Plaintiff is mistaken, as multiple witnesses will explain at trial. In fact, there were no limitations placed on BNY's right to use the spreadsheets, and regardless, the spreadsheets were never used beyond the purpose that was contemplated by the parties at the outset of the engagement. As several witnesses from Deloitte and BNY will explain, Deloitte did not copy Plaintiff's model, but rather developed its own software at considerable expense to the Bank, which it then used to monitor the Bank's wind energy investments.

The dispute between the parties is traceable to 2016. Plaintiff was falling behind on his updating of spreadsheets that BNY used to track the performance of wind energy investments. So, Plaintiff was given a choice. He could do "deal" work, creating spreadsheets for the evaluation of potential new wind energy investments, or "monitoring" work, which required him to update the spreadsheets with investment performance data provided by investment sponsors. Plaintiff chose the deal work, for which he was paid at a higher hourly rate. BNY then turned to Deloitte to do the tracking or monitoring work. Plaintiff knew full well that Deloitte was taking over the

monitoring, and that his spreadsheets were sent to Deloitte. He was even asked to participate in a transition call with Deloitte to discuss the handling of the monitoring work. Meanwhile, the deal work that Plaintiff had been doing evaporated, as unfavorable developments on the tax side caused the Bank to suspend new wind energy investment activity.

In connection with the transition of the monitoring work, Plaintiff saw some of Deloitte's monitoring reports. He seemingly concluded that the Deloitte reports were similar in certain respects to the format of the spreadsheets that he had been generated, and he questioned whether Deloitte had copied his methodology. But in fact, Deloitte did not copy Plaintiff's model. Instead, it used its own proprietary iPACS software to develop a new program specifically for use by BNY in tracking wind energy investments. The head of the project for Deloitte will explain that the Pauwels spreadsheets were rife with error and that the Excel format was poorly suited for the task at hand, and that rather than duplicate or even use the model, Deloitte had to start from scratch. It extracted some data from the spreadsheets that had been provided to Plaintiff and BNY by third party investment sponsors, and then developed its own software for the project, rather than duplicating what Plaintiff had done. While several "cells" in the Excel spreadsheets looked like what Plaintiff had produced for the Bank, that was a function of Excel itself, together with basic principles of arithmetic and accounting.

Even if there were some basis for a finding of liability on the unjust enrichment claim, Plaintiff cannot recover any damages based on his case theory. As discussed in the briefing on BNY's Motion to Strike the Report and Preclude the Testimony of Slim Bentami (Dkt. 199), in *E.J. Brooks Co. v. Cambridge Sec. Seals*, the New York Court of Appeals held in a materially indistinguishable case that "a plaintiff bringing an unjust enrichment action *may not recover* as compensatory damages the *costs that the defendant avoided due to its unlawful activity in lieu of*

2

*the plaintiff's own losses.*" 31 N.Y.3d 441, 457 (N.Y. 2018) (emphasis added). Plaintiff has never articulated a claim for damages other than with respect to cost savings that BNY supposedly achieved by having Deloitte use his spreadsheets as a springboard. Nor could he, as there is no evidence of any other benefit that the Bank arguably achieved by providing copies of the spreadsheets to Deloitte.

## II.  RELEVANT FACTUAL BACKGROUND

### A.  Plaintiff Created Excel Spreadsheets For BNY To Analyze Wind Investments BNY Was Considering And Monitor Wind Investments BNY Had Made.

Plaintiff was retained as an independent contractor to create and provide Excel spreadsheets to BNY that were used to evaluate potential wind-energy investments ("deal work") and to monitor wind-energy investments the Bank had already made ("monitoring" or "tracking work").[1] By 2016, Plaintiff was being paid £290 (GBP) per hour for deal work and £125 (GBP) per hour for tracking work. For the deal work, Plaintiff reviewed assumptions and data provided by third-party wind energy investment sponsors in "base case models" and created model spreadsheets that were used to check the sponsors' assumptions and projections. He delivered those spreadsheets to BNY, which used them as an input in deciding whether to make a proposed investment.

For the monitoring work, Plaintiff updated his deal work spreadsheets periodically to incorporate performance data for the investments, which was provided by the sponsors or was publicly available. In creating these monitoring spreadsheets, Plaintiff performed certain financial calculations and inserted basic accounting formulations. Such calculations and formulas were not

---

[1] The spreadsheets at issue, which Plaintiff calls the "Pauwels Model," are the ones used for monitoring, as that is the only work that Deloitte took over and those were the only spreadsheets BNY provided to Deloitte.

3

proprietary to Plaintiff; they were either dictated by statute or generally accepted accounting methods.

### B. The Parties Had An Implied-In-Fact Contract By Which BNY Could Use The Spreadsheets Plaintiff Created.

There was no written agreement between Plaintiff and BNY governing the use or ownership of the deal work or tracking work spreadsheets. The parties had an implied-in-fact contract, as recognized by the Second Circuit. *See Pauwels v. Deloitte LLP*, 83 F.4th 171, 187 (2d Cir. 2023) ("Pauwels does not dispute that he entered into a valid and enforceable oral or implied-in-fact contract with BNYM to provide consulting services to BNYM."). BNY's witnesses will explain the scope and purpose of the implied-in-fact contract, which gave the Bank unfettered access and rights to the spreadsheets.

Nevertheless, Plaintiff challenges BNY's right to use the spreadsheets that he was paid to prepare and deliver to the Bank. His challenge is misguided. *First*, Plaintiff admitted that he voluntarily sent numerous iterations of his spreadsheets to multiple employees of BNY without any written confidentiality designation or any other explicit restriction on BNY's use of those spreadsheets in tracking its own investments. *Second*, Plaintiff admitted that he charged BNY for creating the spreadsheets and sending them to BNY. *Third*, Plaintiff was aware that BNY had shared his spreadsheets with Deloitte, but he never asked BNY or Deloitte to return them. As will be made clear at trial, Plaintiff's concerns with respect to keeping his spreadsheets secret were cabined to sharing his spreadsheet with *sponsors* of investments – third parties that were on the other side of the table from BNY.

### C. BNY Hired Deloitte To Continue Plaintiff's Monitoring Work When Plaintiff Experienced Delays In Completing Both Monitoring And Deal Work.

From 2014 through 2016, Plaintiff performed both deal work and monitoring work. In 2016, however, he became busy with deal work and fell behind in the tracking work. Plaintiff

4

admits that at the time, in 2016, he was spending more than 40 hours a week on the deal work, for which BNY paid him his higher hourly rate (£290 GBP/hour versus £125 GBP/hour for the monitoring work), and it was expected that the deal work would increase in the future. When BNY asked which he would prefer to continue, he chose the deal work. Meanwhile, given the growing volume of BNY's wind-energy investments and the significant tax and auditing consequences associated with those investments, BNY sought to implement additional controls around the monitoring work—the accuracy of which was crucial from a tax consequence and financial reporting standpoint. BNY looked to Deloitte to create a propriety software system to error-proof the monitoring process, which to that point had been manual and error-prone. Plaintiff continued to perform the deal work, and BNY hired Deloitte to take over the monitoring work.

The former Deloitte manager who oversaw the tracking project, David Schwartz, will testify at trial that Deloitte did not even attempt to duplicate any methodology that Plaintiff had used. In fact, the Pauwels spreadsheets were replete with mistakes, and the Excel format that Plaintiff was using was susceptible to manipulation and error, and therefore unsuitable for the kind of tracking and tax reporting that BNY needed.

Deloitte already had considerable experience in this kind of monitoring work. It used a proprietary tax technology tool known as iPACS, which stands for "internet-based Process and Compliance System," with a number of its other clients. Plaintiff's spreadsheets, on the other hand, were prepared manually in Microsoft Excel, which Deloitte considered to be suboptimal because the manual generation of the spreadsheets allowed too much room for error (and indeed, Deloitte did discover errors in Plaintiff's spreadsheets). Rather than continuing to rely on Plaintiff's Excel spreadsheets, BNY paid Deloitte approximately $455,000 to develop and implement a customized version of the iPACS monitoring software to create the quarterly wind

5

energy investment tracking reports. In other words, BNY hired Deloitte to build its own model "from scratch." Deloitte then used that proprietary software exclusively for BNY's monitoring work which BNY could rely on as error-proof for reporting purposes.

To build the iPACS software so that it could generate the requested quarterly tracking reports, Deloitte required underlying data on BNY's existing wind energy investments. It needed: (1) the "base case" data that had been provided by the sponsors of the underlying wind investments; and (2) "performance" data reflecting the actual performance of the wind energy investments over time, as compared to the projections in the base case models. Those data points were provided by the sponsors of the transactions and were shown in the sponsors' base case models and quarterly tracking reports. The same data points were also cumulatively reflected in Plaintiff's spreadsheets. Deloitte extracted this basic information from Plaintiff's spreadsheets and ran the customized iPACS tool it had tailored to generate the tracking spreadsheets requested by BNY. Once Deloitte built the custom version of the iPACS software and input the base case and performance data for each wind farm investment into the system, Deloitte did not consult or otherwise use the spreadsheets created by Plaintiff for any reason.

Deloitte's work for BNY was limited to monitoring wind energy investments that were made between 2015 and 2017, *i.e.,* monitoring work. BNY did not engage Deloitte to perform *any* deal work related to potential new wind farm investments.

### D. The End Of Plaintiff's Working Relationship With BNY.

Plaintiff continued to perform deal work for BNY on wind energy investments through 2017, but that work ended in 2018 due to changes in tax laws. BNY did not make any wind energy investments in 2018 or 2019, and, therefore, there was no longer a need for deal work from Plaintiff (or anyone else).

By 2020, uncertainties in the tax laws had been resolved and BNY began to consider new wind energy investments. BNY engaged EY to do the deal work and create models for the evaluation of potential new wind farm investments. BNY did not provide EY with copies of the spreadsheets that Plaintiff had created, nor did EY have access to the monitoring software that Deloitte had created for BNY. Nevertheless, EY was able to develop its own working model for use in BNY's deal work. The cost to the Bank for EY to develop a deal model was approximately $72,000. Additional fees were paid to EY over time for successive new investments.

### III. PLAINTIFF DOES NOT HAVE A VIABLE UNJUST ENRICHMENT CLAIM OR A CLAIM FOR DAMAGES.

Plaintiff cannot succeed on his unjust enrichment claim because neither BNY nor Deloitte wrongfully used his spreadsheets. "To prevail on a claim of unjust enrichment, [Plaintiff] must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Gameologist Grp.v. Scientific Games Int'l. Inc.,*, 838 F. Supp. 2d 141, 167 (quoting *Old Republic Nat'l Title Ins. Co. v. Luft*, 52 A.D.3d 491, 859 N.Y.S.2d 261, 262 (2008)). The "doctrine is a narrow one; it is 'not a catchall cause of action to be used when others fail.'" *E.J. Brooks Co.*, 31 N.Y.3d at 455, *quoting Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012)). Plaintiff's unjust enrichment claim cannot fulfill these elements.

The unjust enrichment claim in this case rests on a hunch that Plaintiff formed in 2017 after seeing a tracking spreadsheet Deloitte had produced. He thought the format was similar to the spreadsheets that he had sent to the Bank, and he wondered whether Deloitte had copied his "model" for evaluating and tracking wind energy investments. He ultimately jumped to a conclusion without knowing what Deloitte actually did or how it generated its reports for BNY. In this lawsuit, Plaintiff contends that by sharing the spreadsheets with Deloitte and allowing them

7

to copy his model, BNY avoided "the time and expense of paying Deloitte to develop their own model for analyzing BNYM's wind-energy investments[.]" Dkt. 63, Sec. Am. Compl. at ¶ 109; *see also Pauwels v. Deloitte LLP* (2d Cir., 22-21, Dkt. 36 at 40).

Plaintiff's speculation turned out to be unfounded. Deloitte did not copy Plaintiff's model. All it did was refer to the spreadsheets to pull out performance data about the performance of the wind energy investments. That data was provided by the investment sponsors and available from their reports to BNY, and it was certainly not proprietary to Plaintiff. Accordingly, BNY was not unjustly enriched by anything that Deloitte did.

Furthermore, ***there is no evidentiary or logical support*** for the claim that BNY's use of the spreadsheets to monitor its investments was inconsistent with the parties implied-in-fact contract. Plaintiff alleges that BNY paid him only for his analysis, not for his spreadsheets. But that is flatly untrue. The primary purpose of the engagement was to have Plaintiff generate the spreadsheets and deliver them to the Bank. While he occasionally shared his thoughts, he was not hired to analyze the deals or to participate in decision-making about potential investments. His job was to insert investment sponsor data into an Excel format, using his considerable experience with the Excel application, and then deliver the spreadsheets to the Bank. And that is precisely what he did, and what BNY paid him for. He delivered to BNY 11 of the 12 spreadsheets that he had created, sending them to at least four different Bank employees without any confidentiality designations or express restrictions on use. BNY was then free to use the spreadsheets as it wished.

This is why Plaintiff's unjust enrichment claim is legally untenable. It is well-accepted that "the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (1987). The rule applies

8

equally to oral and implied-in-fact contracts. *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 587 (2d Cir. 2006); *see also Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy*, 449 F. App'x 57, 59 (2d Cir. 2011) ("Under New York law, when a valid agreement governs the subject matter of a dispute between parties, claims arising from that dispute are contractual; attempts to repackage them as . . . unjust enrichment, implied and quasi contract, and quantum meruit, are generally precluded, unless based on a duty independent of the contract."); *MacIntyre v. Moore*, 335 F. Supp. 3d 402, 416 (W.D.N.Y. 2018) ("there was an arrangement or agreement between the parties, and therefore, any claim for unjust enrichment cannot survive."); *Vista Food Exchange, Inc., v. Comercial De Alimentos Sanchez S De R L De C.V.*, 627 F. Supp. 3d 408, 422 (Abrams, J.) (granting summary judgment against defendant's counterclaim for unjust enrichment on the basis that an express contract governed the same subject matter). The implied-in-fact contract in this case plainly applied to the delivery of the spreadsheets and any use by the Bank, and, therefore, there is no basis for a quasi-contractual claim.

### A.     A Finding For BNY Does Not Offend Equity And Good Conscience.

There is not a scintilla of evidence that BNY's conduct would offend "equity and good conscience." As set forth above, the core conduct alleged as to BNY relates to BNY's providing Deloitte with the monitoring spreadsheets, and the record makes clear that – despite Plaintiff's *post hoc* indignation – BNY openly shared with him that it had shared his spreadsheets with Deloitte. It even asked him to look at a spreadsheet that Deloitte had created. Further, the record is devoid of evidence that Deloitte in any way utilized Plaintiff's spreadsheets to compete with Plaintiff. As set forth in BNY's Motion for Summary Judgment, Plaintiff was highly compensated to create spreadsheets for BNY for particular investments, and notions of equity and good conscience do not require he receive anything more for additional work that BNY or its third-party

9

service provider did on those same investments. *C.f. Maple Med., LLP v. Scott*, 191 A.D.3d 81, 77 (2020), *aff'd sub nom. Columbia Mem'l Hosp. v. Hinds*, 38 N.Y.3d 253 (2022) (holding an unjust enrichment plaintiff "must establish that it conferred a benefit on the other party and that the other party will retain that benefit without adequately compensating the first party therefor"); *see also Corsello*, 18 N.Y.3d at 790 (unjust enrichment may lie when a party "received money to which he or she is *not entitled*") (emphasis added)). After all, it is well-settled that "[e]quity and good conscience do not require a party to give up what it rightfully obtained, or is entitled to, under a contract." *Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*, No. 07-cv-9580, 2009 WL 2514033, at *14 (S.D.N.Y. Aug. 18, 2009), *aff'd in part*, *rev'd in part*, 631 F.3d 42 (2d Cir. 2011) (citation omitted); *see also Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 767 F. Supp. 1269, 1284 (S.D.N.Y. 1991), *aff'd in part, rev'd in part*, 970 F.2d 1138 (internal citation omitted); *see also Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 467 (S.D.N.Y. 2009) ("[B]argained-for benefits cannot be deemed to unjustly enrich a contracting party.") (citation omitted); *see also supra* (discussing *Federal Treasury Enter. Sojuzplodoimport, McGrath, Rostami*). Accordingly, Plaintiff cannot succeed at trial on his unjust enrichment claim.

### B.   New York Law Bars Plaintiff's Demand For Damages.

As a matter of law, Plaintiff cannot establish a right to recover damages purportedly caused by the alleged use of his spreadsheet by Deloitte. The New York Court of Appeals held in *E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y. 3d 441 (N.Y. 2018) that an "avoided costs" theory of damages—*i.e.*, "damages that are measured by the costs the defendant avoided due to its unlawful activity"—is not cognizable under New York law in a claim for unjust enrichment. Even if BNY had acted unlawfully when it provided Deloitte with certain of Plaintiff's spreadsheets, an unjust enrichment claim is "not a catchall cause of action to be used when others fail." Instead of avoiding a steeper bill by using another service provider rather than Plaintiff, BNY needed to have

been enriched "at the expense of" Plaintiff. *E.J. Brooks*, 31 N.Y. 3d at 444 (citation omitted). Costs that a defendant avoided due to its unlawful activity are not "in lieu of plaintiff's own losses," and as such, avoided expenses that would have been otherwise payable to third-parties are not a proper measure of damages in an unjust enrichment claim. *Id.*

Plaintiff cannot dispute *E.J. Brooks's* holding. Nor could Plaintiff dispute that, here, any recovery for the expenses (if any) that BNY saved by sharing his spreadsheets with Deloitte would fall squarely within the "avoided expense" damages theory that the New York Court of Appeals barred in *E.J. Brooks*. Indeed, Plaintiff *conceded* in his Opposition to BNY's motion to preclude his expert's testimony that *E.J. Brooks* requires exclusion of his expert to the extent his Report opined on an "avoided cost" theory.

After learning that his damages theory would fail as a matter of law in the parties *Daubert* briefing, Plaintiff claimed that *E.J. Brooks* is inapplicable because he does not seek to use "avoided costs" as a "stand-alone" measure of damages. Dkt. 208 at 13. Plaintiff has tried to make an end run around *E.J. Brooks* by contending that the relief he is seeking is not limited to expense avoidance. *Id.* ("Defendants cannot at this time definitively and conclusively state that "avoided costs" is Plaintiff's *only* damages theory…") (emphasis added). However, in over seven years of litigation, Plaintiff has sought damages under only one damages theory; that BNY saved "time and expense" in allowing Deloitte to "copy" his spreadsheets. This is the only theory of liability that makes logical sense when considering Plaintiff's theory of the case and the allegations he has made about BNY. Not once has he alleged that BNY did anything with Plaintiff's spreadsheets other than share them with Deloitte to save on costs. Accordingly, even if BNY had acted unjustly in providing Deloitte with some of Plaintiff's spreadsheets and saved some amount by doing so, Plaintiff cannot recover any damages for the same.

11

## IV. CONCLUSION

Plaintiff's remaining claim for unjust enrichment fails as a matter of law and fact, and he cannot recover the damages he seeks.

Dated:  October 30, 2025          Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

By:  */s/ Michael L. Banks*_____

Michael L. Banks (*admitted pro hac vice*)
2222 Market Street
Philadelphia, PA 19103-2921
T:  215.963.5000
michael.banks@morganlewis.com

Keri L. Engelman (*admitted pro hac vice*)
1 Federal Street
Boston, MA 02110-1726
T: 617.341.7700
keri.engelman@morganlewis.com

Elisa C. Egonu
101 Park Avenue
New York, NY 10178-0060
T: 212.309.6000
elisa.egonu@morganlewis.com

*Attorneys for Defendants The Bank of New York Mellon and The Bank of New York Mellon Corporation*

## **WORD COUNT CERTIFICATION**

I hereby certify that this memorandum complies with the word-count limits pursuant to Local Civil Rule 7.1. This memorandum contains 3643 words, exclusive of the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates, but inclusive of material contained in footnotes, according to the word processing software used to prepare it.

/s/ *Michael L. Banks*
Michael L. Banks