UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANDRÉ PAUWELS, | |
| Plaintiffs, | |
| v. | 19-CV-2313 |
| BANK OF NEW YORK MELLON CORPORATION, THE BANK OF NEW YORK MELLON, DELOITTE LLP, DELOITTE USA LLP, and DELOITTE TAX LLP, | OPINION AND ORDER |
| Defendants. | |

RONNIE ABRAMS, United States District Judge:

Plaintiff Andre Pauwels's sole surviving claim in this matter is for unjust enrichment against Defendants The Bank of New York Mellon Corporation and The Bank of New York Mellon (together, "BNYM"). *See Pauwels v. Deloitte LLP*, 83 F.4th 171, 188–89 (2d Cir. 2023). In brief, Pauwels, who previously served as a consultant for BNYM, alleges that BNYM was unjustly enriched by its continued use of his "proprietary computational model"—the Pauwels Model—which is used to analyze proposed tax-equity investments in wind energy projects and monitor the investment BNYM chose to pursue. Dkt. 63 ("SAC") ¶¶ 1, 27, 34.

Pauwels seeks to quantify the amount by which BNYM was unjustly enriched through the expert testimony of Slim Bentami. Bentami, in his Report and proposed testimony, opines on the cost BNYM, or a similar large bank, would expend to recreate the Pauwels Model from scratch. BNYM moves to strike Bentami's report and exclude his testimony from trial. Applying the relevant analysis under Federal Rule of Evidence 702, the Court finds that Bentami's opinions are not supported by a reliable methodology and are therefore inadmissible. BNYM's motion to strike is thus granted.

**BACKGROUND**

The Court assumes the parties' familiarity with the facts and procedural history of this matter, and sets forth only that necessary for the instant Opinion and Order. The Pauwels Model is a tool Pauwels created to evaluate proposed tax-equity investments in wind energy projects and monitor those investments over time. Pauwels describes his model as an "interconnected system of formulas and equations . . . integrated into and implemented in Excel spreadsheets" to analyze a given investment or set of investments (the "Pauwels Model Spreadsheets"). SAC ¶ 33. Pauwels created twelve spreadsheets to analyze and track about twenty investments. Dkt. No. 156 ("BNYM Rule 56.1") ¶ 19.

Pauwels performed consulting work for BNYM from 2014 to 2017. *Id.* ¶¶ 9, 41. Pauwels stopped monitoring BNYM's investments in September 2017, when BNYM replaced him with Deloitte LLP, Deloitte Tax LLP, and Deloitte USA LLP (together, "Deloitte"). *Id.* ¶ 22. The parties dispute the extent to which Deloitte used the Pauwels Model when it took over this monitoring work. BNYM admits that Deloitte referenced Pauwels's spreadsheets when it tailored its own tool, called iPACS, to monitor these investments. *Id.* ¶¶ 36–37. Pauwels claims that Deloitte effectively copied his spreadsheets, Dkt. 169 ("Pauwels Rule 56.1") ¶ 68, and that BNYM benefitted because it did not have to pay Deloitte to develop its own model. *Id.* ¶ 67.

Pauwels eventually stopped advising BNYM on new investments, although the parties disagree about how their relationship ended. BNYM maintains that it ended its engagement with Pauwels by the end of 2017, when it stopped making new tax-equity investments in wind projects. BNYM Rule 56.1 ¶¶ 41–42. Pauwels argues that BNYM terminated the relationship after he complained about Deloitte's use of his spreadsheets in its monitoring work. Pauwels Rule 56.1 ¶¶ 70–76. The parties did not have a written contract, BNYM Rule 56.1 ¶¶ 10, 21, and they dispute

whether the oral or implied contract between them permitted BNYM to use Pauwels's spreadsheets after BNYM terminated their relationship. The essence of Pauwels's unjust enrichment claim is that BNYM paid him "strictly for his consulting services," not his spreadsheets, but that BNYM continued to use the spreadsheets following the termination of the parties' relationship, and was thus unjustly enriched. *Pauwels*, 83 F.4th at 188. [1]

Count V of Pauwels's Second Amended Complaint ("SAC") alleges that "[b]y taking the Pauwels Model and Pauwels Model Spreadsheets and giving them to Deloitte to use and copy, despite Pauwels' express admonition against doing so, BNYM enriched themselves by avoiding the time and expense of paying Deloitte to develop their own model for analyzing BNYM's wind-energy investments, which would have taken more time and been more expensive than just copying the Pauwels Model." SAC ¶ 109. It further alleges that "[b]ecause Pauwels (a) had his model taken from him against his instructions and wishes, (b) was deceived by BNYM as to their plans to give the Pauwels Model to Deloitte, and (c) was ultimately terminated after BNYM took what they wanted from Pauwels (*i.e.*, his model) surreptitiously, BNYM was enriched at Pauwels' expense." *Id.* ¶ 111. In his SAC, Pauwels sought "damages, including compensatory damages in quantum meruit, and punitive damages, for Defendants' . . . unjust enrichment." *Id.* at 32.

Pauwels now seeks to prove these damages through the testimony of Slim Bentami. *See* Dkt. 201, Ex. A ("Bentami Rpt."). Bentami previously held various leadership roles within the Risk Division at Goldman Sachs, where he was responsible for "ensuring that the models used by the firm were fit for purpose and error free." *Id.* ¶¶ 3–4. Bentami thus opines on "the cost of developing" and "maintaining a model equivalent to the Pauwels Model from scratch" within a large financial institution such as BNYM. *Id.* ¶¶ 1, 44. In particular, Bentami offers three primary

---

[1] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, omissions, and alterations.

opinions: (1) "[t]he complexity of the Pauwels Model and the impact of its use by BNYM would require that a team of experienced quantitative professionals and subject matter experts be dedicated to building and maintaining such [a] model to the highest standard of practice," (2) that the "cost of building a model equivalent in coverage and capabilities to the Pauwels Model from scratch . . . [to this standard of practice is] between $4.68 million and $6.24 million," and (3) that the "cost of maintaining such a model . . . [is] between $468,000 and $624,000 per annum." *Id.* ¶ 10.

As Bentami notes, Pauwels charged the bank "approximately 2.1 million GBP" for all of his work for BNYM, including model development, investment evaluation, and monitoring.[2] *Id.* ¶ 21. Bentami justifies this difference in cost by opining that "the development, maintenance and use of the Pauwels Model by a banking organization such as BNYM would have to be made according to the highest standard of practice" by "involv[ing] dedicated modeling professionals" to create a model "in line with the internal controls apparatus appropriate to high-risk model uses." *Id.* ¶ 41. Unlike the Pauwels Model, which was developed in Excel, Bentami assumes the replicated model would be developed through "enterprise systems and processes." *Id.* ¶¶ 29, 51, 53. As a result, Bentami opines that a team of six "quantitative modeling professionals of various [seniority] levels" must be "dedicated to the development of a Pauwels Model equivalent." *Id.* ¶ 46. Bentami also asserts that approximately two additional staff members are required for ancillary tasks, namely "one VP level full-time tax accounting employee" for "user acceptance and assumption/input validation," who works alongside the quantitative team to develop the model, and "one Associate level professional in the Quant team and one third of the VP level on the User

---

[2] The Court takes judicial notice that this is equivalent to approximately $2.8 million under prevailing exchange rates.

team" for ongoing maintenance work. *Id.* ¶¶ 46–47, 58.[3]  Bentami assumes a set of yearly salaries for these employees. *Id.* ¶ 49. He estimates the cost for an hour of the team's time based on these yearly salaries. *Id.* ¶ 50.

Bentami asserts that the six quantitative modeling team members and one user acceptance team member would work "between 36 months and 48 months" to replicate the Pauwels Model.[4] *Id.* ¶ 51; *see* Pl's Opp'n 24.  This is the same amount of time Pauwels took to develop and implement the Pauwels Model; Bentami opines that the team should be considered the "'hybrid' equivalent of Andre Pauwels" for Bentami's replication cost estimation. *Id.* ¶¶ 45–46.  He further increases the worked time by an additional 20% because (1) "developing such a model within an enterprise system and processes takes longer than implementing spreadsheets," (2) "[t]he experience and skillset of Andre Pauwels is not going to be replicated upfront," and (3) "other reasonably expected delays" might be encountered. *Id.* ¶ 51.  Bentami arrives at his damages estimate by multiplying his estimates of hourly team cost and worked hours.  He also tacks on an additional 10% of staff costs to account for "controls" and an additional 30% of staff costs "to account for non-compensation expenses." *Id.* ¶ 48.  Bentami ultimately concludes that it would cost BNYM or a similar bank between $4,680,000 and $6,240,000 to replicate the Pauwels Model, which is more than twice what Pauwels was paid in total, over more than four years consulting for BNYM. *Id.* ¶¶ 16, 21, 52.

Trial in this matter is scheduled for November 12, 2025.  On September 26, 2025, BNYM filed a motion seeking to strike the entirety of Bentami's Report and preclude his testimony.  Dkt.

---

[3] Bentami's Report is not clear as to whether the "Associate level professional in the Quant team" and "one third of the VP level on the User team" are the same staff members as those involved in replicating the Pauwels Model. Bentami Rpt. ¶ 58.  The answer to this question does not affect the Court's ultimate conclusion.

[4] Bentami does not disaggregate the time Pauwels spent developing his model and the time he spent implementing it for specific investments, noting that Pauwels spent between 36 and 48 months . . . on the development of the Pauwels Model only, excluding other work" and that Pauwels "spent very little elapsed time on monitoring activities . . . and some time on advisory and negotiation assistance to BNYM." Pauwels Rpt. ¶ 45.

200 ("Def's Mot."). BNYM attached Bentami's Report and excerpts from his deposition. Bentami Rpt.; Dkt. 201, Ex. B ("Bentami Dep."). Pauwels timely filed his opposition. Dkt. 208 ("Pl's Opp'n"), to which BNYM replied. Dkt. 214 ("Def's Reply"). Oral argument was held on October 20, 2025.

BNYM argues, in short, that Bentami's Report and anticipated testimony (1) support a theory of damages which is not cognizable as a matter of New York law, *see E.J. Brooks Co v. Cambridge Security Seals ("Brooks II")*, 31 N.Y.3d 441 (N.Y. 2018); (2) rely on insufficient facts or data; and (3) use an unreliable methodology.

## LEGAL STANDARD

The admissibility of an expert opinion is subject to both Federal Rule of Evidence 702 and Federal Rule of Evidence 403. Under Rule 702, a district court "act[s] as a 'gatekeeper' to ensure that the 'expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (quoting *Daubert v. Merrell Dow Pharms., Inc.* 509 U.S. 579, 597 (1993)). Pursuant to Rule 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> (b) the testimony is based on sufficient facts or data;
>> (c) the testimony is the product of reliable principles and methods; and
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. A district court has "broad discretion" to determine the admissibility of expert evidence, *In re Pfizer Inc. Sec. Litig.*, 819 F.3d at 658, which includes "testimony based on technical and other specialized knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999). Furthermore, "the law grants a district court the same broad latitude when it decides *how*

to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142 (emphasis in original).

The Second Circuit has instructed district courts, when conducting the Rule 702 inquiry, to consider three factors: "(1) the qualifications of the expert to testify as to a particular matter, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of the expert's testimony (*i.e.*, whether the expert's testimony as to a particular matter will assist the trier of fact)." *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 352 (S.D.N.Y. 2023) (quoting *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005)). Only the second and third prongs are at issue in this motion. While there is "a presumption of admissibility of evidence," *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995), "[t]he proponent of the expert testimony has the burden to establish these admissibility requirements." *In re Pfizer Inc. Sec. Litig.*, 819 F.3d at 658.

When considering reliability, the Second Circuit instructs that district courts "should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison," but cautions that, in general, "other contentions that the assumptions" underlying an expert opinion "are unfounded go to the weight, not the admissibility, of the testimony." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

When considering relevance, a district court may exclude expert testimony articulating a theory of damages that is not legally cognizable on the grounds that it would not assist the trier of

fact.  *See Jakobvits as Tr. of Lite Tr. I v. PHL Variable Ins. Co.*, 645 F. Supp. 3d 95, 113 (E.D.N.Y. 2022); *Patriarch Partners Agency Servs., LLC v. Zohar CDO 2003-I, Ltd.*, 16-CV-4488 (VM), 2025 WL 2592224, at *12 (S.D.N.Y. Sept. 8, 2025).  In other words, "an expert's testimony must fit the substantive law and the facts of the case."  *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 679 (S.D.N.Y. 2007); *see also Comcast Corp. v. Beherend*, 569 U.S. 27, 35 ("[A] model purporting to serve as evidence of damages . . . must measure only those damages attributable to that theory [of liability]").

## DISCUSSION

### I.    Bentami's Report Is Relevant Under Rule 702

BNYM first argues that Bentami's Report and testimony should be "excluded because they merely attempt to quantify a theory of damages that is not recoverable as a matter of law."  Def's Mot. 12–15.  BNYM points to *E.J. Brooks Co v. Cambridge Security Seals ("Brooks II")*, a New York Court of Appeals case which, it argues, completely forecloses the "'avoided cost' theory of damages" it says Pauwels is pursuing.  31 N.Y.3d 441 (N.Y. 2018).  Pauwels disagrees, arguing that BNYM is misreading *Brooks*, and that, in any event, it is premature to strike Bentami's opinions when Pauwels's damages theory has not yet been "crystalized" at trial.  Pl's Opp'n 3, 13.  The Court agrees with Pauwels and finds that Bentami's opinions are relevant because they could support a legally cognizable theory of damages.

BNYM's objection speaks to the third prong of the Rule 702 inquiry:  relevance.  BNYM asserts that Bentami's report is not relevant because it supports a theory of damages that is foreclosed as a matter of law.  The Court must thus determine whether Bentami's Report supports a theory of damages available to Pauwels.  *Cf. Town & Country Linen Corp. v. Ingenious Designs*

*LLC*, 18-CV-5075 (LJL), 2022 WL 2757643, at *3 (S.D.N.Y. July 14, 2022) (conducting a similar analysis to resolve a *Daubert* motion seeking to exclude the opinions of a damages expert).

Under New York law, restitution is the appropriate remedy for an unjust enrichment claim.[5] *See Spallina v. Giannoccaro*, 98 A.D.2d 103, 106 (4th Dep't 1983). Accordingly, it is "well-settled that the measure of damages for an unjust enrichment claim is restricted to the reasonable value of the benefit conferred upon the defendants." *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 534 (S.D.N.Y. 2011); *see also Giordano v. Thomson*, 564 F.3d 163, 170 (2d Cir. 2009) (recovery on an unjust enrichment claim "limited to the reasonable value of the services rendered by the plaintiff"). Restitution thus "provides for a measure of recovery that is analytically distinct from that of damages" because it aims to quantify a defendant's unjust gain, rather than a plaintiff's loss. *In re Lehman Bros. Holdings, Inc.*, 855 F.3d 459, 480 n.29 (2d Cir. 2017). "Although there is some degree of flexibility in methodology, a plaintiff must present sufficient evidence to measure the defendant's unjust gain." *Caro Cap., LLC v. Koch*, 653 F. Supp. 3d 108, 133 (S.D.N.Y. 2023).

"There are several accepted practices to measure the value of a defendant's unjust gain, including the increase in the defendant's assets, the market value of services provided to the defendant, the use value of the benefits received, the gains realized by the defendant upon the sale or an asset, and secondary profits earned by the defendant." *Caro*, 653 F. Supp. 3d at 133; *see* Restatement (Third) of Restitution and Unjust Enrichment § 49(3) (similar); 1 D. Dobbs, *Law of Remedies* § 4.5(1), at 628 (2d ed. 1993) (similar). The choice between these measures of restitution should be guided by "the substantive law purpose that calls for restitution in the first place,"

---

[5] New York courts also describe restitution as the *remedy* (as opposed to the *cause of action*) of unjust enrichment. *E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 456 n.7 (2018); *Phillips Int'l Investments, LLC v. Pektor*, 117 A.D.3d 1, 3 (1st Dep't 2014).

Restatement (Third) of Restitution and Unjust Enrichment § 49 cmt. a, which here is the return to a plaintiff of the value of the "specific and direct" benefit conferred upon a defendant. *M+J Savitt, Inc. v. Savitt*, No. 08 Civ. 8535 (DLC), 2009 WL 691278, at *10 (S.D.N.Y. Mar. 17, 2009).

In *Brooks II*, the New York Court of Appeals, considering a certified question from the Second Circuit about whether "a plaintiff asserting [a] claim[] of unjust enrichment" may "recover damages that are measured by the costs the defendant avoided due to its unlawful activity," *E.J. Brooks Co v. Cambridge Sec. Seals* ("*Brooks I*"), 858 F.3d 744 (2d Cir. 2017), narrowed what a court may consider in determining restitution in unjust enrichment cases. It did so by looking to the definition of the cause of action, as one element of unjust enrichment under New York law is that a defendant was enriched "at the plaintiff's expense." *Brooks II*, 31 N.Y.3d at 455. Reasoning that an unjust-enrichment plaintiff may not recover fees paid to a defendant by third parties where a plaintiff had no "preexisting right" to the fees, the Court of Appeals held that "where a defendant saves, through its unlawful activities, costs and expenses that otherwise would have been payable to third parties, those avoided third-party payments do not constitute funds held by the defendant at the expense of the plaintiff." *Id.* at 456–57. *Brooks II* implicitly overruled previous cases, applying New York law, which held that avoided third-party costs are recoverable in an unjust enrichment action. *See, e.g.*, *Matarese v. Moore-McCormack Lines*, 58 F.3d 631, 635–36 (2d Cir. 1946); *Blue Cross of Cent. N.Y., Inc. v. Wheeler*, 93 A.D.2d 995, 996 (4th Dep't 1983); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. e (noting that an unjust-enrichment plaintiff may recover a defendant's profit "from the avoidance of an otherwise necessary expenditure.")

After *Brooks II*, "a plaintiff bringing an unjust enrichment action may not recover as compensatory damages the costs that the defendant avoided due to its unlawful activity in lieu of

the plaintiff's own losses." *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Group, Inc.*, No. 15 Civ. 211 (LGS), 2024 WL 1116090, at *2 (S.D.N.Y. Mar. 13, 2024) (quoting *Brooks II*, 31 N.Y.3d at 457). Given the decision's clear holding that, in an unjust-enrichment case, "avoided" third-party costs do not constitute the benefit given to a defendant "at the expense of" the plaintiff, the case bars consideration of these costs when fashioning a restitutionary remedy. *Brooks II*, 31 N.Y.3d at 457.

As Pauwels rightly observes, however, *Brooks II* did not foreclose other measures of the benefit alleged to be conferred on BNYM. Pl's Opp'n 16. And avoided third-party costs—here, the value of what BNYM would have paid Deloitte or others to produce spreadsheets equivalent to the Pauwels Model, which the Court takes to be a rough proxy for BNYM's net profits from its allegedly wrongful use of the Pauwels Model—is not the only plausible measure of BNYM's benefit. If it is ultimately determined that BNYM was unjustly enriched because the Pauwels Model, when unjustly taken, had intrinsic value beyond BNYM's avoided costs, "it would be against equity to allow the defendant to retain the value it received." *Brooks II*, 31 N.Y.3d at 472 (Wilson, J., dissenting); *cf. Dorfman v. Reffkin*, No. 652269/2014, 2020 WL 4287411, at *8 (Sup. Ct. N.Y. Cnty. July 27, 2020) (permitting damages-expert testimony on the "intrinsic value of [Plaintiff's] services" in an unjust-enrichment trial). BNYM appears to agree, arguing that "any damages would be measured by quantifying the value *to the Bank* (if any) of the existing Pauwels[] spreadsheets—already in their possession—beyond the amount it already paid Pauwels to create them." Def's Reply 7.

BNYM nonetheless argues, through reference to *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Group, Inc.*, that *Brooks II* bars Pauwels's theory of damages because that theory bears no relationship to his own losses. 2024 WL 1116090, at *2–3; Def's Mot. 14–15. But neither

*Syntel* nor *Brooks II* dictates such a result. *Syntel* dealt with a trade-secret misappropriation claim under New York state law, rather than a standalone unjust enrichment claim, and correctly interpreted *Brooks II* to hold that damages for a misappropriation claim "must be measured by the plaintiff's actual losses," which "may not correspond to what the defendant has wrongfully gained." *Syntel*, 2024 WL 1116090, at *2–3. Because "avoided development costs do not necessarily correlate" to the plaintiff's injury and would not, in that case, "restore the plaintiff to the position it would have been in but for the infringement," those costs were not an appropriate measure of damages. *Id.* *Brooks II*, however, did not create such a requirement for unjust enrichment claims. *See Brooks II*, 31 N.Y.3d at 455–56. For those claims, it is a "well-settled" proposition of law that a plaintiff's recovery can be measured by a defendant's unjust benefit rather than her own losses. *Pure Power*, 813 F. Supp. 2d at 534; *see also Saunders v. Kline*, 55 A.D.2d 887, 888 (1st Dep't 1977) ("[I]t is not a necessary element of a cause of action for unjust enrichment to show that plaintiff suffered a loss corresponding to the gain received by the defendant.").

Pauwels contends that Bentami's opinions speak to the "value of the thing that BNYM took from Plaintiff" by quantifying the "development cost" of the Pauwels Model. Pl's Opp'n 16. Bentami is offering an opinion on the costs that would be incurred if BNYM or an equivalent bank sought to replicate the Pauwels Model. Pl's Opp'n 24 ("Mr. Bentami [is calculating] average cost per work hour in a financial institution like BNYM."); Bentami Rpt. ¶ 44 (assuming "the model related activities would be performed internally by BNYM"). He does not opine on the costs Pauwels himself incurred to create the Pauwels Model or the third-party costs BNYM avoided through the use of the Pauwels Model. Notably, as BNYM has argued, Bentami's valuation "does

not even correspond to . . . the costs that BNY[M] purportedly avoided paying *to Deloitte* in performing the ongoing investment monitoring work."  Def's Mot. 15 (emphasis in original).

BNYM attempts to preclude admission of Bentami's Report and testimony on the basis that it does not, and cannot, accurately reflect BNYM's avoided costs through a reduction in the work done by Deloitte, Def's Mot. 15.  Bentami's Report, however, makes clear that it is attempting to measure BNYM's own cost to replicate the Pauwels Model, rather than its avoided costs with respect to Deloitte.  Bentami Rpt. ¶ 41; *see also* Pl's Opp'n 19 ("[T]he Bentami Report never claims to have calculate[d] Deloitte's actual savings . . . . The focus of his testimony is therefore not what Deloitte did, or how much Deloitte may have saved, but what it would cost to replicate the Pauwels Model in an institutional setting.").  Indeed, it does not mention Deloitte at all.

BNYM also argues that, to the extent the Report quantifies BNYM's "replication costs," those costs are an inapposite measure of Pauwels's damages.  Def's Reply at 6–7; Oral Argument Tr. at 36:7–9 ("[T]hat arguable replacement cost is nonsensical as a way of valuing the supposed damage.").  But it is sufficient that Bentami's Report speaks to a "live issue":  "the existence and extent" of the benefit conferred on BNYM at Pauwels's expense.  *Malletier*, 525 F. Supp. 2d at 673.

This distinguishes this case from the *Golden Unicorn* case cited by BNYM.  *Golden Unicorn Enters., Inc. v. Audible, Inc.*, 682 F. Supp. 3d 368 (S.D.N.Y. 2023).  There, the damages expert attempted to quantify the damages for an implied covenant claim where the plaintiff's theory of damages was based on the number of exchanges of audiobooks pursuant to a guarantee by defendant.  *Id.* at 380.  The expert calculated damages based on *all* audiobook returns, rather than those pursuant to the guarantee at issue in the case, and thus did not, and could not, "measure

the damages . . . attributable to [defendant's] breach of the implied covenant." *Id.* Unlike the *Golden Unicorn* plaintiff, Pauwels has established that Bentami's opinions "*could* comport with their theory of damages," *id.* at 381 (emphasis in original), even if that theory is, at this point in time, painted in rather broad strokes. *Cf. id.* ("Simply stating that [the expert] could calculate damages once liability is established is insufficient to show that [the expert's] methodology is reliable.").

Accordingly, the Court finds that Bentami's opinions could support a legally cognizable theory of damages that is not barred by the Court of Appeals's holding in *Brooks II*. The Report serves as an approximation of the intrinsic value of the Pauwels model, and thus, the benefit Pauwels conferred on BNYM and held at Pauwels's expense. The Court therefore finds that Bentami's opinions may ultimately "assist the trier of fact," *id.* at 380, and should not, on that basis, be excluded under Rule 702.

## II.    Bentami's Report Should Be Excluded as Unreliable under Rule 702

BNYM next argues that Bentami's report should be excluded as unreliable under Rule 702. Although Pauwels is right that many of BNYM's objections speak to "the weight, not the admissibility" of Bentami's testimony, *Zerega*, 571 F.3d at 214, BNYM's objections to Bentami's methodology do have merit. BNYM primarily objects on the basis that "nearly all of the figures underlying Bentami's calculations derive from Bentami's general (i.e., unspecified) experience and analysis" and are therefore not "the product of a reliable methodology reliably applied." Def's Mot. 20. The Court agrees. Because Bentami fails to explain how his general experience leads him to his assumptions about the time it would take to replicate the Pauwels Model, or why those assumptions are reasonable, the Court finds that his methodology is unreliable. Accordingly, the Court will strike his report and preclude him from testifying.

"A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002), and exclusion is "warranted only where a district court finds serious flaws in reasoning or methodology." *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 330 (S.D.N.Y. 2022). In general, there is no issue of reliability under Rule 702 where an expert ties "observations to conclusions" using "general truths derived from specialized experience." *Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Envt'l Consulting, Inc.*, 754 F. Supp. 3d 456, 466 (S.D.N.Y. 2024).

Nevertheless, an expert "must explain how [his] experience leads to his proffered conclusion and why it provides a sufficient basis for it." *Faryniarz v. Nike, Inc.*, No. 00 Civ. 2623 (NRB), 2002 WL1968351, at *3 (S.D.N.Y. Aug. 23, 2002); *Lippe v. Bairnco Corp.*, 288 B.R. 678, 686 (S.D.N.Y. 2003) ("An expert basing his opinion solely on experience must do more than aver conclusorily that his experience led to his opinion."). The Court is obligated to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. 137, 152. And an expert's conclusions must be supported "by good grounds for each step in the analysis," meaning that "*any* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *Amorgianos*, 303 F.3d at 267; *In re LIBOR-Based Fin. Inst. Antitrust Litig.*, 299 F. Supp. 3d 430, 467 (S.D.N.Y. 2018) ("The expert's methodology is to be assessed step-by-step, and it is critical that an expert's analysis be reliable at every step.")

Courts strike expert opinions based on experience where they "make[] no effort to explain how [an expert's] conclusions were reached, why the conclusions have a factual basis, or how [an

expert's] experience is reliably applied." *Lippe*, 288 B.R. at 689. "The trial court's gatekeeping function requires more than simply 'taking the expert's word for it,'" Fed. R. Evid. 702 advisory committee's note to 2000 amendment, and "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). An expert must "link his personal knowledge and experience to the issue in a non-speculative and non-conjectural manner." *Davis v. Carroll*, 937 F. Supp. 2d 390, 417 (S.D.N.Y. 2013). "A district court has discretion" to "determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996).

It appears uncontested that Bentami has substantial experience developing financial models inside large financial institutions. BNYM appears to make a passing objection that Bentami is not qualified to opine as an expert because he has "no experience with wind energy investments." Def's Mot. 3. But "the court will not exclude [expert] testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *In re Zypexa Prods. Liab. Litig. v. Eli Lilly & Co.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007). Rather, when "considering a witness's practical experience and educational background as criteria for qualification, the only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth." *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp*, No. 04 Civ. 7369 (LTS), 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006). BNYM makes no case as to why generalized expertise in financial modeling would not be relevant to the tax-equity modeling exercise here; such an

inquiry "obviously goes to the weight" of Bentami's testimony, "not the admissibility." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 309 (S.D.N.Y. 2015).

More critically, aspects of Bentami's methodology, derived from his expertise, cross the line from "shaky," *Daubert*, 509 U.S. at 596, to unreliable. Many of Bentami's opinions appear to be supported by nothing more than speculation and conjecture. This is most apparent from his discussion of (1) the composition and compensation of the team required to replicate the Pauwels Model, and (2) the time it would take such a team to do so.

BNYM primarily attacks Bentami's relatively terse explanation of why various staff members would be necessary as a part of his "hybrid equivalent" team replicating the Pauwels Model in-house. Def's Mot. 20. Bentami justifies the composition of such a team as follows:

> Based on my experience and analysis, I would expect a team of quantitative modeling professionals of various levels to be dedicated to the development of a Pauwels Model equivalent from scratch. In my opinion, such a team would likely consist of (1) one Managing Director ("MD") level person experienced with this type of investment; (2) two senior Vice President ("VP") level persons experienced with this type of investment as well as with enterprise systems and processes; and (3) three Associate level staff who would perform the brunt of the development. Such staff would typically be part of a structuring modeling team and/or quantitative development team. The necessity for three associate-level staff follows from the need for redundancy and for cross-validation of work. Bentami Rpt. ¶ 46.

Pauwels argues that Bentami's proposed team composition is "linked . . . directly to . . . [his] decades of experience supervising quantitative modeling teams at Goldman Sachs," however terse his explanation may be. Pl's Opp'n 24; Oral Argument Tr. at 45:11–13 (stating that Bentami relied "on his experiences, because at Goldman Sachs they did not hire a singular consultant"). But, as BNYM rightly notes, "Bentami does not explain," with any specificity, "how his experience led him to reach these conclusions." Def's Mot. 20. For example, Bentami includes no detail as to why a "Managing Director" and two "senior Vice President[s]" would be necessary to recreate a model one man created himself. Bentami Rpt. ¶ 46. And without the benefit of any

explanation from Bentami, the Court does not see how it "follows" that three associate level staff would also be necessary to satisfy the need for "redundancy and cross-validation of work." Bentami Rpt. ¶ 46.

Bentami's estimation of the compensation paid to each of these team members is accomplished through a similarly superficial exercise. He simply states that, "based on [his] experience and analysis, [he] estimated the [team] compensation costs," for which he lists annual compensation figures. *Id.* ¶ 49. He does not provide any detail about why or how he arrived at this estimate of team member compensation, or explain why they would be the right compensation figures applicable to staff in "a banking organization such as BNYM." *Id.* ¶ 41. In short, Bentami provides no reason why his assumptions relating to team size and compensation, ostensibly derived from his expertise, are anything more than speculation and conjecture. *See Davis*, 937 F. Supp. 2d at 417.

Bentami's unexplained equivalence between one hour of Pauwels's work and one hour of his "hybrid equivalent" team of seven people is also puzzling. Bentami Rpt. ¶ 46 ("One hour of Andre Pauwels' work will be translated into one hour of this 'hybrid equivalent' [team] and the cost taken as an input to the replication cost estimation."). Although Bentami does not explain the basis for this translation in his Report, he appears to have equated one hour of Pauwels's time to approximately 8.5 minutes of each team member's time (which together totals one hour). Bentami Rpt., Ex. 1. Bentami also appears to assume, without any support, that every member of the team's time is significantly less valuable than Pauwels's and that each member of the team would be working on the replication project for the same amount of time, regardless of job function.

Bentami's conclusions regarding the length of time an in-house team would spend developing an equivalent to the Pauwels Model appear to be based exclusively on this unsupported,

18

approximately one-to-one equivalence between an hour of Pauwels's time and an hour of hybrid-equivalent team time.  *Compare* Bentami Rpt. ¶ 45 ("I understand that [Pauwels] spent between 36 and 48 months during this period on the development of the Pauwels Model only"), *with id.* ¶ 51 ("The total worked hours [in the cost estimate] are between 36 months and 48 months.").  But at the end of his analysis, he also increases the number of hours worked by the hybrid-equivalent team by an additional 20%, because of what he terms his "slippage factor."  *Id.*  He justifies this addition, in part, because "[t]he experience and skillset of Andre Pauwels is not going to be replicated upfront even with a senior team of quantitative professionals as I would expect to be dedicated to this work."  *Id.*

Bentami's report lacks any explanation in support of these series of assumptions. He offers no indication as to why his experience would lead him to opine that this rough equivalence in productivity would be sufficient as even a crude proxy for the work necessary to replicate the Pauwels Model.  Even more problematically, Bentami, who admittedly has little experience modeling wind-energy or tax-equity investments, Bentami Dep. 33:19–34:18, has no basis in expertise on which to evaluate "[t]he experience and skillset of Andre Pauwels."  Bentami Rpt. ¶ 51.  While Bentami spoke with Pauwels and reviewed two of the Pauwels Model spreadsheets, Bentami's expertise does not encompass Pauwels's allegedly unique knowledge and productivity when creating this model.  *See id.* at ¶ 42 (discussing Pauwels's "industry experience and cumulative knowledge and understanding of the complex ins and outs built into windfarm investment transactions.").

This matters because Bentami only reviewed two out of the twelve Pauwels Model spreadsheets (and only one in any detail), Def's Mot. 18; Pl's Opp'n 19–21, yet offers an opinion on the work necessary to tailor the reproduced Pauwels Model to the full set of investments for

which it was used.   Bentami Rpt. ¶ 43; Bentami Dep. 114:12–13 ("A. . . . One model, 22 investments."). As Pauwels concedes in his briefing, "[s]ome investments required extensive modeling, while others shared nearly identical structures and thus minimal incremental work." Pl's Opp'n 21. Bentami appears to base his opinions on the work required to replicate an individual Pauwels Model spreadsheet for an investment or set of investments on the assertion that "[t]he development and building of the Pauwels Model and respective spreadsheet implementations for each of the investment transactions took [Pauwels], on average, 6 months each." Bentami Rpt. ¶ 32. But Bentami also asserts that the development of each spreadsheet implementing the Pauwels Model involved both generalizable work such as "the development of the model from a modeling perspective" *and* what appear to be investment-specific decisions, such as "negotiation and discussion of the various assumptions, attributes, features, tax rules, tax implications, etc." *Id.*; *see* Def's Reply at 10.

Pauwels' argument that Bentami merely reviewed a "representative data set" and "appl[ied] his professional expertise to it" does not change the Court's conclusion. Pl's Opp'n 20. Without reviewing the spreadsheets created for the remainder of BNYM's investments—which Bentami could easily access—he has no basis from which to opine on the time it would take to make the investment-specific decisions required to implement the Pauwels model. Instead, Bentami exclusively relies on an assessment, without relevant expertise, of Pauwels' "industry experience" and "knowledge" to conclude that BNYM's internal replication team would work the same amount of time as Pauwels (for over twice what Pauwels was paid for all his work). Bentami Rpt. ¶ 42. This crosses the line into speculation. Bentami's opinion regarding the hours required to replicate the Pauwels Model and tailor it to specific investments is therefore unsubstantiated. He does not appropriately link his expertise to the development of the Pauwels Model itself. And

he has no basis upon which to opine on how long it would take to implement the model for the majority of BNYM's investments.[6]

Bentami's use of "*ipse dixit*," *Joiner*, 522 U.S. at 146, and pure speculation to support the opinions he offers in his Report is fatal under a Rule 702 analysis. *LinkCo, Inc. v. Fujitsu, Ltd.* is instructive here. No. 00 Civ. 7242 (SAS), 2002 WL 1585551, at *3 (S.D.N.Y. July 16, 2002). There, a damages expert "support[ed] his conclusion that 'the 25% profit split, as a starting point for negotiations . . . should be increased to 30%' for calculating LinkCo's damages with '[his] prior experience in intellectual property matters,' but neglect[ed] to explain how his experience supports his conclusion." *Id.* at *4. The court excluded his report because it did not "employ actual licensing agreements for comparison, articles, studies or anecdotal evidence to support or explain his conclusions." *Id.*

Similarly, in *Scentsational Technologies LLC v. Pepsi, Inc.*, the court struck an expert report that presented "no methodology" to calculate assumptions relied upon to support the expert's ultimate opinion. 13-cv-8645 (KBF), 2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018). There, the expert offered an assessment of the likelihood of a particular product's commercial success. The court struck this section of her expert report because the underlying assertions relating to the timeline for commercialization were "neither supported by data or analysis nor

---

[6] Bentami's opinion is also internally inconsistent. He alternates between opining that an hour of Pauwels's time is equivalent to an hour of the replication team's time, Bentami Rpt. ¶ 46, and opining that an hour of Pauwels's time is more productive than an hour of this team's time, *id.* ¶ 51, while providing no real reason as to why the two are roughly comparable. Under *Kumho Tire*, the Court should be "vigilant as to internal inconsistencies within" an expert's mode of analysis, particularly where a methodology leads to inconsistent results. *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 527 (S.D.N.Y. 2001). Nonetheless, Bentami's internal inconsistencies, standing alone, do not doom his Report. "As with any witness, inconsistencies in an expert witness's testimony do not implicate *Daubert*, but rather are properly addressed during cross examination." *In re Fosamax Prods. Liab. Litig.*, 924 F. Supp. 2d 477, 496 (S.D.N.Y. 2013); *see also Clark v. Travelers Cos.*, 16-cv-02503 (ADS), 2020 WL 473616, at *5 (E.D.N.Y. Jan. 29, 2020) (contradictions in expert testimony do not warrant preclusion). *But see Scentsational Techs. LLC v. Pepsi, Inc.*, 13-cv-8645 (KBF), 2018 WL 1889763, at *7 (S.D.N.Y. Apr. 18, 2018) (striking expert report in part because expert offered contradictory opinions).

clearly connected to underlying facts," and instead were "ipse dixit, pure speculation, or both." *Id.* at *6. Other parts of the expert report were likewise stricken because the expert "offered no detail to support [her] assumption[s]," such that portions of the expert report appeared to be "mere guesswork." *Id.* at *7. In the same opinion, the court struck another expert's report and testimony regarding a lost profits analysis because the expert "offer[ed] very little information to support the inputs for his calculations." *Id.* at *16.

So too here. Bentami provides no detail to support his assumptions beyond a generalized reference to his expertise. And he does not explain "how his experience supports his conclusion" as to the required team composition, compensation, or time spent on the replication project. *LinkCo*, 2002 WL 1585551, at *4; *see also Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 355 (S.D.N.Y. 2003) (striking damages expert report and testimony as unreliable where expert added additional fees and multipliers "purportedly based upon 'industry practice'" and "wholly unsupported by any citations" such that the report and testimony were "rife with unfounded speculations").

By contrast, in *Novartis Pharma AG v. Incyte Corp.*, an expert testifying from general expertise was found to be reliable where she "tie[d] that experience to observations of what she considers typical in the industry." No. 20-cv-400, 2024 WL 3608338, at *15 (S.D.N.Y. July 29, 2024). There, the expert offered an explanation of "what is customary in the industry and why," and described what she had seen "in other territorial split contracts and basing her opinion on other agreements she has reviewed in the industry," and cited "her own experience having gone through multiple rounds of term sheet negotiations to work out the core financial deal terms." *Id.*

Bentami fails to clear this low bar: he does not offer even anecdotal evidence as to why such a team composition would be necessary or why this team would work a "hybrid-equivalent"

number of hours to Pauwels, through specific reference to his own experience or what is customary in the industry. *Cf. Iacobelli Const., Inc. v. Cnty. of Monroe*, 32 F.3d 19, 25 (2d Cir. 1994) (finding expert witness testimony from experience to be admissible where affidavits "described industry practices and customs, defined terms of art used in the industry, explained the approach by which reasonably prudent contractors would interpret the contract documents, and enumerated the conclusions such reasonably prudent contractors would reach.").   Because critical steps of Bentami's methodology are supported by nothing more than his "*ipse dixit*," *Joiner*, 522 U.S. at 146, the Court finds his methodology to be unreliable.  Accordingly, it will strike his Report and testimony.

## CONCLUSION

For the reasons stated above, BNYM's motion to strike Bentami's Report and preclude his testimony is granted.  The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 199.

SO ORDERED.

Dated:     October 31, 2025
            New York, New York

_____
Ronnie Abrams
United States District Judge